UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

| | | |
|---|---|---|
| STATE OF CONNECTICUT | : | ss: Hartford, CT |
| | : | |
| | : | |
| COUNTY OF HARTFORD | : | July 18, 2018 |

US DISTRICT COURT

### AFFIDAVIT

I, Michael Breen, a Task Force Officer with the Drug Enforcement Administration, having been duly sworn, state:

### INTRODUCTION

1.    I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18 of the United States Code.  I have been employed as a Police Officer with the Rocky Hill (CT) Police Department since 2012. From December 2016 to the present I have been assigned to the Drug Enforcement Administration ("DEA") Hartford Resident Office ("HRO") as a Task Force Officer ("TFO"). Prior to being assigned to the DEA, I was assigned to a regional narcotics unit (Mid state Narcotics Task Force) from November 2015 until December 2016.  As a DEA Task Force Officer, I have participated in numerous investigations concerning violations of federal narcotics and firearms laws.  I have coordinated controlled purchases of illegal drugs utilizing confidential sources and cooperating witnesses. I have obtained/participated in the execution of search and arrest warrants pertaining to individuals involved in the distribution of controlled substances, conducted electronic surveillance and physical surveillance of individuals involved in the distribution of controlled substances, analyzed records documenting the purchase

1

and sale of illegal drugs, spoken with informants and subjects, as well as other local, state and Federal law enforcement officers, regarding the manner in which narcotics traffickers obtain, finance, store manufacture, transport, and distribute illegal drugs. I have received instruction relative to conducting drug investigations while attending in-service training at the Connecticut Police Academy (POSTC) in Meriden, CT. In addition, I also attended a two- week course hosted by the Drug Enforcement Administration in which I received specialized training in the field of narcotics investigations.  I also receive periodic in-service training relative to conducting drug investigations.

2.     I am currently assigned to the DEA HRO and have been participating in an investigation into the activities of a drug trafficking organization (DTO) that is operating out of Hartford, CT.

3.     I make this Affidavit in support of criminal complaints and arrest warrants for Miguel ORTIZ, Bianca VELASQUEZ, Jose COTTO, Sean GRIFFIN, Antonio JOHNSON a.k.a. "UNK", Pedro RIVERA a.k.a. "HEAVY", Jeremy RODRIGUEZ, Jennifer JONES, Michael SPERO, Alexis DEJESUS, Luis RODRIGUEZ, Jonathan QUINONES, Angel ROMAN, aka "EDGAR," a Hispanic male who uses telephone number 860-205-3816 and is referred to herein as "SPIDER," Julio OLIVERAS and Victor PERDOMO, aka "DOMI," on charges of conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1).

4.     I also make this affidavit in support of an application for search and seizure warrants to search the following premises:

a.     **95 Spring Street, Apartment #1K, Hartford, CT (SUBJECT PREMISES #1):** 95 Spring St. is a brown brick apartment building marked with the numbers "95" affixed to the west side of the building. 95 Spring St. is a three story, multiple apartment building. Apartment 1K is a tan colored door on the first floor with no markings on the door. To access Apartment 1K, a person would walk into the 95 Spring Street entrance, walk up a small flight of stairs, turn right down the hallway and the door to Apartment 1K is the last door on the right side.

b.     **56 Bedford Street, 2nd floor, Hartford, CT (SUBJECT PREMISES #2):** 56 Bedford St. is a two-story multi-family home colored gray with a white trimmed roof and white trimmed windows. The number "56" is affixed in bold white lettering to the front door area of the home. In the front of the residence, there is a front porch accessing "56" on the north side and "54" on the south side, both main entrance doors colored white. A gray colored metal fence surrounds the front of the residence.

c.     **53 Ward Place, Hartford, CT (SUBJECT PREMISES #3):** 53 Ward Place is a three-story muti-family home colored gray and white with a dark gray roof and white trimmed windows. The number "53" is affixed in bold black lettering to the front door area of the home. In the front of the residence, there is a front porch accessing "53" on the south side and "55" on the north side, both main entrance doors colored white. A gray colored metal fence surrounds the front of the residence connected to bushes on the north side.

d.     **8 Ellington Street, Hartford, CT (SUBJECT PREMISES #4):** 8 Ellington Street is a single-family home colored yellow with a dark gray roof and white trimmed windows. In the front of the residence, there is a front porch accessing the main front door of the

residence. In addition, there is a second access door on the southeast side of the residence along the main driveway of the home. A gray colored metal fence surrounds the front of the residence with a mailbox attached to the fence.

      e.    **5 Gray Street, Apartment 3, Hartford, CT (SUBJECT PREMISES #5)**, is a brick style two story apartment complex. The main entrance is located on the east side of the structure in close proximity to Sisson Ave; it abuts the parking area associated with the structure. The structure has access walkways on the north side and the east side of the structure.

      f.    **44 Belmont Street, Apartment FL3W, Hartford, CT (SUBJECT PREMISES #6)** is a three story brick style structure. The numerals 44 are clearly marked in black on the front porch beam. The main door is on the south side of the structure and the driveway is located on the east side of the structure.  Based on the information contained in this affidavit, I believe there is probable cause to establish that this residence contains evidence of narcotics distribution and trafficking.

      g.    **90 Catherine Street, Apartment B5, Hartford, CT (SUBJECT PREMISES #7)** is a three story brick style structure. The main entrance is located on the south side of the building, the door is off white in color with the numerals 90 marked in white above the main entrance. There is a parking area located on the east side of the structure. Based on the information contained in this affidavit, I believe there is probable cause to establish that this residence contains evidence of narcotics distribution and trafficking.

      h.    **38 York Street, 2nd floor, Hartford, CT (SUBJECT PREMISES #8)** is a three story multi- family brick structure. It has red trim on the exterior just below the roof, along with red spindles on each balcony. The numerals 38 are clearly marked in silver on the

front porch beam. The front entrance is located on the south side of the structure. Based on the information contained in this affidavit, I believe there is probable cause to establish that this residence contains evidence of narcotics distribution and trafficking.

      i.     **88 Ellis Street, 1st floor, New Britain, CT (SUBJECT PREMISES #9)** is a two story home colored yellow with a brownish colored roof. The numerals 88 are clearly marked on the south entrance of the home directly above the mailbox. Based on the information contained in this affidavit, I believe there is probable cause to establish that this residence contains evidence of narcotics distribution and trafficking.

      j.     **U-Haul Storage unit #1024, 755 Capitol Ave, Hartford, CT (SUBJECT PREMISES #10)**

## RELEVANT FACTS

### Background Information Regarding this DTO

5.     Since at least August 2017, investigators have been investigating a drug trafficking organization ("DTO") that is distributing heroin, fentanyl and other narcotics in the Hartford, CT area.  The investigation has revealed that members of this DTO include, among others, the following:  Miguel ORTIZ; Bianca VELASQUEZ; Pedro RIVERA a.k.a. "HEAVY"; Jeremy RODRIGUEZ; Robert A. Campbell, aka "Ant" or "Anthony"; Jose COTTO; Sean GRIFFIN; Antonio JOHNSON a.k.a. "UNK"; Jennifer JONES; Michael SPERO; Alexis DEJESUS; Luis RODRIGUEZ; Jonathan QUINONES; Angel ROMAN, aka "Edgar"; a Hispanic male who uses telephone number 860-205-3816 and is referenced herein as "SPIDER"; Julio OLIVERAS; and Victor PERDOMO.

6.     Between January 2018 and July 2018, investigators intercepted communications

over cellular telephones used by Ortiz, RIVERA, Jeremy RODRIGUEZ and OLIVERAS.  The investigation has revealed, among other things, that:

- ORTIZ is a street-level narcotics seller in the Hartford, CT area.  ORTIZ lives with his girlfriend, VELAZQUEZ, who helps ORTIZ with his narcotics trafficking activities.  ORTIZ is supplied with heroin and fentanyl by Jeremy RODRIGUEZ, Pedro RIVERA and others.

- Jeremy RODRIGUEZ sells narcotics in the Hartford, CT area.  Jeremy RODRIGUEZ lives at 95 Spring St, Apartment 1K, Hartford, CT (**SUBJECT PREMISES #1**), which he uses to store and distribute narcotics.  Jeremy RODRIGUEZ also stashes narcotics and conducts narcotics transactions at 56 Bedford St, 2nd Floor Hartford, CT (**SUBJECT PREMISES #2**).  COTTO and JOHNSON are close associates of Jeremy RODRIGUEZ and assist him with his narcotics trafficking activities.  Jeremy RODRIGUEZ sells narcotics to numerous customers, including GRIFFIN.  Jeremy RODRIGUEZ's primary source of supply is OLIVERAS.

- RIVERA lives at 53 Ward Place, Hartford, CT (**SUBJECT PREMISES #3**), which he uses to facilitate his narcotics trafficking activities.  RIVERA is a close associate of Jeremy RODRIGUEZ and they assist each other with their drug trafficking.  Jeremy RODRIGUEZ and RIVERA both provide narcotics proceeds to Elizabeth Gallardo, who stores the money at her house at 8 Ellington Street, Hartford, CT (**SUBJECT PREMISES #4**).  Like Jeremy RODRIGUEZ, RIVERA obtains narcotics from OLIVERAS.

- OLIVERAS's primary residence is 88 Ellis St, 1st Floor, New Britain, CT (**SUBJECT PREMISES #9**), which he uses to facilitate his narcotics trafficking activities.

OLIVERAS distributes narcotics to numerous customers, which include Jeremy RODRIGUEZ, RIVERA, JONES, SPERO and numerous others.  OLIVERAS has several trusted associates who assist him with his narcotics trafficking activities, including DEJESUS, Luis RODRIGUEZ and QUINONES.  OLIVERAS uses multiple locations to process, store and distribute narcotics, including 5 Gray St, Apt. 3, Hartford, CT (**SUBJECT PREMISES #5**), 44 Belmont St, Apt. FL3W, Hartford, CT (**SUBJECT PREMISES #6**), 90 Catherine St., Apt. B5, Hartford, CT (**SUBJECT PREMISES #7**) and 38 York St, 2nd Floor, Hartford, CT (**SUBJECT PREMISES #8**).  In addition, OLIVERAS stores multiple firearms within unit 1024 at the U-Haul Storage facility at 755 Capitol Ave, Hartford, CT (**SUBJECT PREMISES #10**).  ROMAN and SPIDER serve narcotics customers on OLIVERAS's behalf.  On a daily basis, ROMAN is at **SUBJECT PREMISES #8**, where he sells narcotics to numerous customers.  On a daily basis, SPIDER is at **SUBJECT PREMISES #5,** where he serves numerous customers throughout the day.

- PERDOMO is OLIVERAS's primary source of supply of narcotics. OLIVERAS periodically provides drug proceeds to PERDOMO at Sky Grocery, 593 Broad St., Hartford, CT.

### EVIDENCE REGARDING MIGUEL ORTIZ

Intercepted calls, controlled purchases of narcotics and other evidence have revealed that ORTIZ is a street-level narcotics seller in the Hartford, CT area.  ORTIZ is supplied with heroin and fentanyl by Jeremy RODRIGUEZ, Pedro RIVERA and others.

A.   **Controlled Purchases of Heroin and/or Fentanyl from ORTIZ.**

7.    During this investigation, a cooperating source, who is referenced herein as "CS-1," conducted eight controlled purchases of heroin and/or fentanyl from Miguel ORTIZ and his

7

associates.  These controlled purchases are discussed below:

### i.   Controlled Purchase of Fentanyl on 8/16/17.

8.      On August 16, 2017, CS-1 conducted a controlled purchase of a sample of fentanyl from ORTIZ.  Prior to the transaction, CS-1 made a call to ORTIZ to arrange the transaction.  Investigators observed CS-1 meet with ORTIZ on Bedford St.  ORTIZ provided CS-1 with a sample of suspected heroin and told CS-1 that this was "fire," indicating that it was high quality heroin.  ORTIZ also said that he could get CS-1 whatever was needed as his "nigga" (ORTIZ's source of supply) was capable of getting anything.  Subsequent testing at the DEA laboratory revealed that ORTIZ provided CS-1 with 0.465 grams of fentanyl and acetylfentanyl.

### ii.   Controlled Purchase of Fentanyl and Heroin on 9/7/17.

9.      On September 7, 2017, CS-1 conducted a controlled purchase of 9.0 grams of fentanyl and heroin from ORTIZ.  Prior to the transaction, CS-1 made a call to ORTIZ to arrange the transaction.  Investigators observed CS-1 meet with ORTIZ on Bedford St, where ORTIZ provided CS-1 with the narcotics in exchange for $650.  Subsequent testing at the DEA laboratory revealed that the substance was 9.0 grams of fentanyl and heroin.

### iii.   Controlled Purchase of Heroin on 9/27/17.

10.      On September 27, 2017, CS-1 conducted a controlled purchase of approximately 5 grams of heroin from ORTIZ.  Prior to the transaction, ORTIZ told CS-1 in a recorded phone call to meet him at "453 Albany Ave".  CS-1 went to 453 Albany Ave and met with ORTIZ inside of apartment C1.  Inside ORTIZ's apartment, ORTIZ sold 4.88 grams of heroin to CS-1 in exchange for $350.

### iv.    Controlled Purchase of Fentanyl and Heroin on 10/18/17.

11.    On October 18, 2017, CS-1 conducted a controlled purchase of 20.8 grams of fentanyl and heroin from ORTIZ.  CS-1 went to ORTIZ's apartment at 453 Albany Ave., Apt. C1, Hartford, CT to purchase heroin.  During the recorded meeting between ORTIZ and CS-1, ORTIZ told CS-1 that his boy just got a kilogram of fentanyl.  CS-1 said that she/he needs 20 grams, but she/he wants it for $65 per gram.  ORTIZ told CS-1 that he (ORTIZ) will talk to "him" (i.e., ORTIZ's source) to see if he will sell it for $65 per gram.  ORTIZ made a call in CS-1's presence and told the person on the phone that his guy is asking to get 20 grams.  CS-1 and ORTIZ left ORTIZ's residence and eventually traveled to the lot at 51 Bedford St, Hartford, CT. After ORTIZ met with another person, ORTIZ provided 20.8 grams of fentanyl and heroin to CS-1.

### v.    Controlled Purchase of Fentanyl on 11/8/17.

12.    On November 8, 2017, CS-1 conducted a controlled purchase of a sample of fentanyl ORTIZ, who appeared to obtain the fentanyl from Jeremy RODRIGUEZ and Jose COTTO.  On this date, CS-1 went to ORTIZ's and VELAZQUEZ's residence and asked ORTIZ for a sample of fentanyl.  Toll data revealed that ORTIZ then called Jeremy RODRIGUEZ's phone number (860-655-0977).  ORTIZ then informed VELAZQUEZ that he had to go over to "Jeremy's" house real quick.  CS-1 and ORTIZ then left in ORTIZ's BMW.  While driving, ORTIZ advised the CS that he has to be careful with that fentanyl shit and said that you need to get masks when handling it.  CS-1 relayed that they arrived at 95 Spring Street (**SUBJECT PREMISES #1**), which, as discussed herein, is Jeremy RODRIGUEZ's residence.  While parked outside of 95 Spring St., ORTIZ made another call.  Again, toll analysis revealed that

ORTIZ using Target Telephone 1 contacted Jeremy RODRIGUEZ at 860-655-0977.  ORTIZ informed Jeremy RODRIGUEZ on the telephone that he was parked and Jeremy RODRIGUEZ said that "White boy" would go outside and serve ORTIZ.  Thereafter, an individual, who was addressed by ORTIZ as "White Boy," came out and provided ORTIZ with the sample of suspected fentanyl.  It should be noted that investigators have identified "White Boy" as COTTO, who is a close associate of Jeremy RODRIGUEZ and distributes narcotics for Jeremy RODRIGUEZ.

### vi.    Controlled Purchase of Fentanyl on 11/30/17.

13.    On November 30, 2017, CS-1 conducted a controlled purchase of 39.4 grams of fentanyl from ORTIZ, who appeared to obtain the fentanyl from Pedro RIVERA.  On this date, CS-1 met with ORTIZ at 453 Albany Ave and asked to purchase 40 grams of fentanyl.  While in the presence of CS-1, who was equipped with an audio recording device, ORTIZ called Pedro RIVERA's phone number and asked for "cuarenta" (40).  ORTIZ met with his source to obtain the fentanyl.  Investigators observed a black Nissan Murrano or Rogue, which had tinted windows and CT registration plates, running in the area where ORTIZ emerged after meeting with his source (believed to be Pedro RIVERA).  During this investigation, RIVERA primarily drove a black Nissan Murano with tinted windows and CT registration.

### vii.    Controlled Purchase of Fentanyl on 1/10/18.

14.    On January 10, 2018, CS-1 conducted a controlled purchase of approximately 20.6 grams of fentanyl from ORTIZ.  To arrange the deal, CS-1 sent ORTIZ a text message that said "20 of straight F," meaning 20 grams of straight fentanyl.  CS-1 went to ORTIZ's residence.  While in CS-1's presence, ORTIZ called a phone number subscribed to Pedro RIVERA.

Investigators observed ORTIZ meet with two individuals in a white Acura crossover SUV. Investigators identified RIVERA as the operator of the car and the front seat passenger resembled Robert Campbell. After meeting with RIVERA and a person believed to be Campbell, ORTIZ returned to his residence and provided CS-1 with 20.6 grams of fentanyl.

   **B.**   **Interceptions over ORTIZ's Phone (Target Telephone 1).**

   15.   Between January 26, 2018 and March 21, 2018, investigators intercepted communications over cellular telephone number 959-999-4213 (Target Telephone 1), which was used by Miguel ORTIZ to facilitate narcotics transactions. Interceptions over Target Telephone 1 revealed that ORTIZ was using Target Telephone 1 to discuss and to arrange to sell narcotics to multiple customers.

**EVIDENCE REGARDING BIANCA VELAZQUEZ**

   Intercepted calls, controlled purchases of narcotics and other evidence have revealed that ORTIZ lives with his girlfriend, Bianca VELAZQUEZ, who assists ORTIZ with his narcotics trafficking activities.

   **A.**   **Controlled purchase of Fentanyl on 2/23/18.**

   16.   On February 21, 2018 at approximately 7:21 p.m., ORTIZ called CS-1. CS-1 asked ORTIZ if he talked to his boys about the price. ORTIZ responded that he was about to go see him. At approximately 8:47 p.m., ORTIZ called Jeremy RODRIGUEZ at telephone number (860) 655-0977. ORTIZ tells Jeremy RODRIGUEZ that he is going to need twenty for Friday. Jeremy RODRIGUEZ tells ORTIZ that they do not have that and that they only have the "pure." ORTIZ asks if that's "seventy," and Jeremy RODRIGUEZ affirms.

   17.   At approximately 9:18 p.m., RIVERA called ORTIZ. RIVERA told ORTIZ that

11

Jeremy RODRIGUEZ doesn't do that anymore and that it is only me (RIVERA). RIVERA tells ORTIZ that he is doing everything for the other guy.  RIVERA tells ORTIZ that he has the other one and to just tell him because he (RIVERA) is leaving for Florida.  ORTIZ tells RIVERA to leave it with Jeremy (RODRIGUEZ) and RIVERA tells ORTIZ that if he could do it tonight, he will leave it with Jeremy.  Based on my knowledge of this investigation, when RIVERA tells ORTIZ that he is doing everything for the other guy, I believe that RIVERA is referring to Robert Campbell, who was arrested in Sunrise, FL on February 5, 2018 when Campbell and an associate attempted to purchase two kilograms of cocaine from an undercover officer.  At the time of their arrest, officers seized approximately $46,000 in U.S. currency from their possession.  Since then, Campbell has been in jail in FL.

18.     On February 22, 2018 at approximately 5:33 p.m., CS-1 called ORTIZ.  CS-1 tells ORTIZ that s/he will need ten of the fire.  During a later conversation, CS-1 and ORTIZ agree to meet the following day.  At approximately 8:48 p.m., ORTIZ called Jeremy RODRIGUEZ.  ORTIZ asks Jeremy RODRIGUEZ if he is ready for tomorrow for ten.  Jeremy RODRIGUEZ tells ORTIZ that he will call ORTIZ back.  At approximately 9:46 p.m., Jeremy RODRIGUEZ tells ORTIZ that he has 11.5 and to let him know.

19.     On February 23, 2018 at approximately 1:17 p.m., CS-1 called ORTIZ.  CS-1 tells ORTIZ that s/he got paid today and s/he is trying to get five more.  ORTIZ tells the CS that he will call, and that he (ORTIZ) is still at the motor vehicle.  At approximately 2:31 p.m., ORTIZ called Jeremy RODRIGUEZ.  ORTIZ asked Jeremy RODRIGUEZ how much he had left, and Jeremy RODRIGUEZ affirmed he had 11.5, and with the bag, he thinks it is 12.  ORTIZ tells Jeremy RODRIGUEZ that s/he called right now and needed 15.  Jeremy RODRIGUEZ affirms

he only has 11 and reaffirms that with the bag, it weighs 12.

20.     At approximately 2:32 p.m., ORTIZ received an incoming call from

VELAZQUEZ.  ORTIZ tells VELAZQUEZ that he needs her to do a mission.  VELAZQUEZ

asks ORTIZ what she is supposed to get.  ORTIZ tells VELAZQUEZ that he will see where

Jeremy is.  VELAZQUEZ tells ORTIZ that she doesn't want him fucking with those people, and

ORTIZ tells VELAZQUEZ that it is all about the money.  ORTIZ tells VELAZQUEZ that he is

going to call Jeremy.

21.     At approximately 2:34 p.m., ORTIZ called Jeremy RODRIGUEZ.  ORTIZ asks

Jeremy RODRIGUEZ if he's at his house, and Jeremy RODRIGUEZ affirms.  ORTIZ tells

Jeremy RODRIGUEZ that he is at the motor vehicle in New Britain and that he is sending his

girl.  Jeremy RODRIGUEZ tells ORTIZ to let him know.

22.     At approximately 2:34 p.m., CS-1 called ORTIZ.  CS-1 tells ORTIZ that s/he has

enough for 11.  ORTIZ tells the CS that s/he is going to have to pick up ORTIZ's girl

(VELAZQUEZ), and she is going to pick that up for the CS.  The CS tells ORTIZ that s/he will

be outside in twenty minutes.

23.     At approximately 2:36 p.m., ORTIZ called VELAZQUEZ.  ORTIZ tells

VELAZQUEZ that the CS is on his/her way, and then from there they (VELEAZQUEZ and the

CS) have to go to Jeremy's house, and that the CS is going to take VELAZQUEZ.  ORTIZ asks

VELAZQUEZ if she knows where Jeremy lives.  VELAZQUEZ asks ORTIZ if Jeremy can

drive to their house, and ORTIZ tells VELAZQUEZ that he (Jeremy RODRIGUEZ) doesn't have

a car and that "Heavy" is in Florida.  ("Heavy" is a well known nickname for RIVERA.  During

multiple intercepted calls involving RIVERA, his associates called him by the name "Heavy").

13

VELAZQUEZ asks ORTIZ if Jeremy is the one controlling this, and ORTIZ affirms. ORTIZ asks VELAZQUEZ again if she knows where Jeremy lives, and VELAZQUEZ asks if it is those buildings on Spring Street, and ORTIZ affirms.

24.     At approximately 2:59 p.m., CS-1 arrived at ORTIZ's and VELAZQUEZ's apartment at 453 Albany Avenue, Hartford, CT.  At approximately 3:07 p.m., ORTIZ called the CS.  CS-1 tells ORTIZ that the CS is outside.  At approximately 3:08 p.m., ORTIZ called Jeremy RODRIGUEZ.  Jeremy RODRIGUEZ confirms with ORTIZ the price, telling ORTIZ 11 times 70 is $770.  ORTIZ tells Jeremy RODRIGUEZ that his girl is going to call Jeremy RODRIGUEZ when she is outside.  At approximately 3:10 p.m., ORTIZ called VELAZQUEZ. ORTIZ tells VELAZQUEZ that the CS has to give her $880, and directs VELAZQUEZ to give Jeremy RODRIGUEZ $770 and for her to keep $110.  At approximately 3:24 p.m., Investigators observed as VELAZQUEZ exited the residence, entered CS-1's vehicle, and both parties traveled to 95 Spring Street, Hartford, CT (**SUBJECT PREMISES #1**).  While monitoring the audio transmitter, investigators heard VELAZQUEZ tell the CS to go to 95 Spring.

25.     At approximately 3:31 PM, investigators observed as the CS and VELAZQUEZ exited the vehicle and walked west in between the buildings out of view.  The CS told VELAZQUEZ that he would go inside with her because he wanted to see the narcotics weighed on a scale prior to conducting the transaction.  At approximately 3:38 p.m., investigators observed as the CS and VELAZQUEZ emerged from between the buildings and entered the CS's vehicle.  Investigators surveilled CS-1, as she/he dropped off VELAZQUEZ at her apartment, and then traveled to a predetermined location, where CS-1 provided investigators with the narcotics that she/he had purchased from Jeremy RODRIGUEZ.

14

26.     Investigators debriefed the CS regarding the transaction.  CS-1 stated s/he picked up VELAZQUEZ from 453 Albany Avenue and drove to 95 Spring Street.  The CS said that both s/he and VELAZQUEZ walked into the 95 Spring Street entrance, walked up a small flight of stairs, turned right down the hallway and entered the last door on the right side.  The CS relayed that s/he did not observe a number and/or letter on the doors along the hallway to include the apartment door s/he had entered.  The CS next met with Jeremy RODRIGUEZ.  The CS said that Jeremy RODRIGUEZ placed a knotted clear bag containing white powder substance on the scale and relayed that the bag weighed 12.1 grams. The CS counted the money and provided Jeremy RODRIGUEZ with $880, and Jeremy RODRIGUEZ next provided the bag of suspected fentanyl to the CS.  The CS added that Jeremy RODRIGUEZ stated that he will be getting more soon from either his uncle or cousin. The CS and VELAZQUEZ next exited the apartment and went back to the CS vehicle.  It should be noted that during the timeframe of the controlled purchase, E-911 data revealed that Jeremy RODRIGUEZ's phone (860-655-0977) was within close proximity of 95 Spring Street, Hartford, CT.  Subsequent testing at the DEA laboratory revealed that the substance was 10.895 grams of fentanyl.

**B.     Additional Evidence Regarding VELAZQUEZ**

27.     In addition to facilitating the sale of 10.895 grams of fentanyl on behalf of ORTIZ, intercepted calls revealed that VELEZQUEZ assists ORTIZ with his narcotics trafficking activities.  For example, on March 6, 2018, at approximately 6:22 p.m., ORTIZ called VELAZQUEZ.  They had the following conversation:

BIANCA:     Hello.

ORTIZ:      Heavy is going to bring you something in a little while.

BIANCA:     Oh well call him and tell him.

ORTIZ:      Call who?

BIANCA:     Kevin because he is saying that...

ORTIZ:      You tell him.

BIANCA:     Oh now I have to do it myself.

ORTIZ:      Well I am busy. Tell him in a little while.

BIANCA:     He said he wants to leave by seven (7) or something, but I'll let him know.

ORTIZ:      Alright tell him it's okay.

BIANCA:     Okay.

ORTIZ:      Alright bye.

28.     At approximately 7:36 p.m., ORTIZ and VELAZQUEZ spoke again and had the following conversation:

ORTIZ:      What happened with Kevin?

BIANCA:     What?

ORTIZ:      What did Kevin say?

BIANCA:     Tomorrow morning or when you get out.

ORTIZ:      Ask him [Stammers]  how many he needs because tomorrow morning it's going to be snowing.

BIANCA:     I told him maybe when you get out.

ORTIZ:      So ask him how many he is going to need.

BIANCA:     He said six (6)

ORTIZ:      Huh?

BIANCA:     Six (6)

ORTIZ:      Alright.

29.     Based on my training an experience, experience and involvement in this

investigation, I believe that VELAZQUEZ is facilitating ORTIZ with his narcotics trafficking by, among other things, communicating with a narcotics customer on ORTIZ's behalf. During the above call, ORTIZ tells VELAZQUEZ to ask Kevin how many he needs, and VELAZQUEZ responds that he needs six. These calls, coupled with the controlled purchase on 2/23/18 and physical surveillance, reveal that VELAZQUEZ assists ORTIZ with narcotics transactions.

### ARRESTS OF JEREMY RODRIGUEZ'S NARCOTICS CUSTOMERS

30.      Between March 29, 2018 and May 27, 2018, investigators intercepted communications over cellular telephone number 860-914-6816 (Target Telephone 4), which was used by Jeremy RODRIGUEZ to facilitate narcotics transactions. Typically, on a daily basis, Jeremy RODRIGUEZ used Target Telephone 4 to arrange to sell narcotics to numerous customers throughout the day. During this investigation, investigators conducted multiple walled-off traffic stops of customers who purchased narcotics from Jeremy RODRIGUEZ, including Cameron Desena, Terri Labarre, Jacob Burbank, Christopher Smith and Sean GRIFFIN. These stops are discussed below:

     **A.**      **Traffic stop of Cameron Desena on May 3, 2018.**

31.      On May 3, 2018 at approximately 11:25 a.m., Desena called Jeremy RODRIGUEZ said, "I need two (2) and a half (1/2)" and Jeremy RODRIGUEZ responded, "Alright come to Bedford." Shortly thereafter, investigators established surveillance in the area of 56 Bedford Street, Hartford, CT (**SUBJECT PREMISES #2**). At approximately 11:38 a.m., Desena called Jeremy RODRIGUEZ and, in substance, told RODRIGUEZ he was there. Jeremy RODRIGUEZ told Desena alright and that Jeremy RODRIGUEZ was about to send his people, and Desena affirmed.

32.     At approximately 11:39 a.m., investigators observed Desena arrive in front of 56 Bedford Street.  Desena met quickly with an individual at his car window and departed the area. Investigators followed Desena.  At approximately 11:44 a.m., a Hartford Police Department (HPD) officer conducted a motor vehicle stop of Desena's car in Hartford, CT.  During the stop, investigators seized 25 white wax paper sleeves stamped in red lettering "SHINE," each containing suspected heroin/fentanyl.  Investigators field tested a small portion of the white powder, which tested positive for the presence of heroin/fentanyl.  Based on this stop, Desena was issued a summons and complaint for state motor vehicle and criminal offenses.

33.     At approximately 12:17 p.m., Desena called Jeremy RODRIGUEZ and notified Jeremy RODRIGUEZ that he (Desena) had lost the two and a half and wanted Jeremy RODRIGUEZ to provide Desena with another two and a half, referring to two and a half bundles of heroin.  Jeremy RODRIGUEZ affirmed and directed Desena to come back to Bedford Street. Based on my training and experience, I know that one bundle refers to approximately ten wax paper sleeves of packaged heroin.

**B.     Traffic stop of Terri Labarre on May 3, 2018.**

34.     On May 3, 2018 at approximately 3:01 p.m., Terri Labarre called Jeremy RODRIGUEZ.  Labarre told Jeremy RODRIGUEZ she was on her way.  Jeremy RODRIGUEZ asked "What you needed?" and Labarre responded, "Two (2)."  Jeremy RODRIGUEZ directed Labarre to Bedford Street.  At approximately 3:47 p.m., Labarre called J.RODIGUEZ and told Jeremy RODRIGUEZ that she would be there in a minute and again said she needed two. Based on my training, experience and involvement in this investigation, I believe Labarre was referring to two bundles of heroin, or 20 wax paper sleeves of heroin.

35.     At approximately 3:55 p.m., investigators observed Labarre arrive at 56 Bedford Street.  Investigators observed an unknown person meet with Labarre quickly at her vehicle, and next observed as Labarre drive away from 56 Bedford Street.  At approximately 4:05 p.m., an HPD officer a motor vehicle stop of Labarre's car.  During the stop, investigators seized twenty (20) white wax paper sleeves stamped in red lettering "SHINE," each containing a white powder like substance of suspected heroin/fentanyl.  Investigators field tested a small portion of the white powder, which tested positive for the presence of heroin/fentanyl.  Based on the incident, Labarre was issued a Summons and Complaint for state narcotics and traffic offenses.

36.     At approximately 4:16 p.m., Labarre called Jeremy RODRIGUEZ.  Labarre informed Jeremy RODRIGUEZ that she got caught with shit and so she was walking back to Jeremy RODRIGUEZ.  Jeremy RODRIGUEZ asked Labarre who took her car, and she told Jeremy RODRIGUEZ it was the police.   Throughout the evening hours of May 3, 2018, Labarre and RODRIGUEZ exchanged several pertinent calls and text messages.  The calls indicated that LABERRE met with Jeremy RODRIGUEZ to pick up one.  Based on my training, experience and involvement in this investigation, I believe that one referred to one bundle, or 10 wax paper sleeves, of heroin.

**C.     Traffic stop of Jacob Burbank on May 8, 2018.**

37.     On May 8, 2018 at approximately 9:52 a.m., Jeremy RODRIGUEZ called Jacob Burbank.  Jeremy RODRIGUEZ asked Burbank how long he was going to take, and Burbank told Jeremy RODRIGUEZ that he will head up now.  Jeremy RODRIGUEZ asked "What you wanted, 8?" and Burbank responded, "Um, I have money for 7. Can you spot me 'til Thursday, for like 1?"  Jeremy RODRIGUEZ affirmed, and the call ended shortly thereafter.

38.     At approximately 10:30 a.m., investigators established surveillance in the area of 95 Spring Street in Hartford, CT.  At approximately 11:23 a.m., Jeremy RODRIGUEZ received an incoming call from Burbank.  Burbank told Jeremy RODRIGUEZ he was here at Spring St.  Jeremy RODRIGUEZ asked Burbank what he wanted and Burbank told Jeremy RODRIGUEZ he needed eight.  Jeremy RODRIGUEZ affirmed.

39.     At approximately 11:28 a.m., investigators observed Burbank arrive at 95 Spring Street in a silver Honda Civic.  At approximately 11:30 a.m., Jeremy RODRIGUEZ called BURANK.  Jeremy RODRIGUEZ asked Burbank what car he was in.  Burbank told Jeremy RODRIGUEZ he was in a silver Civic.  Jeremy RODRIGUEZ confirmed and asked BURANK if he was on Spring.  Burbank affirmed and told Jeremy RODRIGUEZ he was in the middle.  Jeremy RODRIGUEZ affirmed and the call ended shortly thereafter.

40.     At approximately 11:38 a.m., investigators observed as Burbank departed from Spring Street.  Investigators maintained physical surveillance on Burbank.  At approximately 11:41AM, HPD detectives conducted a motor vehicle stop of Burbank's car.  During the stop, investigators seized seventy five (75) wax paper sleeves each stamped in red lettering "HYPE," each containing a white powder like substance of suspected heroin/fentanyl.  Investigators tested a small portion of the white powder, which tested positive for the presence of heroin/fentanyl.  Based on the incident, Burbank was arrested and charged with state narcotics and motor vehicle offenses.

41.     At approximately 5:38 p.m., Burbank called Jeremy RODRIGUEZ from a phone used by another narcotics customer of Jeremy RODRIGUEZ.  Burbank told Jeremy RODRIGUEZ that he spilled water all over everything that Jeremy RODRIGUEZ gave him and

his cell phone, and he had to go back home and borrow this phone from his friend.  Burbank next told Jeremy RODRIGUEZ that he wanted another two and a half, and Jeremy RODRIGUEZ directed Burbank to come back to Spring Street.

**D.**     **Traffic stop of Christopher Smith on May 8, 2018.**

42.     On May 8, 2018 at approximately 12:04 p.m., Christopher Smith called Jeremy RODRIGUEZ.  Smith told Jeremy RODRIGUEZ he needed some Bs and the other thing.  Jeremy RODRIGUEZ affirmed and Smith told Jeremy RODRIGUEZ he was on his way.  I know based on my training and experience that a "B" is coded and/or abbreviated language referring to bundles of heroin/fentanyl.  Investigators reestablished surveillance in the vicinity of 95 Spring Street.

43.     At approximately 12:42 p.m., Smith called Jeremy RODRIGUEZ.  Jeremy RODRIGUEZ told Smith to go to Spring and Smith told Jeremy RODRIGUEZ he will be there in five minutes.  At approximately 1:03 p.m., Jeremy RODRIGUEZ received an incoming call from Smith.  Jeremy RODRIGUEZ asked Smith if he was there, and Smith affirmed.  Jeremy RODRIGUEZ told Smith he was going to send his uncle to give Smith the four Bs, and that Smith had to wait for three minutes.  The call ended shortly thereafter.

44.     At approximately 1:13 p.m., investigators observed Smith arrive at 95 Spring Street.  At approximately 1:23 p.m., investigators observed as Pedro RIVERA arrived and parked his Buick along Edwards Street just north of Spring Street.  RIVERA exited the vehicle and walked towards 95 Spring Street carrying a white shopping bag in his left hand.  RIVERA walked in between the buildings and out of view.  At approximately 1:27 p.m., Jeremy RODRIGUEZ received an incoming call from Smith.  Jeremy RODRIGUEZ told Smith that he

(RIVERA) just got there and that Jeremy RODRIGUEZ was about to give it to Smith right now. Smith affirmed.  At approximately 1:31 p.m., investigators observed an individual conduct a hand-to-hand transaction with Smith.  Smith departed the area shortly thereafter.

45.    At approximately 1:35 p.m., HPD officers conducted a motor vehicle stop of Smith's car.  During the stop, investigators seized thirty seven (37) white wax paper sleeves stamped in red lettering "HYPE," each containing a white powder like substance of suspected heroin/fentanyl.  During the stop, Smith spit out two pieces of crinkled plastic each containing a white residue.  Smith stated to officers that the plastic contained cocaine and that it was $20 worth.  Investigators tested a small portion of the white powder contained in the wax paper sleeves, which tested positive for the presence of heroin/fentanyl.  Based on the incident, Smith was arrested and charged with state narcotics and motor vehicle offenses.

46.    At approximately 3:55 p.m., Smith called Jeremy RODRIGUEZ.  Smith told Jeremy RODRIGUEZ that he wanted a B, referring to a bundle of heroin.  Jeremy RODRIGUEZ directed Smith to go to the same spot and Smith affirmed.  The call ended shortly thereafter.  It should also be noted that Jeremy RODRIGUEZ and Smith spoke again at approximately 4:30 p.m., and the call indicated that Smith ordered another bundle of heroin from RODRIGUEZ.

**EVIDENCE REGARDING SEAN GRIFFIN**

47.    Intercepted calls over Target Telephone 4 (which was used by Jeremy RODRIGUEZ) revealed that GRIFFIN purchases narcotics from Jeremy RODRIGUEZ for use and re-sale.  Evidence regarding GRIFFIN and Jeremy RODRIGUEZ's narcotics relationship includes the following:

A.    Arrest of GRIFFIN on April 3, 2018.

48.    On April 3, 2018, at approximately 1:42 p.m., surveillance units were established in the vicinity of 95 Spring Street in Hartford, CT (**SUBJECT PREMISES #1**), in anticipation of conducting physical surveillance of Jeremy RODRIGUEZ, who investigators believed, based on intercepted calls, was arranging to conduct narcotics transactions with multiple customers. At approximately 2:32PM, investigators observed RIVERA exited a Nissan Murano and walk towards **SUBJECT PREMISES #1**. Investigators next observed Jeremy RODRIGUEZ and RIVERA leave 95 Spring St., enter the Murano and drive away.

49.    At approximately 3:04 p.m., Jeremy RODRIGUEZ had a text conversation with GRIFFIN. They discussed, in part, the following: Jeremy RODRIGUEZ: "Yea wat u wanted". GRIFFIN: "8 I'm omw I got bread 4 u too". At approximately 4:35 p.m., Jeremy RODRIGUEZ called GRIFFIN. GRIFFIN tells Jeremy RODRIGUEZ that he has been here for an hour. Jeremy RODRIGUEZ tells GRIFFIN that he is passing East Hartford now and GRIFFIN tells Jeremy RODRIGUEZ to hurry up. At approximately 4:50PM, investigators observed as the Nissan Murano arrived onto Spring Street. The Murano pulled in front of **SUBJECT PREMISES #1**. Jeremy RODRIGUEZ was observed exiting the passenger side of the Murano and walking in the direction of 95 Spring Street and out of view.

50.    At approximately 5:01 p.m., investigators observed as Jeremy RODRIGUEZ emerged from the vicinity of 95 Spring Street and walked to a white utility van. Investigators identified the driver of the van as Sean GRIFFIN. At approximately 5:03 p.m., investigators observed GRIFFIN drive away in the van. Investigators maintained surveillance of GRIFFIN, as he drove to a McDonalds in New Britain, CT. A New Britain Police Department (NBPD) officer

conducted a traffic stop of GRIFFIN.  During the stop, investigators seized approximately 70

bags of heroin from GRIFFIN, who was arrested for state narcotics and motor vehicle violations.

**B.**   **Interceptions involving GRIFFIN and Jeremy RODRIGUEZ.**

51.     After GRIFFIN's arrest and release from custody, GRIFFIN maintained frequent

contact with Jeremy RODRIGUEZ and continued to purchase narcotics from J. RODRIGUUEZ.

Below are a small sampling of intercepted communications between GRIFFIN and Jeremy

RODRIGUEZ.

52.     On April 13, 2018, GRIFFIN and Jeremy RODRIGUEZ had the following text

communication:

| | |
|---|---|
| RODRIGUEZ: | Wat u wanted |
| GRIFFIN: | 8 |
| RODRIGUEZ: | U got the money |
| GRIFFIN: | Half I need u to let me hold a buck just till sat |
| RODRIGUEZ: | Nah i cnt |
| GRIFFIN: | I owe u 100 |
| GRIFFIN: | 100 |

53.     On April 16, 2018 at approximately 4:19pm, GRIFFIN and Jeremy RODRIGUEZ

discussed, in part, the following:  GRIFFIN: "Where can I go?"  RODRIGUEZ: "Uhm...

Bedford."  GRIFFIN: "All right. I'll be right there."  At approximately 6:38pm, GRIFFIN and

Jeremy RODRIGUEZ had a text message conversation, which included, in part, the following:

| | |
|---|---|
| GRIFFIN: | I'm here |
| RODRIGUEZ: | K wat u wanted and u got that wat u owe |

GRIFFIN:        Yea and 8

RODRIGUEZ:   K ama send my unk

RODRIGUEZ:   They seen u

GRIFFIN:        , all good bro thanks

RODRIGUEZ:   K

    54.    At approximately 5:03pm, GRIFFIN and Jeremy RODRIGUEZ spoke.  They discussed, in part, the following:

RODRIGUEZ:   Yo, you only paid a buck fifty (150)?

GRIFFIN:        Yeah, I gave you 150 yesterday, dummie.

RODRIGUEZ:   Huh?

GRIFFIN:        I gave you 150 yesterday too.

RODRIGUEZ:   But [U/I] from the old shit y'all owe me? [Voices Overlap] I gave you 8 more that's what I'm saying.

GRIFFIN:        I know, I owed you 100 yesterday and you gave me 8. And then I gave you 150 dollars yesterday so that means I gave you 50 dollars more than what I owe you. So now I gave you 150 today so now I owe you for 8.

RODRIGUEZ:   All right yo, man. I get lost when we keep doing this.

GRIFFIN:        Nah, I'm not lying to you bro'.

RODRIGUEZ:   All right, I'm a have to [U/I] of my pockets 50 dollars then.

GRIFFIN:        [Chuckles] All right.

    55.    Based on my training, experience and knowledge of this investigation, I believe that GRIFFIN is continuing to purchase narcotics from Jeremy RODRIGUEZ.  I believe that when GRIFFIN asks for "8," he is asking for 8 bundles or 80 bags of heroin/fentanyl for use and re-sale.  It should be noted that GRIFFIN was found to be in possession of approximately 70

bags of heroin during his arrest.  On that day, I believe that GRIFFIN ordered "8" from Jeremy

RODRIGUEZ and that GRIFFIN used a portion of the narcotics prior to the stop by the NBPD

officer.  I believe that 80 bags is GRIFFIN's regular and consistent purchase from Jeremy

RODRIGUEZ.

## EVIDENCE REGARDING JOSE COTTO

56.     Based on intercepted calls and my knowledge of this investigation, Jose COTTO

is a close associate and customer of Jeremy RODRIGUEZ.  Based on numerous intercepted

calls, COTTO is supplied with narcotics from Jeremy RODRIGUEZ on a regular basis and sells

narcotics to his own customer base.  In addition, Jeremy RODRIGUEZ and COTTO assist each

other with their narcotics trafficking activities.  The following are a small sampling of COTTO

communicating with Jeremy RODRIGUEZ to arrange narcotics transactions:

57.     On April 14, 2018 at approximately 10:26 a.m., Jeremy RODRIGUEZ spoke with

COTTO and they discussed the following:

> COTTO:        Hello.
>
> RODRIGUEZ:   Where you at bro?
>
> COTTO:        In the house.
>
> RODRIGUEZ:   You got crack?
>
> COTTO:        No.
>
> RODRIGUEZ:   Huh?
>
> COTTO:        No.
>
> RODRIGUEZ:   Can you get some?
>
> COTTO:        Yeah.

26

RODRIGUEZ:   Yo, listen. My lick is like, twenty minutes away. I'm a have you serve him yo.

COTTO:   What he wanted?

RODRIGUEZ:   He wants two (2) stacks. Grab him two (2) stacks from the book bag yo.

COTTO:   Your mom got it?

RODRIGUEZ:   Yeah, yeah, yeah.

COTTO:   Alright.

RODRIGUEZ:   And [Stammers] He want a hundred (100) piece of crack, but we only, like, what we got? Like sixty (60), seventy (70) piece right?

COTTO:   Yeah, just about.

RODRIGUEZ:   Get that for me yo. He is like fifteen (15) minutes away. In the highway. You hear me?

COTTO:   Yeah, I hear you.

RODRIGUEZ:   And fucking listen... you hear me?

COTTO:   Yeah.

RODRIGUEZ:   I charge him three hundred (300) a stack, so that's six hundred (600) a piece.

COTTO:   Alright.

RODRIGUEZ:   And the hundred (100) dollars, so that's seven hundred (700) dollars total.  Alright?

COTTO:   Yeah I got you.

RODRIGUEZ:   Alright.

COTTO:   Alright.

58.     At approximately 10:35 a.m., Jeremy RODRIGUEZ and COTTO spoke again and they discussed the following:

COTTO:   Hello.

RODRIGUEZ:    Yo, they're there, yo.

COTTO:    All right.

RODRIGUEZ:    You got the crack?

COTTO:    Huh? Yeah.

RODRIGUEZ:    Fucking, listen. Um, don't give him 2 stacks. He want 18 Bs. Listen, make sure...Hold on, hold on. I'm gonna do the math right now.

[Pause]

COTTO:    [Aside: What? All right, bro, I'm [U/I]. Hold on. Take this shit out, take this outta here.]

RODRIGUEZ:    Yo.

COTTO:    Yeah.

RODRIGUEZ:    For the, just for the... Just for the um... the 2, the 18... They don't want 2 stacks, they want 18 B's . That's a stack and 8 bundles. That's 540. Count the money. They gotta give you 540 plus the 100 piece for the crack.

COTTO:    All right.

RODRIGUEZ:    That's 640, brother.

COTTO:    You got it.

RODRIGUEZ:    Don't let them play you. Count the money first, 'cause he be doing that.

COTTO:    I got you.

59.    On April 16, 2018 at approximately 2:34 p.m., RODRIGUEZ over TT-4 was in communication with COTTO.  They discussed, in part, the following:

RODRIGUEZ:    You got crack?

COTTO:    Um, nah, I can get it right quick. What you need?

RODRIGUEZ:    I need like, something for 5.

COTTO:    Huh?

RODRIGUEZ:    Something, he wants a 10 piece. But give him a 5 piece.

COTTO:    All right.

RODRIGUEZ:    And bring it to me. Can you bring it to me right now, yo? He's outside.

COTTO:    [Coughs] Yeah, I'm a just stop and pick it up and then head over there.

RODRIGUEZ:    All right, 'cause I'm a need some money from you too, for my girl. [U/I] smoke with my girl.

COTTO:    All right, I got you.

60.    On April 18, 2018 at approximately 4:34 p.m., RODRIGUEZ spoke with COTTO and they discussed the following:

COTTO:    Yo!

RODRIGUEZ:    Yo, you at the house?

COTTO:    Yeah!

RODRIGUEZ:    Ah?

COTTO:    Yea

RODRIGUEZ:    Yo, do me a favor yo. Bring me 8. [U/I] 8 B's.

COTTO:    8 B's?

RODRIGUEZ:    Yeah, do it right now though. I got you with something.

COTTO:    All right

RODRIGUEZ:    All right.

61.    On April 21, 2018 at approximately 3:56 p.m., Jeremy RODRIGUEZ spoke with COTTO and they discussed the following:

RODRIGUEZ:    Yo.

COTTO:    Hey yo bro you think you can have two (2) whole things ready for me in a half hour?

29

RODRIGUEZ:   Two (2) Bs?

COTTO:           No

RODRIGUEZ:   Two Stizzies?

COTTO:           Yeah.

RODRIGUEZ:   Umm, yeah.

COTTO:           Alright I'ma call you before [U/I]

RODRIGUEZ:   Alright.

COTTO:           Alright.

62.     On May 2, 2018 at approximately 8:32 p.m., RODRIGUEZ spoke with COTTO

and they discussed the following:

COTTO:           Yeah.

RODRIGUEZ:   Yo your lick right here. She want something?

COTTO:           Yeah she trying to count her money to see what she want, but she want
                 powder.

RODRIGUEZ:   Oh she wanted powder, ohh 'cause I sent Peluca to go see what she
                 wanted 'cause I was gonna serve her and give you the money.

COTTO:           Yeah she want some powder.

RODRIGUEZ:   Oh alright, alright.

COTTO:           Okay.

## EVIDENCE REGARDING ANTONIO JOHNSON

63.     Based on intercepted communications over Jeremy RODRIGUEZ's, RIVERAS's

and OLIVERA's phones, JOHNSON is a member of this DTO.  JOHNSON is a close associate

of Jeremy RODRIGUEZ, who assists Jeremy RODRIGUEZ with his narcotics trafficking.  In

addition, JOHNSON obtains narcotics from Jeremy RODRIGUEZ, which JOHNSON distributes

to his own customers.  Examples of some intercepted calls involving JOHNSON include the following:

### A.   Interceptions on May 24, 2018.

64.   On May 24, 2018 at approximately 10:04 a.m., JOHNSON spoke with Jeremy RODRIGUEZ and they discussed the following:

JOHNSON:   Alright so, so, so. A hundred percent fire, right?

RODRIGUEZ:   He says it's better than the last shit that we just had. Which is gravy.

JOHNSON:   Okay, so I'ma about to call all my people to tell my people that we back popping.Motherfucking, just put motherfucking, put... Okay, do this then... What we gonna do? We gonna do 15 and 15?

RODRIGUEZ:   What you mean? Cause I know I got my 100 over here. That was for here and there's 50 more for ya. 50, it was for ya.

JOHNSON:   Okay, so just put. [Voices Overlap]

RODRIGUEZ:   [U/I], he gave me a extra 50 for, for... Just in case if you would sell a 20 or whatever. If this nigga sell 20 and then that's why he... [Voices Overlap]

JOHNSON:   You know I mean? But if it's fire... If it's fire! If it's fire like you said, I want 15 like last time I had. What you put on the 15 like last time for me?

RODRIGUEZ:   Uh, 15, 15, 15, 15, 15... You could put on a 10? 11? [Aside: Right Peluca?][Voices Overlap]

JOHNSON:   Alright.

RODRIGUEZ:   It's just... What it is... That's what I did. I did... On this one today... The one that we're doing now, I did 50 on um, um... 40..., 46.

JOHNSON:   46? Alright, yeah. So, so, alright so do that then 15, alright.

RODRIGUEZ:   Yup, yup! It'll be between 15 and 12.

JOHNSON:   15 and 12? Okay, alright. That's what I'ma do. I want to do that then.

RODRIGUEZ:     Alright.

JOHNSON:       I still got, yo... That's sounds like it. [Stammers] That's gonna take care of some of Cita's. You heard?

UM:            [Chuckles]

RODRIGUEZ:     [Chuckles] Alright.

JOHNSON:       Alright, alright 21.

65.     Based on my training, experience and involvement in this investigation, in this call I believe that JOHNSON asks RODRIGUEZ if the quality of the new supply of narcotics is good, referring to it as "fire." RODRIGUEZ tells JOHNSON that it is of better quality than the last time. JOHNSON then indicated that he will get his people ready. I believe that JOHNSON is referring to his customer(s). When RODRIGUEZ says "I got my 100 over here," I believe that RODRIGUEZ is referring to 100 grams of fentanyl, heroin, or a mix of the two. RODRIGUEZ tells JOHNSON that "there's 50 more for ya," I believe that RODRIGUEZ is saying that he has 50 grams of narcotics that he placed aside for JOHNSON. Based on this call (and numerous other calls), I believe that JOHNSON receives his supply of narcotics from RODRIGUEZ. Further, I believe that when JOHNSON says that he will get his people ready, JOHNSON is referring to his own client base to whom he distributes narcotics.

**B.     Interceptions on April 4, 2018.**

66.     On April 4, 2018 at approximately 10:01 a.m., JOHNSON called RODRIGUEZ. JOHNSON asked RODRIGUEZ if he had called Cousin J, referring to OLIVERAS. RODRIGUEZ asked JOHNSON to tell him (OLIVERAS) what. JOHNSON tells RODRIGUEZ he needs help with "one hundred." RODRIGUEZ tells JOHNSON he will see if he picks up. RODRIGUEZ tells JOHNSON he will call him right now.

67.     At approximately 10:03 a.m., RODRIGUEZ sent the following text message to OLIVERAS at TT-6: "Yo".  At approximately 10:18 a.m., OLIVERAS called RODRIGUEZ. RODRIGUEZ asked OLIVERAS if he remembered the shit that they were talking about, the 100.  OLIVERAS affirmed, and told RODRIGUEZ he would call RODRIGUEZ when he got back in the hood.  RODRIGUEZ affirmed.

68.     At approximately 2:03 p.m., RODRIGUEZ received an incoming call from OLIVERAS.  OLIVERAS tells RODRIGUEZ that he is going to grab that and come get RODRIGUEZ, and RODRIGUEZ affirms.  The call ends shortly thereafter.  At approximately 2:04 p.m., RODRIGUEZ called JOHNSON.  RODRIGUEZ tells JOHNSON that he is about to grab that.  RODRIGUEZ asks JOHNSON where his people are.  JOHNSON tells RODRIGUEZ they are leaving "Stamford" now.

69.     At approximately 2:44 p.m., RODRIGUEZ called JOHNSON.  RODRIGUEZ tells JOHNSON he has it, and that JOHNSON has to call him for the money.  RODRIGUEZ tells JOHNSON that it is 65 that he (JOHNSON) has to give him.  RODRIGUEZ tells JOHNSON that he (OLIVERAS) gave RODRIGUEZ one hundred.  RODRIGUEZ and JOHNSON make arrangements to meet on Spring Street, and the call ends shortly thereafter.

70.     Based on my training, experience and knowledge of this investigation, I believe that RODRIGUEZ acquired one hundred grams of fentanyl from OLIVERAS on behalf of JOHNSON.  I further believe that JOHNSON is facilitating a narcotics transition with his own customers.

71.     At approximately 3:08 p.m., RODRIGUEZ received the following incoming text message from JOHNSON: *Here.* RODRIGUEZ responded with the following text message at

approximately 3:09 p.m.: *K two min away.* At approximately 3:13 p.m, RODRIGUEZ called

JOHNSON.  RODRIGUEZ asks JOHNSON where he is.  JOHNSON tells RODRIGUEZ that he

is right here in the middle.  RODRIGUEZ asks JOHNSON if he is coming in the house and

JOHNSON affirms.  At approximately 3:14 p.m., investigators observed as RODRIGUEZ

arrived at 95 Spring Street and walked into the residence and out of view.  I believe that

JOHNSON was already in the residence waiting for RODRIGUEZ to arrive.

    72.    At approximately 3:39 p.m., RODRIGUEZ placed an outgoing text message to

JOHNSON.  They had the following text message conversation:

| | |
|---|---|
| RODRIGUEZ: | Unk everythin straight |
| JOHNSON: | Definitely nef on 91 s |
| RODRIGUEZ: | K |
| JOHNSON: | Gonna hit u soon as I meet dude |
| RODRIGUEZ: | Bet |
| JOHNSON: | Only gonna meet so he wont put off til tomorrow feel me because they called early |
| RODRIGUEZ: | Bet |
| RODRIGUEZ: | Everythin straight |
| RODRIGUEZ: | K makhn sure u straight |
| JOHNSON: | Deal done on way back nef |
| JOHNSON: | For sure |
| RODRIGUEZ: | K im on Bedford |
| JOHNSON: | I am already here nef |
| RODRIGUEZ: | K ill be their |

JOHNSON:       Money and scale on me

RODRIGUEZ:   K ama pull up in 7min

73.     Based on my training, experience and knowledge of this investigation, I believe

that this call reveals that JOHNSON acquired the one hundred grams of fentanyl from

RODRIGUEZ and provided the narcotics to his customers.  When JOHNSON says, "Deal done

on way back nef," I believe that JOHNSON is information Jeremy RODRIGUEZ that he

completed the deal with his customers.  Jeremy RODRIGUEZ says, "K im on Bedford," alerting

JOHNSON that he is at **SUBJECT PREMISES #2.**

### COMMUNICATIONS BETWEEN Jeremy RODRIGUEZ AND OLIVERAS

74.     Intercepted communications over Target Telephone 4, which was used by Jeremy

RODRIGUEZ, and Target Telephones 6, 7 and 10, which are used by OLIVERAS, revealed that

OLIVERAS supplies narcotics to Jeremy RODRIGUEZ and his associates.  Examples of

intercepted calls involving Jeremy RODRIGUEZ and OLIVERAS include the following:

**A.      Pertinent communications on May 23, 2018**

75.     On May 23, 2018 at approximately 1:58 p.m., Jeremy RODRIGUEZ called

OLIVERAS.  Jeremy RODRIGUEZ informed OLIVERAS that this was Jeremy RODRIGUEZ's

new number.  Jeremy RODRIGUEZ next told OLIVERAS to come to the house because Jeremy

RODRIGUEZ has that for OLIVERAS.  Jeremy RODRIGUEZ next told OLIVERAS to bring

the "same" and told OLIVERAS to give him (RODRIGUEZ) "150."  The call ended shortly

thereafter.  Based on my training and experience, and my experience with this investigation, I

believe that Jeremy RODRIGUEZ was referring to "that" as drug proceeds that Jeremy

RODRIGUEZ owes OLIVERAS. I further believe "150" is in reference to 150 grams of suspected heroin, fentanyl or a mixture thereof.

76.     At approximately 4:33 p.m., OLIVERAS called Jeremy RODRIGUEZ. OLIVERAS told Jeremy RODRIGUEZ that he was driving over there right now. Jeremy RODRIGUEZ affirmed, and the call ended shortly thereafter. At approximately 4:40 p.m., OLIVERAS called Jeremy RODRIGUEZ. Jeremy RODRIGUEZ told OLIVERAS he was going to come right out and OLIVERAS affirmed. The call ended shortly thereafter. E-911 data over Target Telephones 6 and 7 had the devices in close proximity of 95 Spring Street around this time. Further, E-911 data over Target Telephone 4 had the device in close proximity to 95 Spring Street (**SUBJECT PREMISES #1**) at this time. Based on the content of the above calls between Jeremy RODRIGUEZ and OLIVERAS, and the ping information, I believe that OLIVERAS picked up a drug debt from Jeremy RODRIGUEZ, and also resupplied Jeremy RODRIGUEZ with 150 grams of suspected heroin/fentanyl.

**B.      Pertinent communications on June 25, 2018**

77.     On June 25, 2018 at approximately 3:52 p.m., Jeremy RODRIGUEZ called OLIVERAS and they discussed, in part, the following:

RODRIGUEZ:      I got um... I have half of the money for you. I got 24 for you.

OLIVERAS:        Alright, alright, alright. Motherfuckin' um...

RODRIGUEZ:      How ever you want to do it, man. You wanna finish what you doing and we meet up at my um... Same spot, my sister's spot?

OLIVERAS:        Uh... Yeah, yeah. Let me finish doing what I'm doing right fast and then we could get up over there.

RODRIGUEZ:      Alright. Just text me cuzzo.

OLIVERAS:      What ya'll... Ya'll was just trying get, like half of the chicken and ya'll still good or what's going on?

RODRIGUEZ:     Nah, nah! Fuckin, um...[Stammers]... We got... We got all your bread ready. We just um... We might just grab like fucking... The same as usual.

OLIVERAS:      Alright.

RODRIGUEZ:     But we got everything... We got all the bread right there though.

OLIVERAS:      Alright, so the "hundle" [Ph].

RODRIGUEZ:     Yeah! Yup!

OLIVERAS:      Alright then. Let me go... Let me finish doing what i'm doing. [Voices Overlap]

78.     At approximately 4:12 p.m., Jeremy RODRIGUEZ sent a text message to OLIVERAS. They had the following text message conversation:

RODRIGUEZ:     And brother ant said he wanted to speak to u if u ganna be around 630 he bouta call

RODRIGUEZ:     Cuxo

RODRIGUEZ:     Let me know wats the word cuxo

OLIVERAS:      Yea ima see u ina half

RODRIGUEZ:     K southwhitney st or my spot

OLIVERAS:      South

RODRIGUEZ:     K my sister house

RODRIGUEZ:     100 special 30 brown 20 yellow

RODRIGUEZ:     Im on my way to my sister house

79.     At approximately 9:31 p.m., OLIVERAS called Jeremy RODRIGUEZ and they discussed the following:

OLIVERAS:      Aye yo, listen... Um... I know ya' needed the 100 special and I think

you said 30 of the brown. But was it [U/I] of the candy?

RODRIGUEZ:   Huh?

OLIVERAS:   [U/I]?

RODRIGUEZ:   Oh, oh... [Voices Overlap]

OLIVERAS:   [U/I] of the candy right? [Voices Overlap]

RODRIGUEZ:   Yeah, yeah. Yeah. [Voices Overlap]

OLIVERAS:   Yeah, so... What you ... [Voices Overlap]

RODRIGUEZ:   Nah, nah.  I mean, I mean...  You ain't have no um..., yellow, yellow, yellow food?

OLIVERAS:   Yellow food?  What you mean, for the candy? You know that there's the snack right?

RODRIGUEZ:   Nah, nah. Nah, nah.  I thought you had some yellow of the other shit. Like... Like you said the other time when we was speaking.

OLIVERAS:   Oh, yeah!  The, the yellow special, right?  That's what you saying.

RODRIGUEZ:   Yeah, yeah. The Yellow special also. That's what I'm saying, 10 of that and...[Stammers]... You know, the other. The 30... [Voices Overlap]

OLIVERAS:   Yeah, the 100 and the 30.  Yeah. But yeah, on the yellow tip... I'm still waiting on my man, is what I'm waiting on right now.

RODRIGUEZ:   Alright, alright. [Voices Overlap]

OLIVERAS:   Actually I only have a little left though.  You heard?

RODRIGUEZ:   But just let me know about...  Just let me know about that one Cuzzo.

OLIVERAS:   Yeah, definitely.  I'ma bring the "hundle" [PH] and the 30.

RODRIGUEZ:   I'm on my way to my sister house right now, on South Whitney.  If anything I'll call you when I get there.

OLIVERAS:   Alright then, yeah. I'ma finish doing what I'm doing. And I'm 'bout to head over there. It's gonna be real soon.

RODRIGUEZ:   Alright. Alright.

OLIVERAS:     Alright.

80.     At approximately 10:00 p.m., Jeremy RODRIGUEZ sent the following text message to OLIVERAS : "Im here cuxo".  At approximately 10:24 p.m., OLIVERAS received an incoming call from Jeremy RODRIGUEZ and they discussed the following:

OLIVERAS:     Yo

RODRIGUEZ:  What up baby?

OLIVERAS:     Yeah I'm going over there right now, I'll be over there like in 7  minutes.

RODRIGUEZ:  Alright I'm right here.

OLIVERAS:     Alright.

RODRIGUEZ:  Alright baby.

81.     At approximately 10:37 p.m., OLIVERAS called Jeremy RODRIGUEZ. The following conversation ensued:

RODRIGUEZ:  Yo.

OLIVERAS:     Yo.  [U/I] right now.

RODRIGUEZ:  Alright

82.     Based on the contents of these calls, the location information, and based on my training and experience, I believe that OLIVERAS delivered a resupply of narcotics to Jeremy RODRIGUEZ and further picked up a drug debt from Jeremy RODRIGUEZ.  When Jeremy RODRIGUEZ wrote in the text message "100 special 30 brown 20 yellow," I believe he was saying that he wanted 100 grams of fentanyl, 30 grams of heroin and 20 grams of another narcotics.  Based on my experience with this investigation, I know that members of this DTO refer fentanyl as "special."  Based on these communications and numerous other intercepted communications, I believe that OLIVERAS is Jeremy RODRIGUEZ's primary source of supply for narcotics and that Jeremy RODRIGUEZ typically is purchasing 100 grams or more of

heroin/fentanyl or a mixture thereof during each transaction. Jeremy RODRIGUEZ then repackages and resells the narcotics in smaller user amounts, as demonstrated by the seizures made during the traffic stops and arrests of several of Jeremy RODRIGUEZ's customers (which are discussed above).

## EVIDENCE REGARDING PEDRO RIVERA

### A.    Interceptions involving Pedro RIVERA.

83.     As discussed herein, RIVERA is a member of this DTO, who is a close associate of Jeremy RODRIGUEZ. During intercepted calls, RIVERA discusses and/or coordinates narcotics trafficking activities with, among others, Jeremy RODRIGUEZ, OLIVERAS, JOHNSON, COTTO and Elizabeth Gallardo, aka "Cita" (who is Robert Campbell's mother). Based on intercepted calls, RIVERA not only assists Jeremy RODRIGUEZ with his narcotics trafficking activities, but RIVERA also conducts his own trafficking and sales of narcotics. This is demonstrated by, among other intercepts, the following:

84.     During an intercepted call between RIVERA and an unidentified male referred to as "Waldito LNU" on April 1, 2018, RIVERA and Waldito LNU agree to meet the next day at Waldito LNU's location, which investigators believe is in Providence, RI. During the call, RIVERA says that he doesn't want to drive by himself. Waldito LNU asks RIVERA who he is coming with and if it is someone of trust. RIVERA affirms. Waldito LNU says that's fine if it's someone RIVERA trusts. They agree to meet the following morning.

85.     On April 2, 2018, investigators intercepted several conversations between RIVERA and Waldito LNU. In sum, Waldito LNU was making contact with RIVERA to ensure that RIVERA was in fact going to make the trip to him. Through prior intercepted calls, myself

and other investigators believed that Waldito LNU resides near Providence, RI. At 10:52 a.m.

RIVERA called Waldito LNU and said, "I'm outside". E-911 location information indicated that

RIVERA was in close proximity to Glenham St, Providence, RI. E-911 location data indicated

that RIVERA spent a relatively short amount of time in the area of Glenham St and then headed

back towards Connecticut. RIVERA appeared to return directly to 53 Ward Place, Hartford, CT

after his meeting with Waldito LNU. Investigators conducting physical surveillance confirmed

that RIVERA had returned to 53 Ward Place.

86.     Shortly thereafter, at approximately 1:40 p.m., RIVERA called Waldito LNU over

Target Telephone 3. They discussed, in part, the following:

> Waldito LNU: Did you arrive?
>
> RIVERA:     I arrived
>
> Waldito LNU: Well that's fine then. If anything, hit me up.
>
> RIVERA:     Yes because.. the one that was open…that one had.. I took out 250 and 40
> so, 290.
>
> Waldito LNU: What is it, what is it?
>
> RIVERA:     That 290 and… and I took a little bit out here. I have to weigh the little bit.
> It is 2…it is 290 295.
>
> Waldito LNU: 295? And the other one?
>
> RIVERA:     I didn't open it because since you said.. I don't know how much is there.
>
> Waldito LNU: Then it was backwards then, then the one I opened had..the one that I
> opened..the one that I opened had 300 and the other one had 125.

87.     Based on my training, experience and participation in this investigation, including

other intercepted conversations between RIVERA and Waldito LNU, I believe that RIVERA

obtained approximately 425 grams of suspected narcotics from Waldito LNU (likely heroin/and

fentanyl).  I believe that Waldito LNU likely informed RIVERA to be careful opening one of the bags likely because it contained fentanyl.  It appears that RIVERA heeded Waldito LNU's warning, as RIVERA says, "I didn't open it because since you said.."  Further, location information in conjunction with physical surveillance indicated that RIVERA was at 53 Ward Place (**SUBJECT PREMISES #3**) during this conversation with Waldito LNU.

88.     On April 2, 2018 at approximately 3:15p.m., RIVERA called OLIVERAS. OLIVERAS tells RIVERA that he is driving over there now.  OLIVERAS tells RIVERA to tell him about that special.  RIVERA asks OLIVERAS if it is the one that OLIVERAS has, and OLIVERAS says yeah.  RIVERA tells OLIVERAS that shit is "fire."  OLIVERAS tells RIVERA that he is four to five minutes away. The calls ends shortly thereafter.

89.     At approximately 3:35PM, RIVERA received an incoming call from OLIVERAS. OLIVERAS tells RIVERA that he is right here in the front.  RIVERA tells OLIVERAS to come to the back.  OLIVERAS asks with the car or just walking, and RIVERA tells OLIVERAS to come with the car.  OLIVERAS affirms and the call ends shortly thereafter.  Investigators drove by RIVERA's residence (**SUBJECT PREMISES #3**) and observed OLIVERAS's Acura and RIVERAS's black Nissan Murano parked in the rear of the residence in close proximity to each other.

## B.     State Narcotics Arrest of Rivera on 6/12/18.

90.     On June 12, 2018 at approximately 4:58 p.m., RIVERA called OLIVERAS. RIVERA asked OLIVERAS if he (OLIVERAS) could do that buck and the white girl. OLIVERAS affirmed.  The call ended shortly thereafter.  At approximately 6:28 p.m., RIVERA called OLIVERAS.  RIVERA told OLIVERAS not to come to the house because his landlord

was there.  OLIVERAS told RIVERA to just come here to the parking lot.  RIVERA affirmed.

At approximately 6:48 p.m., RIVERA called OLIVERAS and told OLIVERAS that he

(RIVERA) was outside.  OLIVERAS told RIVERA that he (OLIVERAS) was going out there

right now.

91.     At approximately 6:48 p.m., investigators observed a Buick sedan bearing CT

registration 00FKYA (known to be used by RIVERA) arrive and park at 5 Gray Street.  At

approximately 6:50 p.m., investigators observed as OLIVERAS exited 5 Gray Street, approached

the passenger side of RIVERA's Buick, and entered the vehicle.  At approximately 7:07 p.m.,

investigators observed as OLIVERAS exited the passenger side of RIVERA's Buick.

Investigators then observed RIVERA drive away in his Buick.  Physical surveillance was

maintained on RIVERA's car.

92.     At approximately 7:09 p.m., CSP conducted a motor vehicle stop on RIVERA's

vehicle.  During the stop, investigators found the following narcotics in RIVERA's possession:

approximately 103 grams of suspected fentanyl; approximately 30 grams of suspected cocaine;

multiple small knotted plastic baggies further containing an off white powder like substance

suspected to be cocaine; two blue pills in a knotted baggie; and multiple wax sleeves with the

writing "SHINE".  RIVERA was arrested and charged with state narcotics and motor vehicle

offenses.

C.     **Communications after RIVERA's arrest on 6/12/18.**

93.     On June 12, 2018 at approximately 8:42 p.m., OLIVERAS called Jeremy

RODRIGUEZ soon after Jeremy RODRIGUEZ made several attempts to contact OLIVERAS.

Jeremy RODRIGUEZ asked OLIVERAS if Heavy (RIVERA) saw him.  OLIVERAS told

Jeremy RODRIGUEZ that he (OLIVERAS) saw him (Heavy) like an hour ago.  Jeremy

RODRIGUEZ affirmed and the call ended shortly thereafter.

      94.     At approximately 9:24 p.m., OLIVERAS called Jeremy RODRIGUEZ.  Jeremy

RODRIGUEZ told OLIVERAS that he still hasn't seen this nigga (referring to RIVERA).

Jeremy RODRIGUEZ told OLIVERAS that his girl (RIVERA's girl) told Jeremy RODRIGUEZ

that he (RIVERA) got arrested.  Jeremy RODRIGUEZ continued to say that his (RIVERA's) girl

said that the DEA rushed a house that he (RIVERA) was at.  Soon after, Jeremy RODRIGUEZ

told OLIVERAS that he (Jeremy RODRIGUEZ) was putting Unk (JOHNSON) on.  It should be

noted that Unk is an alias or nickname that is commonly used by Antonio

JOHNSON.  JOHNSON told OLIVERAS that he (RIVERA) got a bunch of drug charges and

that a trooper put him (RIVERA) at HCC (Hartford Correctional Center).  They continue to

discuss the details of the traffic stop and the information JOHNSON received from the

bondsman.  JOHNSON mentioned the white girl to OLIVERAS, and explained that it is

possession with attempt to sell.  JOHNSON questioned the reason why RIVERA got pulled over.

OLIVERAS explained to JOHNSON that he (OLIVERAS) just bonded somebody out and that

he (OLIVERAS) is losing money.  They continued to talk and the call ended shortly thereafter.

      95.     At approximately 10:38 p.m., Jeremy RODRIGUEZ sent the following text

message to OLIVERAS: Jeremy RODRIGUEZ: "Cuzzo whats da word bondsman hit us back so

we gonna figure that in few but we need the same food and we gonna pay u back for old food

little to get out of standstill".  OLIVERAS responded: "Call me".

      96.     At approximately 10:41 p.m., OLIVERAS called Jeremy RODRIGUEZ and

JOHNSON.   In sum, they discuss the drug charges that RIVERA was charged with.

OLIVERAS told JOHNSON he was going to offer them (JOHNSON and Jeremy RODRIGUEZ)

the other shit, referring to other shit as dog food.   OLIVERAS asked JOHNSON if they still

wanted the special (fentanyl) and JOHNSON affirmed.   OLIVERAS told JOHNSON that he

(OLIVERAS) could do 30, 30 and that way they could have 60.   JOHNSON affirmed.

OLIVERAS told JOHNSON that he (OLIVERAS) would take care of them (JOHNSON and

Jeremy RODRIGUEZ).   They continue to discuss the stop.   JOHNSON told OLIVERAS that

RIVERA was stopped by a trooper by the state capitol building.   They continue to talk and the

call ends shortly thereafter.

     97.     Based on my training, experience and knowledge of this investigation, I believe

that this conversation shows the nature of the relationship between Jeremy RODRIGUEZ,

RIVERA, JOHNSON and OLIVERAS.   It shows that that OLIVERAS is a source of supply of

narcotics to Jeremy RODRIGUEZ, RIVERA, and JOHNSON.   In addition, I believe that

OLIVERAS provided 30 more grams each of fentanyl and cocaine to Jeremy RODRIGUEZ and

JOHNSON, in addition to the narcotics that RIVERA was arrested with.

### EVIDENCE REGARDING JENNIFER JONES and MICHAEL SPERO

     98.     On June 6, 2018 at approximately 5:26 p.m., OLIVERAS and JONES started the

following text conversation:

> JONES:     Hey ro said if talked to last night about how much and he said for me to
> come see you is it ok to head up there
>
> OLIVERAS:  Yea call me

     99.     At approximately 5:36 p.m., JONES called OLIVERAS.   OLIVERAS asked

JONES what she needed and told JONES that he couldn't do the coke and only had three to four

ounces of crack left.  OLIVERAS told JONES he (OLIVERAS) was waiting on a shipment to come in and as soon as it did, he (OLIVERAS) would have JONES come pick some up.  OLIVERAS reemphasized to JONES that he could do the crack, but can't do the coke, and told JONES that he would give JONES everything else but the "soft" right now.  JONES affirmed.  OLIVERAS told JONES that he needed JONES to be there before 7:30 because he had a meeting at 8:00.  JONES affirmed.  OLIVERAS asked JONES for the numbers they wanted.  JONES told OLIVERAS that she didn't know.  OLIVERAS told JONES to have "Ro" call OLIVERAS.  The call ended shortly thereafter.

100.    At approximately 6:13PM, OLIVERAS received an incoming text message from JONES.  The following text message conversation ensued:

JONES:      K he said the fifty he you can do more you can he said up to you

JONES:      And on the highway on way to you now

OLIVERAS:  Ok

JONES:      He just called me he wanna do a hundred of each he want you to call him 18604578010 He cant get his other phone to work

101.    At approximately 6:28 p.m., OLIVERAS called an unidentified male referred to as "Ro."  OLIVERAS asked Ro what he needed, and Ro told OLIVERAS a hundred, hundred, hundred.  Ro asked OLIVERAS if he had the "white girl," and OLIVERAS told Ro no.  OLIVERAS told Ro that he would do a hundred and a hundred, and that he would do a couple of those in candy, and clarified two ounces of the candy.  Ro affirmed and told OLIVERAS that would get him (Ro) back on his feet.  The call ended shortly thereafter.

102.    At approximately 6:32 p.m., E-911 location information for Target Telephone 7 indicated that the device was in close proximity to **SUBJECT PREMISES #5**.  Investigators

46

subsequently established surveillance in the area of **SUBJECT PREMISES #5.** At

approximately 7:39 p.m., OLIVERAS received an incoming text message from JONES. At

approximately 8:02PM, JONES called OLIVERAS. JONES told OLIVERAS that they were

trying to get off his exit right now and that there was traffic. OLIVERAS affirmed. The call

ended shortly thereafter.

103. At approximately 8:07 p.m., investigators observed a silver colored Volkswagen

Jetta as the vehicle exited the off ramp of 84 and headed north on Sisson Ave in Hartford, CT.

The vehicle was occupied by a male driver (SPERO) and female passenger (JONES).

Investigators observed the Volkswagen travel to **SUBJECT PREMISES #5** and park next to

OLIVERAS's truck. At approximately 8:08 p.m., JONES sent the following text message to

OLIVERAS: "Here".

104. At approximately 8:10 p.m., investigators observed OLIVERAS exit **SUBJECT**

**PREMISES #5** and walk to his truck. Investigators observed JONES exit the passenger side of

the Volkswagen Jetta and enter the passenger side of OLIVERAS's truck as OLIVERAS entered

the driver's side of his truck. At approximately 8:19 p.m., investigators observed as OLIVERAS

and JONES exited the truck. OLIVERAS walked back into **SUBJECT PREMISES #5**, and

JONES reentered the Volkswagen, which drove away. Investigators maintained physical

surveillance on the Volkswagen as it traveled into the Newington, CT area.

105. A Newington Police Department (NPD) officer conducted a traffic stop on the

Volkswagen. During the stop, officers found approximately 110 grams of suspected

fentanyl, approximately 110 grams of suspected heroin and approximately 72 grams of suspected

crack cocaine in the possession of JONES and SPERO.  JONES and SPERO were charged with state narcotics offenses.

106.    At approximately 11:14 p.m., OLIVERAS received an incoming call from the "Ro."  In sum, Ro told OLIVERAS that Jennifer (JONES) and them (SPERO) got bagged, and that they got caught in Newington.  OLIVERAS told Ro that he just lost a whole shit load of money then.  Ro next told OLIVERAS that he will try to find out what happened and OLIVERAS told Ro to keep him (OLIVERAS) posted. The call ended shortly thereafter.

107.    Based on the above-described communications and other intercepted calls between JONES and OLIVERAS, along with the arrest of JONES and SPERO by NPD, investigators believe that JONES regularly purchases large quantities of narcotics from OLIVERAS.  During intercepted calls, JONES will tell OLIVERAS when she is getting the "big" order, or if she is coming to see OLIVERAS for a smaller quantity.  It is likely that JONES is purchasing large quantities of narcotics from OLIVERAS to then process or have others assist in processing the narcotics for street level sales.

108.    Through intercepted communications, I believe that SPERO is a regular driver for JONES when she comes to see OLIVERAS.  For example, on May 22, 2018, during an intercepted call between OLIVERAS and JONES, OLIVERAS is unable to hear JONES. JONES then says to Mike (SPERO), "Mike, tell him, cause he can't hear me". At this time, SPERO begins a telephone conversation with OLIVERAS.  OLIVERAS directs SPERO to his location because JONES and SPERO had to get off a different exit than normal.  This incident in conjunction with the arrest of JONES and SPERO shows that SPERO is drives JONES to meet with OLIVERAS to purchase narcotics on multiple occasions.  Further, this communication

indicates that SPERO is trusted by JONES and OLIVERAS, as he talks to OLIVERAS on the

telephone and is directed to **SUBJECT PREMISES #5**.

## EVIDENCE REGARDING ALEXIS DEJESUS

109.    On June 20, 2018 at 2:35 p.m., DEJESUS called OLIVERAS and they discuss, in

part, the following:

OLIVERAS:    What's going on baby boy?

DEJESUS:    What up what's good?

OLIVERAS:    Shit working right here.. a little something... something. You know, putting something together.

DEJESUS:    Hell yeah. Nah, but I got that shirt for you right quick. I'm about to fucking bring it to you right quick.

OLIVERAS:    Alright, alright. Uh... what's that... that shit you be getting off of Domi? You know that.. that... you know. What you was [U/I] last time, the specials? [Voices Overlap]

DEJESUS:    The specials.

OLIVERAS:    Okay, okay. Motherfucking um.... where you at right now?

DEJESUS:    Right now I'm coming down on Broad Street.

OLIVERAS:    Broad Street, alright.

DEJESUS:    I'm in area by the old... by the old spot.. Around that area.

OLIVERAS:    Okay, okay, okay um... you got that on you already or you was about to grab whatever. Or what you was trying to do?

DEJESUS:    I got it right now. It was sample. You know what am saying? Just to see what it is.

OLIVERAS:    A little Samp, um... um... yeah. I'm about to see you right now then. Where you want me to go. To the same spot I seen you last time?

DEJESUS:    Yeah, yeah. I'm already here basically.

OLIVERAS:   Alright I'ma head over there right now.

110.    Based on my training, experience and participation in this investigation, during this call I believe that when DEJESUS he "got that shirt for you" of the "specials," DEJESUS was saying that he picked up a sample amount of fentanyl from DOMI and was going to provide it to OLIVERAS so that he could test the potency.   This call indicates that DEJESUS is utilizing DOMI as a source of supply for fentanyl, and is familiar with DOMI.

111.    On June 13, 2018 at 3:04 p.m., DEJESUS called OLIVERAS and they discuss, in part, the following:

OLIVERAS:   Aye, yo!

DEJESUS:    Yo, what's good, bro'?

OLIVERAS:   What's good, nigga?

DEJESUS:    Shit, coolin! Yo, the same thing. You heard?

OLIVERAS:   Uh... One 120?

DEJESUS:    Uh-huh!

OLIVERAS:   Alright, alright. Um...

DEJESUS:    So, it's 'ight. He said he's just, you know... He's doing the same thing I'm doing.

OLIVERAS:   Um-hum.

DEJESUS:    I want you fasten to that. You feel me?

OLIVERAS:   Um-hum.

DEJESUS:    To tell you the truth, I still got mine thrown there. I haven't really... You feel me? I've been on my other. Feel me? My other lane. You still ain't hear from your peeps?

OLIVERAS:   Let me try... I can't even hear you. Say that again.

DEJESUS:     You didn't still hear back from your um... Whatchamacallit... Those people?

OLIVERAS:    Nah, not yet. I'm waiting. I'm waiting on that.

DEJESUS:     Yeah, that would help.

OLIVERAS:    Um-hum. I'm waiting on both, from the special and the Christina.

DEJESUS:     Nah, I got Christina. That's what I'm saying, I'm talking about your people that wanted to see me.

OLIVERAS:    Oh, okay. Oh, no! Them people's, no. Them niggas ain't never get back at me.

DEJESUS:     Yeah.

OLIVERAS:    Um-hum.

DEJESUS:     I got some right there.

OLIVERAS:    Yeah, motherfucking um... I'm waiting on Dookie-Do [Ph], he should be hitting me up a little later or whenever, you feel me. So if anything, if nigga's don't come out, if you need it [Ph] , I just grab like one (1) or two (2). [Aside: Oh shit, I forgot all about that.]

DEJESUS:     Yeah, yeah. [Voices Overlap]

OLIVERAS:    [Aside: Yeah, but you could get (U/I).] Um, whatever. Um... [Voice Overlap]

DEJESUS:     That ain't gonna help, nigga. Shit, you know how it is, nigga. Like I told you, nigga I just... You feel me?

OLIVERAS:    Um-hum.

DEJESUS:     I know... I know... Look, look, you already know how it is, shit. Shit add up. I don't want you to do it. You feel me?

OLIVERAS:    Um-hum. Motherfuckin... [Voices Overlap]

DEJESUS:     I told you, all that shit add up. Have some whatever. You feel me? 'Cause it all...You know I mean?

OLIVERAS:    Um-hum.

DEJESUS:     Alright then. I'll hit you in a few.

112.     Based on my training, experience and knowledge of this investigation, I believe that DEJESUS is asking to purchase 120 grams of heroin from OLIVERAS.  In addition, OLIVERAS is telling DEJESUS that he is waiting on the "special" (fentanyl) and "Christina" (which I believe is a reference to cocaine).  This call furthers my belief that OLIVERAS and DEJESUS work together trafficking narcotics.  It appears that OLIVERAS and DEJESUS obtain narcotics from one another when the other is low on product.

113.     On May 10, 2018 at 10:51 a.m. OLIVERAS called DEJESUS and they discuss, in part, the following:

DEJESUS:     Yo!

OLIVERAS:    Uh... [Mumbles] 'Ight um... I gotta get away from these people. Um, um, um.

DEJESUS:     So, bro'! Listen, first and for..., I wanted to say that say that this is very important, my nigga. You heard?

OLIVERAS:    Yeah, yeah. Nah, nah, nah. Um...

DEJESUS:     'Cause with this right here... [Voices Overlap]

OLIVERAS:    I'ma, I'ma try... Nah, I'ma try. I'ma try to grab you at least something or whatever. Um... I know I owe for the 90. Well, I had called you [U/I]. [Voices Overlap]

DEJESUS:     No, no, but listen! No, my nigga. Listen, even if I... That don't got nothing to do with these. He's helping me do something. 'Cause this right here, that's gonna help me get something else, my nigga. You heard?

OLIVERAS:    Yeah.

DEJESUS:     Which will mean... [Voices Overlap]

OLIVERAS:    Nah, nah, nah. [Voices Overlap]

DEJESUS:    Like, I'm working on something real nice, my nigga. And I just need that right there, my nigga. You heard?

OLIVERAS:   Um-hum. I'm saying... I'ma try... I gotta see what I got over there. I'm driving over there... I'ma drive over there in probably like, like 45 minutes. I'ma see what I got. You know I mean? At the most we can probably say, probably, from what I remember from yesterday, last night... There's probably two (2). But I'ma even still check what it is, anyways. But what I wanted to knock down was...What I wanted to go see what was over there was the extra 90. That's what we was talking about. Um... So, I got a extra 90. What you was trying to do with that? Like, how much was... You said 45 a grizz? [Short Pause] Or... [Voices Overlap]

DEJESUS:    Yeah. [Voices Overlap]

OLIVERAS:   Or, or what you was trying to do? 'Cause, I know you just spit out something. You just text me something about three (3) bands [Ph]. But I didn't know what you was talking about. Three (3) Ks for what?

DEJESUS:    Yeah.

OLIVERAS:   I ain't know what you were talking about right there or whatever. But anyways...

DEJESUS:    No, but you could help me with that right there, like, right there. That's gonna help me right there open up this, open up this nice beautiful door, my nigga, that I got over... 'Cause I'm doing something right now. You feel me? And I'ma be honest with you right now. I don't... I ain't got... They called me right now, I do not have anything. But that's gonna open up a door for something with some..., with some... With us. You heard?

OLIVERAS:   Um-hum. Um-hum.

DEJESUS:    With Fernando. You feel me? [Voices Overlap]

OLIVERAS:   I mean... I'm just saying, I ain't promising you the the, the four (4). I'm not... I'm not gonna sit here and promise you. I'ma go check what it is right now, see what I got over there. And then from there I'll let you know. But let me see...

DEJESUS:    Make sure, make sure it is, it is, it is... What you ma' call it? Um, Goya. You heard?

OLIVERAS:   Yeah, nah, nah, nah! I'm telling you, like... You know, I don't touch my shit, my nigga. You know, I don't... I don't... If I'ma give it to you, it's 'cause that's the same way I got it. You feel me?

DEJESUS:    All right, brosky! Go ahead, go ahead. Handle that as soon as and then hit me. You heard? [Voices Overlap]

OLIVERAS:   If I could see what's good with the um..., with those four (4)... If I could see was that... I might as well just give you that and we just call it even. Or you want to grab two (2)?

DEJESUS:    We could do that.

OLIVERAS:   All right, well let me go see first and for most... [Voices Overlap]

DEJESUS:    I would like for you to help. Feel me?

OLIVERAS:   Let me see, first let me see what I got first over there. Like I said before, I promise anything. But if I do got the four (4), then... You know I'm saying? I'll just... I'll just knock 90 off of that. You feel me? Like, "Fucking here, just take that."

OLIVERAS:   I'm trying to get a lot of money back right now. And I... Honestly, yo, G! I'm trying to get money right now. I been... You know, loosing money from every which way, my nigga and it's been like... It's been so crazy. You feel me? But I'm really trying to grab all this money back. You see, only thing that help me right now is what I just finished doing with Domi' or whatever. And giving him all that shit back and he's gonna bring me a whole bunch of new shit and a few, where... You feel me? It's just... It's like, I don't wanna grab that and I got so much of it. You get what I'm saying? I got too much of it. It's like, it's like I'm over here sitting on five (5) of them things. You know I'm saying? And you trying to [U/I]. [Voices Overlap]

DEJESUS:    Yeah, but for the next one at least do like a "yuck" [ph] at four (4). Feel me?

OLIVERAS:   Say that again?

DEJESUS:    Do like four (4) for um... Four (4) for the next round.

OLIVERAS:   I, I, I... I mean your numbers is beautiful. I'm not... I can't even knock it. You definitely selling it. You know I'm saying? But it's just like... I even got more of it. You heard? And the thing is, I don't like to get rushed, my nigga. It's like... You know how you give me something and it's like:

"Yo!" You tell me like three (3) to four (4) days. "Yeah, whatever. What the bread is like. [U/I]." [Voices Overlap]

DEJESUS:   Take your time. You feel me? I'm not gonna rush you, my nigga.

114.   Based on my training, experience and knowledge of this investigation, during this call I believe that OLIVERAS is setting up a future purchase from DEJESUS, possibly for 4 kilograms of heroin.  The call also indicates that OLIVERAS owes DEJESUS for 90 grams of product that he previously obtained from DEJESUS.  This call shows that OLIVERAS and DEJESUS both have knowledge of each other's narcotics trafficking, and work together to facilitate large scale narcotics transactions.  In addition, when OLIVERAS said, "I'm over here sitting on five (5) of them things," I believe that OLIVERAS had 5 kilograms of heroin or fentanyl in his possession.

## EVIDENCE REGARDING LUIS RODRIGUEZ

115.   Based on intercepted calls, in conjunction with my knowledge of this case, I believe that Luis RODRIGUEZ is a close associate of OLIVERAS and a narcotics customer of OLIVERAS.  Luis RODRIGUEZ is trusted by OLIVERAS and is frequently at **SUBJECT PREMISES #5** with OLIVERAS.  While Luis RODRIGUEZ does not typically handle sales of narcotics directly for OLIVERAS, he is supplied with narcotics from OLIVERAS on a regular basis, and sells narcotics to his own customer base.  The following are examples of narcotics-related communications between Luis and OLIVERAS:

116.   On June 24, 2018 at 12:19 p.m. OLIVERAS over Target Telephone 6 places an outgoing call to Luis RODRIGUEZ, they discuss, in part, the following:

LUIS RODRIGUEZ: Yo umm, oh you about to take off right now?

OLIVERAS: Yeah I'll hit you off man.

LUIS RODRIGUEZ: Damn I'm about to get off the highway in like 5 minutes, not even.

OLIVERAS: You hit bro, you hit, I'm ma do something bro, I gotta do this, I got, I gotta do this right here.

LUIS RODRIGUEZ: Damn I can't see June real quick?

OLIVERAS: What you needed?

LUIS RODRIGUEZ: A stack of the special.

OLIVERAS: Oh he ain't got that over there.

LUIS RODRIGUEZ: Damn! And umm fuck, oh my God this little lick. Alright.

117.     Based on my training, experience and my knowledge of this investigation, I believe that when Luis RODRIGUEZ says he needs "a stack of the special," Luis RODRIGUEZ is asking OLIVERAS for 100 bags of fentanyl.  I believe that OLIVERAS is telling Luis RODRIGUEZ that he is not around and can't help him right now.

118.     On June 27, 2018 at 12:36 p.m., OLIVERAS and RODRIGUEZ had the following telephone conversation:

RODRIGUEZ:     Um... Fuckin'... 'Ight! Alright, so... I think that shit done. Is June there?

OLIVERAS:     Yeah, June over there. What ya' needed?

RODRIGUEZ:     Um... A whole of the specials.

OLIVERAS:     Go check what over there.

RODRIGUEZ:     Alright. I'm on Franklin and I'm in Vic's car, so... I gotta wait 'til he takes me over there. I should be over there in like 15 minutes.

OLIVERAS:     Alright then.

RODRIGUEZ:     Alright.

119.     Based on my training, experience and knowledge of this investigation, during this call I believe that when Luis RODRIGUEZ arranges to obtain a whole one of "the specials," Luis RODRIGUEZ is arranging to obtain a quantity of fentanyl from OLIVERAS. RODRIGUEZ and OLIVERAS agree to meet in 15 minutes to conduct the transaction.

## EVIDENCE REGARDING JONATHAN QUINONES

120.     During intercepted calls, QUINONES and OLIVERAS discuss preparing, obtaining and stashing narcotics on a regular basis.  I believe that QUINONES is a trusted associate of OLIVERAS, who is familiar with the inner workings of this DTO.  It appears that QUINONES does not have a criminal history and appears to have steady employment. For these reasons, investigators believe that OLIVERAS utilizes QUINONES to register vehicles and place utilities in his name.  Investigators believe that OLIVERAS does this in an attempt to insulate himself from law enforcement detection.  In addition, intercepted communications have revealed that QUINONES also has his own customer base, to which he sells narcotics.  The following examples set forth QUINONES's role within this DTO:

121.     On June 25, 2018 at 7:40 p.m., OLIVERAS called QUINONES.  They discussed, in part, the following:

QUINONES:  Hello.

OLIVERAS:  Yo, if anything. Angel out there still too.

QUINONES:  Oh shit, I already told them to go over there.

OLIVERAS:  Okay. What they needed?

QUINONES:  They need a stack.

OLIVERAS:   Stack of what? Regular?

QUINONES:   Yeah.

OLIVERAS:   Alright then.

QUINONES:   Alright, I'ma call you when he get there, when he get to Evergreen.

OLIVERAS:   Alright then.

QUINONES:   Alright.

122.    Based on my training, experience and involvement in this investigation, I believe that QUINONES is calling OLIVERAS because a narcotics customer of QUINONES needs a "stack" (100 bags) of "regular" (which I believe is a reference to heroin).  QUINONES tells OLIVERAS that he will call him once the customer is close to OLIVERAS's location on Evergreen Street.  This conversation shows that QUINONES and OLIVERAS are associates who assist one another with narcotics trafficking.

123.    On May 21, 2018 at 4:52 p.m. QUINONES at telephone number 860-936-5287 called OLIVERAS on **Target Telephone 6** and discussed, in part, the following:

OLIVERAS: Yeah, I counted them bread yesterday. Motherfucking for the U/I, the other wave, three (3) bags but I [U/I]. I was surprised that I only got [U/I] because you know... U/I. We got 18,5 right there. Where all the money that I've been giving out U/I. Hold on, hold on... [Aside: Yo, all right. You there? Yeah, alright. Alright. Hey yo! Um Jimmy there. Thats's Jimmy] Uhm but yeah, 18,5 nigga.

QUINONES: That's what you got for Domi?

OLIVERAS: Uh-huh.

QUINONES: Uhm... I'm about to um... I'm already ready to re-up. You know what I mean?

OLIVERAS: Hell yeah, hell yeah.

QUINONES: That's gonna be another grand right there.

OLIVERAS: Uh-huh. Especially cause that's a little five (5) in my pocket so...

QUINONES: Yeah.

OLIVERAS: 20 right there. You feel me? So... I'm alright by next week by.. by.. the end of this we go see at least like another 20 to 40 at least. Cause listen, last time I only had like probably like nigga like 10,11,12 and nigga was "Wow." But with [U/I] it's "Okay, U/I" Less than I thought it was. You feel me? [Voices Overlap]

QUINONES: Yeah. We just gotta get to work and then. It is better off being stacked than anything. You know what I mean?

OLIVERAS : Mm-hmm, mm-hmm.

QUINONES: And that's like the biggest thing we ever had a chance to get the, uh, a real nice little round with that shit. We do the like get and everything prepared, you know?

OLIVERAS: Uh-huh. Everything is being getting prepared, and processed and [Voices Overlap] Alright.

QUINONES: So now we can go hard, starting early in the morning and boom.

OLIVERAS: [U/I] we're gonna have to move that shit to another spot.

QUINONES: Yeah.

OLIVERAS: So and we're gonna have to find a whole new room, a whole [U/I]

gonna be doing [U/I]

QUINONES: Yeah, [U/I] SPIDER are gonna do it, right?

OLIVERAS: Yeah, [U/I] apartment too? You hear me?

QUINONES: Yeah, yeah.

OLIVERAS: Like [U/I] you hear me?

QUINONES: Yeah, hell yeah. [Voices Overlap]

OLIVERAS: At the same time, [U/I] we"re not gonna be there as much, that's gonna be the most safe spot we're gonna have.

QUINONES: Yeah.

OLIVERAS: [U/I] We still gonna use this spot, you feel me?

QUINONES: Yeah.

OLIVERAS: So we checking [U/I] at the same time, [U/I] other apartment in case [U/I]

QUINONES: Yeah, yeah.

OLIVERAS: [U/I] need a spot where to keep safe.

QUINONES: Yeah, exactly yo.

OLIVERAS: You feel me? everybody know nothing whatever... we [U/I]

QUINONES: Yeah.

OLIVERAS: I didn't even have [U/I]

QUINONES: Hell yeah.

OLIVERAS: [U/I] my last apartment so [U/I]

QUINONES: Yeah.

OLIVERAS: You know what I mean?

QUINONES: Yeah, fuck it. We'll get used to that shit anyway.

OLIVERAS: Uh-huh.

QUINONES: Like you said that was mainly for safety anyway, you know what I mean?

OLIVERAS: Yeah, that was just paid [U/I]

QUINONES: Not everything in one spot so... and shit like that. It don't matter you know?

OLIVERAS: Yeah [U/I] on the reserve.

QUINONES: Yeah.

OLIVERAS: In the comfort [U/I] you got a spot for [U/I] you know? we got stuff right over there, other stuff over here. You know what I'm saying? so...

QUINONES: Hell yeah.

OLIVERAS: Now this nigga break the shit [U/I] more down too.

QUINONES: Yeah.

OLIVERAS: [U/I]

QUINONES: But they're still in use, you know what I'm saying? [U/I] still a lot.

OLIVERAS: Hell yeah [U/I]

QUINONES: Yeah, you don't wanna take no lost.

OLIVERAS: [U/I] cause there's still a lot [U/I] you feel me?

QUINONES: Yeah, yeah for real.

OLIVERAS: [U/I] because they're doing so much. [U/I]

QUINONES: That's true.

OLIVERAS: The worst thing is like [U/I] over there and just stuff that's ready over here. And just bring [U/I]

QUINONES: Yeah, we'll see how we do that shit anyway we'll get a feel for that shit.

124.    Based on my training, experience and knowledge of this investigation, I believe that OLIVERAS and QUINONES are talking about preparing a new apartment as a location to "stash" narcotics and process them for street sales.  Through prior intercepted calls, I believe that OLIVERAS was going to be renting a new apartment, which I believe is an effort by OLIVERAS to attempt to avoid detection by law enforcement.  Also during this call, OLIVERAS mentions, "there's still a lot" and "they're doing so much."  I believe this is in reference to having a large quantity of narcotics on hand, and processing a large quantity of narcotics for street sales.  OLIVERAS and QUINONES also talk about getting money ready for "Domi," who I believe is a source of supply for OLIVERAS.  QUINONES also mentions that he is ready to "reup," which I believe is a reference that his quantity of narcotics is low and he

needs to purchase more.  This conversation bolsters the fact that OLIVERAS and QUINONES

are working together to purchase, traffic, process and ultimately sell narcotics.

125.   On May 21, 2018 at 10:19 p.m., QUINONES called OLIVERAS and discussed,

in part, the following:

QUINONES: Oh, you know what yo? Hello?

OLIVERAS: What up? Yeah, what happened?

QUINONES: I'm about to just grab what I need from you tonight, what you got right here
and then I'll just give [U/I] tomorrow, we don't got [U/I] right now.

OLIVERAS: All right then.

QUINONES: All right. Cause I only need a couple of things, I'll just grab it here and then
tomorrow we'll take it, we'll deduct it from the new [U/I] you know what I
mean?

OLIVERAS: All right then, nigga.

QUINONES: That's even easier.

126.   Based on my training, experience and knowledge of this investigation, during this

call I believe that QUINONES is telling OLIVERAS that he needs narcotics; however,

QUINONES only needs a smaller quantity for right now and will obtain a larger quantity from

OLIVERAS during the next day.

127.   As another example of an intercepted calls involving OLIVERAS and

QUINONES, on June 19, 2018, investigators established surveillance in the area of 44 Belmont

Street in Hartford, CT (**SUBJECT PREMISES #6**).  E-911 data for OLIVERAS's phones had

the devices pinging in the area of 44 Belmont Street.  Investigators observed OLIVERAS drive

to another location in Hartford, where investigators observed OLIVERAS briefly meet with a

Hispanic male.  Investigators observed OLIVERAS drive to 90 Catherine Street, Hartford, CT

(**SUBJECT PREMISES #7**).  Investigators observed as OLIVERAS exited the vehicle and

appeared to be reaching for an object in the driver's seat.  OLIVERAS was observed taking a red

bag from the vehicle and walking towards 90 Catherine Street.  Investigators drove by and

observed OLIVERAS as he used a key and entered **SUBJECT PREMISES #7** through the rear

door.  At approximately 1:50 p.m., investigators observed as OLIVERAS exited **SUBJECT**

**PREMISES #7** empty handed and left the area.

128.    On June 19, 2018 at 2:55 p.m., QUINONES called OLIVERAS.  They discussed,

in part the following:

> OLIVERAS:  Yeah and I already bought them other ones. I already bought the three (3).
> You know what I am talking about, the big three (3). To the spot. I already
> seen this nigga. You know what I am talking about. The big three (3). You
> know what I am talking about.

> QUINONES:  Ohh for real.

> OLIVERAS:  Yeah, yeah. I already dropped that money off. I already had told him
> yesterday. I was with the nigga [U/I] I am like, "yo listen I am waiting on
> you bro. Like what it is?". He was like, "I [U/I]". Put the rest in the tab so
> what I did... I just finished counting everything, get situated, called the
> man, "yo huh look bro", "alright hu boom". I said, "goddamn". [U/I]

> QUINONES:  Yeah, yeah, yeah.

> OLIVERAS:  I didn't even expect to ride back with anything. He just said "huh take
> this". He said, "huh take your three (3) piece".

> QUINONES:  Yeah.

> OLIVERAS:  I already dropped that shit off over there to you know to your spot.

129.    Based on my training, experience and involvement in this case, I believe that

OLIVERAS is telling QUINONES that he just "bought the three," which is in reference to a

suspected three kilograms of narcotics that OLIVERAS.  Further, OLIVERAS is telling

QUINONES that he dropped off the narcotics at "your spot," which I believe is likely a reference to a stash location at 90 Catherine St., Apt. B5, Hartford, CT (**SUBJECT PREMISES #7**), which is in QUINONES's name.

## EVIDENCE REGARDING ANGEL ROMAN

130.     ROMAN is a close associate for OLIVERAS.  Investigators have intercepted numerous narcotics-related calls between ROMAN and OLIVERAS.  Based on intercepted calls, I believe that ROMAN conducts street level sales for OLIVERAS at **SUBJECT PREMISES #8**. Below are several examples of ROMAN's role within this DTO:

131.     On June 25, 2018 at 8:51 p.m., OLIVERAS called ROMAN.  They discussed, in part, the following:

> ROMAN:      Yo.
>
> OLIVERAS:   Yo, 13 bags... 13 bags and 15 in candy
>
> ROMAN:      13 bags and a 15 in candy?
>
> OLIVERAS:   Yeah.
>
> ROMAN:      Alright
>
> OLIVERAS:   Alright

132.     Based on my training, experience and knowledge of this investigation, during this call I believe that OLIVERAS is telling ROMAN to serve a customer 13 bags of heroin or fentanyl and a $15 piece of crack cocaine.

133.     On June 25, 2018 at 9:50 p.m., OLIVERAS called ROMAN.  They discussed, in part, the following:

> ROMAN:      Yo.

OLIVERAS:   Yo, Jessica out there, 2 Bs and half of G.

ROMAN:        Alright.

OLIVERAS:   Aye yo, quick question. You got the number right there?

ROMAN:        Honestly... No.

OLIVERAS:   After we did that earlier... You seen Red and now her? And who else? Nobody else, right? [Pause] Nah, 'cause you had took off. [U/I].

ROMAN:        Red, 13 and her now.

OLIVERAS:   Yeah, so it's 3½.

ROMAN:        Alright.

OLIVERAS:   3½ from... What was that 30 or something like that.

ROMAN:        You had text me, hold on. I'll tell you right now.

OLIVERAS:   I said, 30½.

134.    Based on my training, experience and knowledge of this investigation, I believe that OLIVERAS is directing ROMAN to sell "Jessica" 2 b's (2 bundles or 20 bags of heroin/fentanyl) and a half a gram of crack or powder cocaine "half of G".  OLIVERAS is then inquiring about the "number" which is in reference to the running total for what quantity of narcotics ROMAN has sold for the day.

135.    On June 28, 2018 at 4:54 p.m., OLIVERAS spoke with ROMAN.  They discussed the following:

ROMAN:        Yo!

OLIVERAS:   Yo you over there right?

ROMAN:        I'm right here at the gas station, right here... Around the corner.

> OLIVERAS:   Alright, I'm um... I'm still in the highway but um... Ima be over there in a few.  Just pick up like one (1) and half (1/2) of the special so I could see Frankie.
>
> ROMAN:   Alright!
>
> OLIVERAS:   Alright!

136.   During this call, I believe that OLIVERAS is telling ROMAN to pick up "one and half" (possibly one and a half bundles or stacks) of fentanyl ("the special") so that OLIVERAS can sell it to a customer named "Frankie."  At 5:06 p.m., OLIVERAS sent a text message to ROMAN that said, "Special".  During this text message, I believe that OLIVERAS was confirming that ROMAN had picked up or was going to pick up "Special" (fentanyl).

137.   As previously discussed, ROMAN is a close associate of OLIVERAS.  ROMAN primarily handles street level narcotics sales taking place on York St in Hartford, CT.  The above examples of intercepted communications between OLIVERAS and ROMAN only show a very small sampling of the numerous intercepted calls between OLIVERAS and ROMAN, during which they arrange to sell narcotics.  OLIVERAS and ROMAN are in constant contact throughout most days, and the amount of narcotics sales taking place on ROMAN's behalf on a daily basis is enormous.

### EVIDENCE REGARDING SPIDER

138.   SPIDER is an unidentified Hispanic male who uses telephone number 860-205-3816 and who resides at **SUBJECT PREMISES #5.**  SPIDER is in frequent contact with OLIVERAS, as SPIDER is responsible for street level narcotics sales out of **SUBJECT PREMISES #5.**  Through intercepted communications, it appears that SPIDER is also used by

OLIVERAS as a "tester" for narcotics in order to determine the potency of the product. Below are examples which show SPIDER's role within this DTO.

139.   On July 10, 2018 at 10:24 a.m., SPIDER called OLIVERAS and they discussed, in part, the following:

SPIDER:   Lou came and got a stack.

OLIVERAS: Okay.

SPIDER:   So he's straight?

OLIVERAS: It's straight. Yeah, it's straight.

SPIDER:   Alright. But he ain't give me no money.

OLIVERAS: Alright.

SPIDER:   Alright.

140.   During this call, I believe that SPIDER is telling OLIVERAS that he sold a stack (100 bags) of heroin/fentanyl to a customer named "Lou." In addition, this call shows that SPIDER is a relatively lower member of the DTO and is not in charge of the money.

141.   On June 30, 2018 at 6:08 p.m., OLIVERAS called SPIDER and they discussed, in part, the following:

SPIDER:   Yo.

OLIVERAS: Yo, uhm, [U/I] out there. He wants a stack and a regular

SPIDER:   What happen?

OLIVERAS: He wants a stack and a regular

SPIDER:   Alright

OLIVERAS: Alright? A whole set

SPIDER:   Yeah

142.    Based on my training, experience and knowledge of this investigation, when OLIVERAS tells SPIDER to sell "a stack and a regular," I believe this to be a reference to 100 bags of fentanyl and 100 bags of heroin (regular).  This conversation again shows that OLIVERAS is in direct control and is directing SPIDER to complete the narcotics transaction on OLIVERAS's behalf.

143.    On June 25, 2018 at 7:52 p.m. OLIVERAS called SPIDER and they discussed, in part, the following:

SPIDER:      Yo.

OLIVERAS:    Yo, go out there. He got a blue Nissan Sentra [U/I] Jonathan, regular.

SPIDER:      Alright, so that's a stack, right?

OLIVERAS:    Yes, a stack.

SPIDER:      Alright

144.    I believe that this conversation between OLIVERAS and SPIDER again shows OLIVERAS directing SPIDER to sell a stack (100 bags) of heroin/fentanyl to a customer on his behalf.

145.    On June 22, 2018 at 1:07 p.m., SPIDER called OLIVERAS and they discussed, in part, the following:

OLIVERAS:    Yo, go to Warrenton, Evergreen. I'm 'bout send him up there right now.

SPIDER:      There is... There's fucking um... A stack and a half.

OLIVERAS:    He uh... S a stack and a half of the specials right?

SPIDER:      Yeah.

OLIVERAS:    Alright, so yeah. Just give it to Rodney. He on [Audio Skips] Evergreen.

SPIDER:      Alright.

OLIVERAS: Go right now, he's there.

SPIDER:      Yeah. Alright.

146.    During this call, I believe that OLIVERAS is directing SPIDER to sell a stack and

a half (150 bags) of fentanyl (specials) to a customer named Rodney.  The above-described

conversations between OLIVERAS and SPIDER only show a very amount of the times that

OLIVERAS directs SPIDER to conduct a narcotics sales on his behalf.  As previously

mentioned, OLIVERAS and SPIDER are in frequent contact throughout the day.  Typically on a

daily basis, OLIVERAS is directing SPIDER to conduct narcotics transactions with numerous

customers throughout the day.

## EVIDENCE REGARDING JULIO OLIVERAS

147.    As detailed throughout this Affidavit, during this investigation, myself and other

investigators have identified OLIVERAS as a large scale narcotics trafficker who is the leader of

his a drug trafficking organization.  OLIVERAS appears to maintain a sizeable quantity of

narcotics, and is using several associates or runners to sell a prolific amount of narcotics on a

daily basis.  OLIVERAS also directly conducts large-scale narcotics deals with several

individuals, which include Jeremy RODRIGUEZ, RIVERA, JOHNSON, JONES and DEJESUS.

I believe that OLIVERAS regularly supplies these individuals with wholesale quantities of

fentanyl.  OLIVERAS maintains multiple locations in which he stores, packages, and sells

narcotics to include **SUBJECT PREMISES #5, 6, 7, and 8**.  Through intercepted

communications, I determined that OLIVERAS has a large customer base which purchases,

fentanyl, heroin, crack, and cocaine from him on a frequent basis.  Further, OLIVERAS uses

multiple cellular telephones.  For example, he uses Target Telephone 6 primarily to

communicate with members of his DTO and he uses Target Telephone 7 primarily to coordinate narcotics transactions with lower level customers.  Target Telephone 7 typically begins receiving calls at approximately 8 a.m. and calls continue throughout the entire day until approximately 12 a.m.  Throughout this investigation, there have been over 20,000 telephone contacts on Target Telephone 7; the large majority of OLIVERAS's communications over Target Telephone 7 relate to narcotics trafficking activities.

### EVIDENCE REGARDING VICTOR PERDOMO

**A.**     **Intercepted communications regarding PERDOMO, aka "DOMI".**

148.    On May 7, 2018 at 5:02 p.m., OLIVERAS received an incoming call from QUINONES on telephone number 860-936-5287 and they discussed, in part, the following:

OLIVERAS: What's goody?

QUINONES: Shit getting home right now.

OLIVERAS: Alright alright, yeah I just finished chapping/shopping to **Domi** yeah, Ima try to see if I could give you anything whatever, I'm just waiting in something to get more work, I didn't do none of that. So some nigga [Voices Overlap]

QUINONES: Say that again yo.

OLIVERAS: What I'll do man is, after that [stammers] you know I'm here nigga, you know I'm here. Where you at? You at the house?

QUINONES: Yeah I'm home.

OLIVERAS: Okay okay, yeah, I'm driving back to umm, to Sisson right now, umm I don't know if you can follow me cause I'm actually driving around with all that shit, you know I'm saying? I just came from seeing **Domi** and [U/I] got that too or whatever so umm.

QUINONES: Oh! I just got here right now.

OLIVERAS: Yeah yeah yeah, nah I'm actually right here going down Weston [ph] by Brookfield [ph]

QUINONES: Oh, I just passed that shit too [Voices Overlap]

OLIVERAS: I was right [stammers] parked in Georgy's tire, that's why.

QUINONES: Oh, do you want me to umm, well I guess I'll talk to you when I see you then.

149.    On May 8, 2018 at 12:44 p.m. OLIVERAS over Target Telephone 7 received an incoming call from QUINONES at telephone number 860-936-5287, they discussed, in part, the following:

OLIVERAS: Yo.

QUINONES: Yo what up?

OLIVERAS: [Chuckles] The crazy shit is, right. That the shit I'm suppose to bring, **Domi**... Well, I got the other three (3) boys right there, so I was gonna bring him back that. But anyways, the shit that I took out for us yesterday, remember? You know how I gotta put the shit back? Anyways, I'm working on that right now or whatever. [U/I]. This shit is wavy. This shit is not coming together. And remember, cause I put a buck and a buck extra of the um..., mani [Ph] to um... Of the mani [Ph] to, to um..., to add in what I took out. So now that... [Voices Overlap]

QUINONES: Yeah.

OLIVERAS: I'm doing this shit. Nigga, this shit is powdery as fuck!

QUINONES: Get the fuck out of here.

OLIVERAS: I swear in everything I love, my nigga. I'm doing this shit right now and I'm trying to tell you that shit is powdery [Chuckles] as fuck. [Voices Overlap]

QUINONES: And is not um... [Voices Overlap]

OLIVERAS: [U/I]. [Voices Overlap]

QUINONES: Is not... Is not getting hard like what it should be, man? [Voices Overlap]

OLIVERAS: Is not even getting hard my nigga. You feel me?

QUINONES: Wow!

OLIVERAS: So, so what I'ma do is, I might just keep this little batch and just give him

the rest of the other stuff, just for... And I'ma tell him... Remember, he don't know I got the other one that we just did. I'm just gonna be like; "Yo, I just took a little bit. Cause, you know, I don't wanna stay without nothing at least. That way you know I'm saying? And I get back to the rest whatever, so that you he will believe me, you feel me? Even more.

QUINONES: Yeah.

OLIVERAS: But now, I got this, but remember the other one before I took out, that shit still good money.

QUINONES: Yeap!

OLIVERAS: The only thing is, I'm hoping that, that extra buck of money I put in there, I hope it ain't fuck it up, which I know it ain't gonna fuck it up but, this shit crazy. I'm like hell look at this shit, real dead, dead right now.

QUINONES: Yeah, that shit crazy as hell bro.

QUINONES: Oh yo, I almost threw up at home yesterday yo. I swear in God, after I got home bro yo, I was like "Yo I feel like throwing up yo" Cause that shit had me kind of woozy too and you did it for a long time.

OLIVERAS: My nigga, I was doing it the whole day.

QUINONES: Yeah I know.

OLIVERAS: You know what I'm saying? [stammers] I fell fucked up nigga, that Fent [ph] that Fent [ph] was [U/I] cause that's what he [U/I] out but umm, nigga I was throwing up nigga, and I said I went to probation and I can't [U/I] anything.

QUINONES: Like I almost fucking threw up last night yo, I think I told your sister I I said "Damn I feel like throwing up yo"

OLIVERAS: Nah [U/I]

QUINONES: That shit got me a little woozy too.

OLIVERAS: The moment you left I threw up.

QUINONES: That shit strong nigga, cause I only had what? The three (3) times.

OLIVERAS: Hell yeah. [Voices Overlap]

QUINONES: Even if I did like half cause you did the whole thing you know what I'm

saying?

OLIVERAS: Yeah I did the whole thing I'm [U/I] like shit, but that shit is wavie [ph]
right?

150.    On May 10, 2018 at 10:51 a.m., OLIVERAS over Target Telephone 6 placed an

outgoing call to DEJESUS at telephone number 860-707-9745 and they discussed, in part, the

following:

OLIVERAS: I'm trying to get a lot of money back right now. And I... Honestly, yo, G!
I'm trying to get money right now. I been... You know, loosing money from
every which way, my nigga and it's been like... It's been so crazy. You feel
me? But I'm really trying to grab all this money back. You see only thing
that help me right now is what I just finished doing with **Domi'** or
whatever. And giving him all that shit back and he's gonna bring me a
whole bunch of new shit and a few, where... You feel me? It's just... It's
like, I don't wanna grab that and I got so much of it. You get what I'm
saying? I got too much of it. It's like, it's like I'm over here sitting on five
(5) of them things. You know I'm saying? And you trying to [U/I]. [Voices
Overlap]

DEJESUS: Yeah, but for the next one at least do like a "yuck" [ph] at four (4). Feel me?

OLIVERAS: Say that again?

DEJESUS: Do like four (4) for um... Four (4) for the next round.

OLIVERAS: I, I, I... I mean your numbers is beautiful. I'm not... I can't even knock it.
You definitely selling it. You know I'm saying? But it's just like... I even
got more of it. You heard? And the thing is, I don't like to get rushed, my
nigga. It's like... You know how you give me something and it's like: "Yo!"
You tell me like three (3) to four (4) days. "Yeah, whatever. What the bread
is like. [U/I]."

[Voices Overlap]

DEJESUS: Take your time. You feel me? I'm not gonna rush you, my nigga.

OLIVERAS: Um-hum. [Voices Overlap]

DEJESUS: Feel me? [U/I] a sample. I rather, nigga... At least I know it's in motion. You
feel me?

151.    On May 13, 2018 at 12:11 p.m., OLIVERAS over Target Telephone 7 received an incoming call from SPIDER on telephone number 860-205-3816 and they discussed, in part, the following:

>
> OLIVERAS: Let me just get over there first cause I got to go see **Domi**, give him money off some other peoples, get their money. But yeah, I got you.
>
> SPIDER: Alright.
>
> OLIVERAS: Fuck it, I got you.
>
> SPIDER: Alright.

152.    On May 21, 2018 at 4:52 p.m., OLIVERAS over Target Telephone 6 received an incoming call from QUINONES at telephone number 860-936-5287 and they discussed, in part, the following:

>
> OLIVERAS: Yeah, I counted the, the bread yesterday. Motherfucking for the [U/I]. The other wave didn't do to bad. But I don't think they better. But I was surprised that I ain't do that bad either. Because, you know, me and [U/I] been extra hard, so... We got 18 five (5) right there. [Background: Phone Ring Tone] With all the money that I've been giving out and everything . Hold on, hold on... [Aside On Another Phone: Yo.] [Voices Overlap]
>
> QUINONES: Yeah, that's [U/I]. [Voices Overlap]
>
> OLIVERAS: [Aside On Another Phone: This is Jay. (Short Pause) You there? Alright. Uh-huh.]  [Aside: Hey yo! Um... Jimmy there. Thats was Jimmy.] Um, but yeah though 18 five (5), nigga.
>
> QUINONES: That's what you got for **Domi**?
>
> OLIVERAS: Um-hum.
>
> QUINONES: Oh, I was 'bout to um... I'm already ready to re-up. You know I mean?
>
> OLIVERAS: Hell yeah, hell yeah. Shit, that's good shit though. [Voices Overlap]
>
> QUINONES: That's gonna be another grand right there.
>
> OLIVERAS: Um-hum. Plus I got like a little five (5) in my pocket, so... [Voices Overlap]

153.    On June 10, 2018 at approximately 6:00 p.m., investigators observed OLIVERAS

travel to the SKY GROCERY.  Investigators observed OLIVERAS exit his vehicle and carry a

black shopping bag (believed to contain U.S. currency) into SKY GROCERY.  Shortly

thereafter, investigators observed OLIVERAS exit SKY GROCERY and he was empty handed.

154.    Shortly after OLIVERAS left SKY GROCERY, OLIVERAS received a call over

Target Telephone 7 from an unidentified male associate who uses telephone number 860-853-

5097 (referred to as "UM5097") and they discuss, in part, the following:

OLIVERAS: I just finished talking to my **Dominican** nigga just now too. Because
                remember that I was telling you I got somebody else at fifty five (55)

UM5097: Yeah [Voice Overlap]

OLIVERAS: Well uhmm [clears throat]I victimized myself right now. So I told them,
                "listen man I can't compete with all this nigga right here paying fifty five
                (55) and shit. I'm over here getting for this number and shit like... Are you
                going to give it to me at this number. Or I gotta go elsewhere and find it. I
                still fuck with you, we could do up or whatever but anything else I just
                gotta go." He was like, "nah, nah two days, give me two days, you going
                to get another number and some stronger shit."

UM5097: They already know, they know they don't want to lose you.

OLIVERAS: They don't want to lose that chicken and stuff [Voice Overlap]

UM5097: Yeah they don't want to loose that. Hell yeah, he's eating off of you too long
                man.

OLIVERAS: You know, they been eating off of me for years.

UM5097: Yeah I know [Voice Overlap]

OLIVERAS: Man listen man "this and that, we got you, just give me the money. Give me
                a couple of days and let me get shit straight." And I know I told them,
                "listen I got another one over there untouched, if I take them back they'll
                give me some new shit." "Nah I don't want to do that." I was like,
                "alright."

UM5097: Hell yeah [Voice Overlap]

> OLIVERAS: I talk to me [U/I] nigga... The new shit is already going to jump in or
> whatever. And I already got a new batch coming in so... I got this nigga is
> straight. You know what I mean?

155.    On June 10, 2018 after OLIVERAS left the SKY GROCERY, HPD officers

conducted a routine check of bodegas in the area, including SKY GROCERY.  During the check,

the HPD officers identified PERDOMO at the SKY GROCERY.  HPD officers took a

photograph of PERDOMO's CT driver license identification card.  During the check,

PERDOMO provided 860-294-2234 (i.e., Target Telephone 11) as his phone number.

156.    On June 11, 2018 at 6:04 p.m. OLIVERAS over Target Telephone 6 placed an

outgoing call to QUINONES at telephone number 860-936-5287, they discussed, in part, the

following:

> OLIVERAS: Shit, I'm jumping off the exit, um. I gotta handle a couple things. I'm gonna
> need you to um..., at least... . uhm, [U/I] I gotta go to Uhaul and grab that
> and bring that to **Domi**. [U/I] I know I'm just [U/I] to drop it off.

QUINONES: Alright

OLIVERAS: Alright? so, uhm, you're on you way?

QUINONES: What happen?

OLIVERAS: You're around?

QUINONES: Yeah, in my house.

OLIVERAS: Okay, uhm... driving though, right?

QUINONES: Yeah, I'm driving.

OLIVERAS: Yeah I wanted you out here to follow me.

QUINONES: Alright, what you wanna do? Uhm, I'll meet you uhm, Do you want me to
meet you, uhm, at the Uhaul?

OLIVERAS: No, you can go to uhm...

QUINONES: Or, go over there first? Do you want me to go to up to [Stammers] over there?

OLIVERAS: No, you can go, uhm [Stammers]... Go to like Airport Road... Go to like... uhm... you know what? Come to Sisson.

QUINONES: Alright, go to Sisson first?

OLIVERAS: Yeah, I'm going to Uhaul right now as we speak. [U/I]

QUINONES: Alright

OLIVERAS: I'ma grab that. If you can just come to U-Haul. [U/I] right now but uhm...

QUINONES: Alright, yeah I'll come through there anyway when I go over there.

OLIVERAS: Yeah, and then, uhm, we'll just meet up at Sisson and from there we'll just go to uhm...

QUINONES: Go over there...

OLIVERAS: Yeah and then when were [U/I] drop it over there. I'ma need you to go to the Shell gas station and let me know everything good on that side cause I'ma go jump on the highway once I go over there. I don't know if he going to meet me at the studio. Feel me so...

QUINONES: Yeah.

OLIVERAS: Yeah, so basically follow me the whole way [U/I] boom, boom boom. And then once I be in front of that shit you just bust a [U/I] and go back to airport road, that way I talk to him instead so by the time [U/I] you should park in the gas station or something.

157.    On June 11, 2018 at 6:14 p.m. OLIVERAS over Target Telephone 6 placed an outgoing call to QUINONES at telephone number 860-936-5287, they discussed, in part, the following:

QUINONES: Hello.

OLIVERAS: Yo.

QUINONES: What up?

OLIVERAS: Um, where you at?

QUINONES: I'ma about be coming down Laurel.

OLIVERAS: Okay, okay. I'm 'bout to just jump on the highway right now. I already got it. **Domi**, just called me. Motherfuckin', I guess his peoples got there. They waiting, so I'ma just head straight over there. So um... I don't know... Like I said, I don't if they got anything for me, so you still head down that way or whatever. But... [Voices Overlap]

QUINONES: Yeah. I'ma Park on that side street.

OLIVERAS: On the...

QUINONES: You want me to go over there... You want me to turn around and check. You probably might get there before me. [Voices Overlap]

OLIVERAS: You know, [U/I]. Go to um... I want you to go to like to Airport Road and let me know over there like... [Voices Overlap]

QUINONES: [U/I] . [Voices Overlap]

OLIVERAS: How everything over there, 'cause I'ma go that way.

QUINONES: Yeah, I know. 'Cause you 'bout to hop out there. That's why I'm trying to get there before you get there.

158.    On June 20, 2018 at 2:35 p.m. OLIVERAS over Target Telephone 6 received an

incoming call from DEJESUS on telephone number 860-707-9745, they discussed, in part, the

following:

OLIVERAS: What's going on baby boy?

DE JESUS: What up what's good?

OLIVERAS: Shit working right here.. a little something... something. You know, putting something together.

DE JESUS: Hell yeah. Nah, but I got that shirt for you right quick. I'm about to fucking bring it to you right quick.

OLIVERAS: Alright, alright. Uh... what's that... that shit you be getting off of **Domi**? You know that.. that... you know. What you was [U/I] last time, the specials? [Voices Overlap]

DE JESUS: The specials.

OLIVERAS: Okay, okay. Motherfucking um.... where you at right now?

DE JESUS: Right now I'm coming down on Broad Street.

OLIVERAS: Broad Street, alright.

DE JESUS: I'm in area by the old... by the old spot.. Around that area.

OLIVERAS: Okay, okay, okay um... you got that on you already or you was about to grab whatever. Or what you was trying to do?

DE JESUS: I got it right now. It was sample. You know what am saying? Just to see what it is.

OLIVERAS: A little Samp, um... um... yeah. I'm about to see you right now then. Where you want me to go. To the same spot I seen you last time?

159.    On June 23, 2018 at 22:46 p.m. OLIVERAS on Target Telephone 7 placed an

outgoing call to Luis RODRIGUEZ at telephone number 860-992-5782, they discussed, in part,

the following:

OLIVERAS: "Where you at? Bye bye"

RODRIGUEZ: What you about to do?

OLIVERAS: I'm counting this money, trying to get everything ready for tomorrow that I'm gonna see the **Domi** and then, ah shit come over here nigga, I'm by myself [stammers] whatever I need you [U/I] thank you.

RODRIGUEZ: Well listen to me, I'm with my brother, I'm about to pull up right now [Aside: Wait, fucker [U/I] you're very closed, you're very closed]

160.    On July 10, 2018 at 1:07 p.m. OLIVERAS on Target Telephone 10 received an

incoming call from Lisa RIOS on telephone number 860-893-3716, they discussed, in part, the

following:

OLIVERAS: Girl, I don't go over there all the time. Hell nah! I just leave when I leave and I don't go back for a while. But then I go back, I grab something and I leave. But I don't have anything over there. Only a couple... a couple of

those things that your brother has.

LISA: A couple of what?

OLIVERAS: A couple of those things that your brother has.

LISA: Weed?

OLIVERAS: [Sucks Teeth] Man, come on babe! What your brother got? Hello!

LISA: My brother?

OLIVERAS: Babe, I got a couple things of what your brother got. What's the only thing your brother got?

LISA: I don't know. [Voices Overlap]

OLIVERAS: Baby! Baby, I have a couple of guns there, baby. Damn!

LISA: My brother's?

OLIVERAS: Oh, my God, baby. Forget about it! Just... Shit!

LISA: [Laughs] Well baby, I don't know.

OLIVERAS: Baby, I'm not trying to talk. Hello! Pay attention!

LISA: It was that I went blank for a second. Okay! I get it.

OLIVERAS: I said; I got... I ain't got nothing over there. The only thing that's over there. The things that your brother got. What the heck... Your brother's don't do shit. What your brother... Do your brother... What do [U/I] got? Only that! Pay attention, babe. I said; "I ain't got nothing over there, babe. I only got a couple of those things that your brother has." You should already knew... "Okay, you have those things there." But as far as **Domi** and all that. That other stuff I ain't got none of that in there. I'm straight. You feel me? And at the end of the day, they can't do nothing to me because that's illegal search. That's entrapment, it's loop wholes. That's bullshit. You can't do that to me. The only thing is, the people that they got caught, they... They was being investigated. That's why they got with the whole U-Haul, with this, with that. If they see me, investigate me, then they can do that. But they can't just off of somebody else go through mine.

161.    Based on my training, experience and knowledge of this investigation, I believe

that these calls reveal that DOMI is source of supply of narcotics for OLIVERAS.  For example,

when OLIVERAS said in the May 7, 2018 call (discussed above) that he "just came from seeing

Domi" and he is "driving around with all that shit," I believe that OLIVERAS is saying that he

just obtained narcotics from DOMI.  In the May 8, 2018 call, I believe that OLIVERAS and

QUINONES are discussing the fact that the narcotics that OLIVERAS got from DOMI were not

good quality.  During this call, they say "this shit is powdery as fuck" and it "is not getting hard

like what it should be" and OLIVERAS discusses bringing it back to DOMI.  In the May 10,

2018 call, when OLIVERAS said that DOMI is "giving all that shit back and he's gonna bring

me a whole bunch of new shit," I believe that OLIVERAS is saying that DOMI is giving him

new product (narcotics).  During the May 13, 2018 call, when OLIVERAS says that "I got to go

see Domi, give him money," I believe that OLIVERAS is saying he needs to give narcotics

proceeds to DOMI.  In the May 21, 2018 call, I believe that OLIVERAS is saying that he has

$18,500 in proceeds and QUINONES asks, "that's what you got for Domi?" and OLIVERAS

responds, "Um-hum."  During the June 10, 2018 call, I believe that OLIVERAS tells an

associate that he just talked with DOMI about the prices of wholesale quantities of narcotics and

obtaining narcotics from DOMI at the right price.  During the June 11, 2018 call, I believe that

OLIVERAS is saying that he has to go to his U-Haul unit to grab some money (believed to be

narcotics proceeds) and "bring that to Domi."  During the June 20, 2018 call, OLIVERAS and

DEJESUS talk about getting "the specials" from DOMI, which I believe is a reference to

OLIVERAS obtaining fentanyl from DOMI.  On July 10, 2018, when OLIVERAS talks with his

girlfriend about have "a couple of guns" and not having any of the stuff that he gets from DOMI

in his U-Haul unit, I believe that OLIVERAS is saying that he does not currently have narcotics

in his unit.

**B.     Intercepted Communications with PERDOMO, aka "DOMI".**

162.     On July 6, 2018, investigators started to intercept communications over Target Telephone 10.  Beginning on July 8, 2018, investigators have intercepted communications between OLIVERAS over Target Telephone 10 and PERDOMO, aka DOMI, over Target Telephone 11.  Based on intercepted communications and physical surveillance, investigators believe that OLIVERAS is providing payment to PERDOMO and then obtaining unknown quantities of narcotics from PERDOMO on a frequent basis.  Based on intercepted calls, physical surveillance and electronic surveillance, I have determined that OLIVERAS often meets with DOMI on Sunday afternoons at the SKY GROCERY and sometimes on other days.

163.     On Sunday, July 8, 2018 at 2:47 p.m., OLIVERAS over Target Telephone 10 and PERDOMO over Target Telephone 11 began contacting each other through text message. The content of the conversation is below:

OLIVERAS: Ima come see u lil later ok

PERDOMO: Ok bro gracias

164.     On July 8, 2018 at 8:13 p.m., OLIVERAS over Target Telephone 10 placed an outgoing call to PERDOMO at Target Telephone 11, the conversation, in part, is as follows:

PERDOMO: Hello?

OLIVERAS: Ah-ha, how are you?

PERDOMO: Hey how are you bro?

OLIVERAS: I'm good, I'm good. Where are you?

PERDOMO: Here at the first (1st).

OLIVERAS: Okay I'm on my way.

PERDOMO: Okay.

165.    At approximately 8:34 p.m., location data for Target Telephone 7 revealed that OLIVERAS was in close proximity to 593 Broad St, Hartford, CT (i.e., the SKY MARKET). Based on location data, OLIVERAS spent a short period of time at the SKY MARKET and then left the area.  Based on electronic surveillance and the intercepted calls, when PERDOMO told OLIVERAS that he was at "the first," I believe that PERDOMO was referring to SKY GROCERY, and that OLIVERAS said he was on his way to meet with PERDOMO.

166.    On July 9, 2018 at 6:46 p.m., OLIVERAS over Target Telephone 10 received an incoming call from PERDOMO over Target Telephone 11. They discuss, in part, the following.

OLIVERAS: Ah-ha, how are you?

PERDOMO: Yo, how are you?

OLIVERAS: How are you?

PERDOMO: Stop by here.

OLIVERAS: Okay, where are you?

PERDOMO: At the second.

OLIVERAS: Okay I'm on my way.

PERDOMO: Okay.

167.    During this call, PERDOMO tells OLIVERAS to "stop by here" and says that he is "at the second."  Precise location information for OLIVERAS's phones revealed that he was in the area of the Family Beltre Grocery.  Based on this electronic surveillance and the intercepted calls, I believe that "the first" is a reference to the SKY GROCERY on Broad Street and "the second" is a reference to the Family Beltre Grocery on Broad Street.

168.    As investigators arrived in the area of Family Beltre Grocery, investigators observed OLIVERAS walking out the front door of the Family Beltre Grocery store. OLIVERAS had both of his hands inside of his pocket and appeared to be clutching an item on the right side of his shorts as he walked away from the business. Right after investigators observed OLIVERAS walking out of the Family Beltre Grocery, investigators observed Victor PERDOMO walk out of the Family Beltre Grocery. PERDOMO stood in front of the business and looked around for several minutes. Investigators observed OLIVERAS get into a Nissan Altima, which was driven by Jonathan QUINONES.  Investigators observed OLIVERAS and QUINONES travel to 90 Catherine Street, Hartford, CT.  OLIVERAS went inside of the building for a short period of time, while QUINONES remained inside the vehicle. OLIVERAS returned to the Nissan Altima and then QUINONES and OLIVERAS drove away from the area.

169.    On July 9, 2018 at 7:56 p.m., OLIVERAS spoke with SPIDER.  During this call, OLIVERAS tells SPIDER that he just came from seeing DOMI, he went to talk to DOMI and that he got that other new shit.  During this call, I believe that OLIVERAS is telling SPIDER that he just got new product from DOMI.  Further, the intercepted calls reveal that OLIVERAS just came from meeting with the user of Target Telephone 11 (i.e., PERDOMO) at the Family Beltre Grocery store and, based on the physical surveillance at that location, it appears that OLIVERAS met with PERDOMO at the Family Beltre Grocery.  In addition, based on physical surveillance and the intercepted calls, I believe that OLIVERAS obtained new product at the Family Beltre Grocery, which OLIVERAS brought to 90 Catherine Street, which is one of OLIVERAS's stash locations.  Moreover, as discussed herein, investigators have identified the user of Target Telephone 11 as PERDOMO, who is a Dominican male.  Indeed, as discussed above, on June

10, 2018, PERDOMO provided telephone number 860-294-2234 (i.e., Target Telephone 11) as

his phone number during a routine bodega check by HPD officers.  Further, HPD officers

identified PERDOMO inside the SKY GROCERY on June 10, 2018 after observing OLIVERAS

travel to the SKY GROCERY under circumstances which led me and other investigators to

believe that OLIVERAS had traveled to SKY GROCERY with narcotics proceeds.  After

OLIVERAS left the SKY GROCERY on June 10, 2018, OLIVERAS spoke with an associate

and told his associate that he just finished talking to his "Dominican nigga" about, in my opinion,

narcotics prices.  Based on all of this information, I believe that PERDOMO is the individual

who OLIVERAS has been referring to as "DOMI" throughout this investigation.

C.    **Identification of PERDOMO as the user of Target Telephone 11.**

170.    As discussed above, on June 10, 2018, PERDOMO provided HPD officers with

the number for Target Telephone 11 as his phone number.

171.    On July 15, 2018, investigators corroborated that PERDOMO is the user of Target

Telephone 11.  While maintaining physical surveillance on PERDOMO, at approximately 9:11

p.m., investigators called telephone number 860-294-2234 (Target Telephone 11).  As the phone

rang, investigators observed PERDOMO reach into his pocket and recover his cell phone.

PERDOMO was observed looking down at his cell phone as the phone rang.  The call went

unanswered.  PERDOMO then placed the phone back into his pocket.

172.    At approximately 9:12 p.m., investigators sent a text message to telephone

number 860-294-2234, which resulted in a response from Target Telephone 11.  At

approximately 9:12 p.m., the time investigators sent the first text message to Target Telephone

11, PERDOMO was observed reaching back into his pocket and retrieving his cell phone. PERDOMO was further observed as he began to text on the cell phone.

## EVIDENCE REGARDING FIREARMS

173.   Based on our investigation, and interceptions over the target telephones, I believe that members of this DTO, including Julio OLIVERAS, Jonathan QUINONES, Jeremy RODRIGUEZ and their associates, have had possession of firearms during this investigation and likely still have access to firearms.  Evidence that members of this DTO having access to firearms includes, *inter alia*, the following:

a.      During an incident which occurred on April 17, 2018, which was captured on a pole camera in the area of Bedford St, Hartford, CT.  The pole camera captured Jeremy RODRIGUEZ involved in a fight taking place between a large group of individuals on Bedford St.  Jeremy RODRIGUEZ attempted to disrupt the fight, but was unsuccessful. Jeremy RODRIGUEZ then entered into **SUBJECT PREMISES #2** and returned outside with what appears to be a firearm in his hands.  Jeremy RODRIGUEZ can be seen pointing the suspected gun into the air, at which time it appears that he fires the suspected gun into the air an unknown amount of times.  Intercepted communications taking place after this incident between Jeremy RODRIGUEZ and Antonio JOHNSON further indicate that Jeremy RODRIGUEZ retrieved a firearm from within 56 Bedford St, discharged it, and utilized another unknown individual to "dispose" of the firearm.  JOHNSON tells Jeremy RODRIGUEZ, "you gotta get some bleach too yo. Get some bleach, soak your hand in bleach for a second." JOHNSON is telling Jeremy RODRIGUEZ to do this in an effort to get the gun powder off of his hands.

b.      During intercepted calls which are discussed in greater detail in below,

OLIVERAS talks to QUINONES about "Blickys" (firearms) and maintaining a stash of firearms at **SUBJECT PREMISES #10**. During a call with his girlfriend on July 10, 2018, OLIVERAS tells her that he has "a couple of guns" at his storage unit. Based on this information, there is a significant likelihood that OLIVERAS and his associates maintain firearms at **SUBJECT PREMISES #5, 6 and 7,** and use **SUBJECT PREMISES #10** to store extra firearms. Through my training and experience, it is common for narcotics traffickers to have firearms readily accessible within stash house locations. This is done to protect their narcotics and proceeds from rival drug dealers or stick up crews. The fact that certain members of this DTO have firearms presents a significant threat to law enforcement officers conducting search warrants.

<u>**OTHER EVIDENCE REGARDING THE SUBJECT PREMISES**</u>

A.     <u>**95 Spring St, Apartment 1K, Hartford, CT (SUBJECT PREMISES #1)**</u>

174.    As discussed in this affidavit, intercepted communications, physical surveillance, electronic surveillance, walled-off arrests and controlled purchases of narcotics have revealed that Jeremy RODRIGUEZ stashes narcotics and conducts narcotics transactions at 95 Spring Street, Apartment 1K, Hartford, CT (**SUBJECT PREMISES #1**) and 56 Bedford St, 2nd Floor Hartford, CT (**SUBJECT PREMISES #2**).

175.    95 Spring Street, Apartment 1K, Hartford, CT (**SUBJECT PREMISES #1**) is Jeremy RODRIGUEZ's residence. The phone used by Jeremy RODRIGUEZ (860-655-0977) is subscribed to Jeremy RODRIGUEZ of 95 Spring Street, Hartford, CT. It should also be noted that telephone number 860-655-0977 was in the Hartford Police Department in-house database as a result of a medical call from 95 Spring Street, Hartford, CT in 2016. A check of the Transunion law enforcement database for Jeremy RODRIGUEZ showed his most recent address

as 95 Spring Street, Hartford, CT.  Throughout this investigation, investigators conducting

physical surveillance have observed Jeremy RODRIGUEZ go to and from the building at 95

Spring Street.

176.     An administrative subpoena to Eversource Energy revealed that the account

holder of 95 Spring St., Apt. 1K, Hartford, CT (**SUBJECT PREMISES #1)** is Robert Campbell,

who, as discussed herein, has been incarcerated in Florida since February 5, 2018.  As discussed

in this affidavit, Campbell is a relative and narcotics associate of Jeremy RODRIGUEZ.  Myself

and other investigators believe that Campbell was ORTIZ's and Jeremy RODRIGUEZ'S

primary source of supply of narcotics prior to Campbell's arrest.  It is your affiant's belief that

Jeremy RODRIGUEZ uses Campbell as the account holder for Eversource Energy in an attempt

to insulate himself from law enforcement detection.  It bears mentioning that when CS-1

conducted the controlled transaction on February 23, 2018, CS-1 saw an ID card for Robert

Campbell inside the apartment.

177.     Based on intercepted communications, it appears that Jeremy RODRIGUEZ will

have trusted customers or individuals who are purchasing narcotics wait curb-side along Spring

Street in close proximity of **SUBJECT PREMISES #1**, at which time Jeremy RODRIGUEZ or

an associate will meet with the customer inside or around their vehicle.  Specifically, with

regards to **SUBJECT PREMISES #1,** there are multiple telephone calls, text messages, E-911

location data ("pings") and physical surveillance that show that Jeremy RODRIGUEZ is utilizing

**SUBJECT PREMISES #1** to not only reside at as his primary residence, but also to process,

package, stash and distribute narcotics.

178.     For example, as discussed above, during the controlled purchase on February 23,

2018, ORTIZ directed VELAZQUEZ to take CS-1 to 95 Spring Street so that VELAZQUEZ could get 10 grams of fentanyl from Jeremy RODRIGUEZ and sell it to CS-1. Prior to the transaction, ORTIZ called Jeremy RODRIGUEZ to ensure that Jeremy RODRIGUEZ was at his house (i.e., 95 Spring St.). ORTIZ told Jeremy RODRIGUEZ that he was going to send his girl (VELAZQUEZ) over. ORTIZ told VELAZQUEZ not to take CS-1 inside. When VELAZQUEZ and CS-1 arrived in the area of 95 Spring St., VELAZQUEZ called Jeremy RODRIGUEZ. Because CS-1 wanted to see the fentanyl weighed on a scale before purchasing it, CS-1 went inside with VELAZQUEZ. Both CS-1 and VELAZQUEZ went inside Jeremy RODRIGUEZ's apartment, where CS-1 conducted the controlled purchase of approximately 10 grams of fentanyl directly from Jeremy RODRIGUEZ. During the timeframe of the controlled purchase, E-911 data revealed that telephone number 860-655-0977 (Jeremy RODRIGUEZ's phone) was within close proximity of **SUBJECT PREMISES #1**.

179.    After the February 23, 2018 controlled purchase, investigators debriefed CS-1. The CS said that s/he and VELAZQUEZ walked into the 95 Spring Street entrance, walked up a small flight of stairs, turned right down the hallway and entered the last door on the right side. Investigators understand that this apartment is Apartment 1K. On July 17, 2018, investigators sent an undercover officer into 95 Spring St. to look at the layout of the premises. While the officer noted that the door to this apartment did not have a number and/or letter on it, the officer believed that it was Apartment 1K. The officer noted that the apartment in the same location on the floor directly above this apartment is identified as Apartment 2K.

180.    Throughout this investigation, Jeremy RODRIGUEZ frequently directed customers to travel to 95 Spring St. to conduct narcotics transactions. Indeed, as discussed in

detail above, on May 8, 2018, Jeremy RODRIGUEZ directed both Jacob Burbank and

Christopher Smith to go to 95 Spring Street to conduct narcotics transactions.  On both

occasions, the customers arrived in front of **SUBJECT PREMISES #1** and conducted a

narcotics transaction with a person who I believe, based on the circumstances, was serving as a

runner for and acting under the direction of Jeremy RODRIGUEZ.  Investigators conducted two

independent motor vehicle stops of Burbank's car and Smith's.  During the stops, investigators

seized the narcotics that Burbank and Smith had purchased from Jeremy RODRIGUEZ.  Both

Burbank and Smith were arrested for state offenses.  Moreover, upon their release from custody,

both Burbank and Smith continued to communicate with Jeremy RODRIGUEZ and order

narcotics from Jeremy RODRIGUEZ, as demonstrated in intercepted communications occurring

after their arrests and release from custody.  Indeed, on the same date, Burbank called Jeremy

RODRIGUEZ and said that he spilled water all over everything that Jeremy RODRIGUEZ gave

him.  Burbank told Jeremy RODRIGUEZ that he wanted another two and a half, and Jeremy

RODRIGUEZ directed Burbank to come back to Spring Street.  Likewise, on the same date,

Smith called Jeremy RODRIGUEZ and asked for B, and Jeremy RODRIGUEZ directed Smith to

come to the same spot.

181.    Another example occurred on May 23, 2018.  As discussed in detail above, during

intercepted communications between Jeremy RODRIGUEZ and OLIVERAS on May 23, 2018,

they arranged to meet at 95 Spring Street to conduct a narcotics transaction.  During an

intercepted call, Jeremy RODRIGUEZ said he was going to come right out and OLIVERAS

affirmed.  E-911 data over Target Telephones 6 and 7 had the devices in close proximity of 95

Spring Street around this time.  Further, E-911 data over Target Telephone 4 had the device in

close proximity to 95 Spring Street at this time.  Based on the intercepted calls between Jeremy

RODRIGUEZ and OLIVERAS (which are discussed in detail above), and the ping information, I

believe that OLIVERAS picked up a drug debt from Jeremy RODRIGUEZ, and also resupplied

Jeremy RODRIGUEZ with 150 grams of suspected heroin/fentanyl.

182.    These are just some of many calls and text messages during which Jeremy

RODRIGUEZ arranged and/or directed customers and associates to come to 95 Spring St.

(**SUBJECT PREMISES #1**) to conduct narcotics transactions.  Intercepted communications

throughout this investigation, combined with physical surveillance and electronic surveillance,

establish that Jeremy RODRIGUEZ meets narcotics customers in order to effect narcotics deals,

maintains large quantities of narcotics and collects narcotics proceeds from customers at his

residence at **SUBJECT PREMISES #1**.

183.    As noted above, on May 3, 2018, Jeremy RODRIGUEZ directed Terri Labarre to

come to 56 Bedford St. conduct a transaction for two bundles of heroin.  After the transaction,

investigators conducted a motor vehicle stop of Labarre and seized the two bundles of heroin.

After Labarre was released from custody, Labarre continued to communicate with Jeremy

RODRIGUEZ to arrange to buy narcotics.

184.    On July 17, 2018, surveillance officers drove by 95 Spring St. and observed

Labarre's car parked on the curb outside of 95 Spring St.  Investigators observed a male, who

matched the physical description of Jeremy RODRIGUEZ (but investigators were not able to

positively identify this male), walking away from Labarre's car.  Labarre's car then drove away

from 95 Spring St. in a manner consistent with having conducted a narcotics exchange.  Indeed,

this is the same manner in which Labarre purchased narcotics from Jeremy RODRIGUEZ on

May 3, 2018 and the same manner in which numerous other customers have purchased narcotics from Jeremy RODRIGUEZ at both 95 Spring St. and 56 Bedford St.

185.    Based on the intercepted calls, text messages, E-911 location information, and physical surveillance and other evidence, I believe that Jeremy RODRIGUEZ sells narcotics from **SUBJECT PREMISES #1**, collects money obtained from narcotics trafficking, and maintains narcotics at **SUBJECT PREMISES #1** for customers.  As such, there is probable cause to believe that narcotics, packaging materials, drug paraphernalia and proceeds from Jeremy RODRIGUEZ'S narcotics sales are likely to be found within **SUBJECT PREMISES #1**.

186.    In addition, **SUBJECT PREMISES #1** is Jeremy RODRIGUEZ's residence. Based on my training and experience, I believe that Jeremy RODRIGUEZ's residence (**SUBJECT PREMISES #1**) will contain other evidence of Jeremy RODRIGUEZ's narcotics trafficking activities, including: cellular telephones used by Jeremy RODRIGUEZ; books, notes, ledgers and other papers and documentation relating to the transportation, receipt, sale and distribution of controlled substances, and the laundering of drug proceeds; proceeds of drug sales and records of drug transactions; evidence of unexplained income or wealth; documentary evidence of money transfers; contraband, quantities of narcotics, scales, cutting agents, diluents and drug packaging materials; addresses or telephone numbers containing information regarding narcotics trafficking associates; identification documents, keys evidencing a possessory interest in and records relating to residences, other premises, vehicles, storage containers, mail boxes (including P.O. Boxes) and other assets used to facilitate and/or that represent the proceeds of narcotics trafficking activities.

B.    **56 Bedford St, 2nd Floor Hartford, CT (SUBJECT PREMISES #2).**

187.    As discussed above, based on intercepted communications, physical surveillance, walled-off arrests and other evidence, I believe that Jeremy RODRIGUEZ stashes narcotics and conducts narcotics transactions at 56 Bedford St, 2nd Floor Hartford, CT (**SUBJECT PREMISES #2**) and 95 Spring Street, Apartment 1K, Hartford, CT (**SUBJECT PREMISES #1**).

188.    On July 9, 2018, in response to an administrative subpoena, Eversource Energy revealed that the account holder of **SUBJECT PREMISES #2** is a Jamilett Rodriguez with the listed number 860-655-3180.  Jamilett Rodriguez is the sister of Jeremy RODRIGUEZ.  During this investigation, investigators have intercepted Jamilett Rodriguez and Jose COTTO using telephone number 860-655-3180 to communicate with Jeremy RODRIGUEZ.  Based on intercepted calls and other evidence, it appears that Jeremy RODRIGUEZ's mother and possibly Jamilett Rodriguez and COTTO reside at **SUBJECT PREMISES #2**.

189.    During this investigation, investigators installed a pole camera in close proximity to **SUBJECT PREMISES #2**.  Based on the pole camera, intercepted calls, physical surveillance and other evidence, it was apparent that Jeremy RODRIGUEZ and his associates sell narcotics from **SUBJECT PREMISES #2**.  During numerous intercepted calls, Jeremy RODRIGUEZ and his associates referred to **SUBJECT PREMISES #2** as the "block."  Often, Jeremy RODRIGUEZ directed his customers to pull up in their car in front of **SUBJECT PREMISES #2** and either Jeremy RODRIGUEZ or one of Jeremy RODRIGUEZ's runners or associates would go to the customer's car to conduct the narcotics transaction.  Below are examples of intercepted calls and other evidence involving **SUBJECT PREMISES #2**:

190.    As discussed in detail above, on May 3, 2018, investigators intercepted calls between OLIVERAS and two customers, Cameron Desena and Terri Labarre, during which Desena and Labarre arranged to purchase narcotics from OLIVERAS.  OLIVERAS directed both customers to come to the area of 56 Bedford Street to conduct the transaction.  For example, on May 3, 2018 at approximately 11:25 a.m., Desena called Jeremy RODRIGUEZ said, "I need two (2) and a half (1/2)" and Jeremy RODRIGUEZ responded, "Alright come to Bedford." Investigators established surveillance in the area of 56 Bedford Street, Hartford, CT (**SUBJECT PREMISES #2**) and observed both Desena and Labarre travel to the area of 56 Bedford St. and park their car on the curb outside of 56 Bedford St.  On both occasions, investigators observed what appeared to be a narcotics transaction between the customer (i.e., Desena and Labarre) and a person, who I believe was a runner or an associate of Jeremy RODRIGUEZ, who was acting under the direction of Jeremy RODRIGUEZ.  As discussed above, investigators conducted motor vehicle stops of both Desena and Labarre after they drove away from **SUBJECT PREMISES #2**.  In both instances, investigators seized the narcotics that Desena and Labarre had obtained from Jeremy RODRIGUEZ and his associates.  Further, upon their release from custody, Desena and Labarre both continued to communicate with Jeremy RODRIGUEZ and order narcotics from Jeremy RODRIGUEZ.

191.    There are numerous other examples of Jeremy RODRIGUEZ and his associates using **SUBJECT PREMISES #2** to facilitate their narcotics trafficking activities.  For example, on April 18, 2018 at approximately 6:19 p.m., Jeremy RODRIGUEZ spoke with Jamilett Rodriguez and an unidentified female called "Ally" over telephone number 860-655-3180 (which is Jamilett's telephone number according to the Eversource account information for

**SUBJECT PREMISES #2).**  During this call, they discussed the following:

Jamilett:        Hello!

Jeremy RODRIGUEZ:        Hello!

Jamilett:        Yo!

Jeremy RODRIGUEZ:        Yo where Ally at?

Jamilett:        In the kitchen eating.

Jeremy RODRIGUEZ:        Put her on right quick.

Jamilett:        [Aside: Ally]

Ally:        Yo!

Jeremy RODRIGUEZ:        Yo!

Ally:        Yeah!

Jeremy RODRIGUEZ:        Go in my mom room, grab the book bag and take out one
        stack. And give it to Heavy [Voice Overlap]

Ally:        You put it her room?

RODRIGUEZ: Yes I put it in her room. Just take out one stack, and put it... And give it
        to Heavy he outside.

Ally:        That's five (5) or ten (10)?

RODRIGUEZ: Tha's ten (10) bundles.

Ally:        Alright bye.

192.    Based on my training, experience and knowledge of this investigation, in this call
I believe that Jeremy RODRIGUEZ was directing Ally to go into Jeremey RODRIGUEZ's
mother's room within **SUBJECT PREMISES #2** and to remove a "stack" of heroin/fentanyl
from a book bag.  Jeremy RODRIGUEZ explains that a "stack" is "10 bundles" (i.e., 100 bags).
Jeremy RODRIGUEZ tells Ally to give the narcotics to "Heavy" (RIVERA).

193.     Another example is on May 22, 2018.  At approximately 11:57 a.m., Jeremy

RODRIGUEZ spoke with a person called "Nick," who, based on intercepted calls, is a frequent

narcotics customer of Jeremy RODRIGUEZ.  They discussed the following:

RODRIGUEZ:   Go to Bedford, I got you. Just, don't talk on the phone. [Voices Overlap]

Nick:        All right, a'ight, a'ight, a'ight, a'ight.

RODRIGUEZ:   Hello.

Nick:        Yo, I just got off the exit. I'll be over there in a minute.

RODRIGUEZ:   You said what?

Nick:        I'll be, I just got off the exit. I'll be over there in a minute. I'm at the light.

RODRIGUEZ:   Uh, what you wanted?

Nick:        Three (3) and a half.

RODRIGUEZ:   Three (3) and a half? How much you got?

Nick:        90.

RODRIGUEZ:   [U/I]. All right, what?

Nick:        90.

RODRIGUEZ:   Hold on hold on hold on. All right, go to um... go to Bedford. I'll be
             there like in 3 minutes.

Nick:        All right.

194.     Based on my training, experience and knowledge of this investigation, I believe

that Nick is arranging to buy a quantity of narcotics (likely, 3 ½ bundles of heroin) for $90.

During this call, Jeremy RODRIGUEZ directs COFFER to go to Bedford (i.e., **SUBJECT**

**PREMISES #2**) to conduct the transaction.

195.     As stated, Jeremy RODRIGUEZ and his associates often refer to **SUBJECT**

**PREMISES #2** as the "block".  For example, on May 25, 2018, at approximately 11:27 a.m., Jeremy RODRIGUEZ spoke with an unidentified male ("UM") and they discussed the following:

RODRIGUEZ:  What up cousin?

UM:              Where you at cousin?

RODRIGUEZ:  I'm at the block.

UM:              Alright, I'm about to pull up to give you that, and I need another one, the white guy wants another one.

RODRIGUEZ:  What did you want?

UM:              He wants umm, two (2) more.

RODRIGUEZ:  What, two (2) Bs?

UM:              I have the two, the two I owe you and two (2) more that he wants. I'm gonna be with him, I'm around Williams.

RODRIGUEZ:  Two (2) Bs?

UM:              Uh-huh.

RODRIGUEZ:  Let me see.

UM:              I'm going over now.

RODRIGUEZ:  Go ahead.

UM:              Go ahead. [Aside: Yo, we gotta go to Bedford, bro]

196.    At approximately 12:02 p.m., Jeremy RODRIGUEZ and the UM again spoke and had the following conversation :

RODRIGUEZ:  Hello.

UM:              What are you doing fat boy?

RODRIGUEZ:  Here, I just got to the house. Why what up?

UM:              Man get that scooter ready nigga. We out here, man.

RODRIGUEZ:   Yo listen.

UM:               Yo.

RODRIGUEZ:   Be careful when you go through um... on Bedford.

UM:               That shit hot?

RODRIGUEZ:   There's two Narcs.

UM:               Oh word.... maybe because of what happened yesterday.

RODRIGUEZ:   Yeah, looking through that whole floor.

UM:               Got to be careful my nigga, you heard?

RODRIGUEZ:   Damn, I already left. I'm already at the house, I'm going to take a shower and have sex.

UM:               [Chuckles] I'm about to stop by and drop that off for you. You heard?

RODRIGUEZ:   Gotta hurry up daddy.

UM:               I'm about to take a shower get dressed, stop by and drop that off for you.

RODRIGUEZ:   Alright.

UM:               Alright, that's all.

197.    At approximately 12:14, Jeremy RODRIGUEZ sent to following text message to the UM: *Go to bedford st many got my work and make sure the cops lefted*.  During these communications, I believe that the UM is arranging to buy narcotics from Jeremy RODRIGUEZ, who directs the UM to **SUBJECT PREMISES #2** to conduct the transaction.  This is just another of many examples of Jeremy RODRIGUEZ conducting narcotics related transactions at **SUBJECT PREMISES #2.**

198.    Throughout this investigation, intercepted communications have revealed that Jeremy RODRIGUEZ typically conducted narcotics trafficking activities on a daily basis throughout the day.  Intercepted calls have revealed that Jeremy RODRIGUEZ continues to

conduct narcotics trafficking activities.  For example, during intercepted communications between OLIVERAS and Jeremy RODRIGUEZ on July 16, 2018, Jeremey RODRIGUEZ was arranging to obtain wholesale quantities of narcotics from OLIVERAS.  For example, during one text message on July 16, 2018, Jeremy RODRIGUEZ sent OLIVERAS the following text: "Got 73 for u right now 150 specail and 20 of brown u ready for us".  Based on my training, experience and knowledge of this investigation, I believe that Jeremy RODRIGUEZ is saying that he has money for OLIVERAS and he is looking to buy 150 grams of fentanyl (which he refers to as "special") and 20 grams of heroin ("brown").  On July 11, 2018, investigators drove by **SUBJECT PREMISES #2** and observed Jeremy RODRIGUEZ outside in front of the residence.

199.    Based on this evidence, I believe that Jeremy RODRIGUEZ and his associates use **SUBJECT PREMISES #2** to facilitate their narcotics trafficking activities.  Jeremy RODRIGUEZ meets narcotics customers in order to effect narcotics deals at **SUBJECT PREMISES #2**, he maintains narcotics at **SUBJECT PREMISES #2** and he collects narcotics proceeds from customers at **SUBJECT PREMISES #2**.  Accordingly, I believe that evidence of Jeremy RODRIGUEZ's narcotics trafficking activities is located within **SUBJECT PREMISES #2.**

C.      **53 Ward Place Hartford, CT (SUBJECT PREMISES #3)**

200.    53 Ward Place, Hartford, CT is RIVERA's residence.  During this investigation, E-911 precise location information for RIVERA's phones revealed that RIVERA was staying in the area of 53 Ward Place every night.  During this investigation, investigators installed a pole camera in the area of 53 Ward Place.  The pole camera, along with physical surveillance and

intercepted communications, revealed that RIVERA was living at 53 Ward Place.  In response to an administrative subpoena, Eversource Energy identified the account holder of **SUBJECT PREMISES #3** as Iliana Figueroa.  Intercepted communications and surveillance revealed that RIVERA and Iliana have an intimate relationship, they live together at the **SUBJECT PREMISES #3** and they have a child together.

201.    Based on my experience, training, and information learned throughout the course of this investigation, it is my belief and the belief of other law enforcement officers working on this investigation that RIVERA uses **SUBJECT PREMISES #3**  not only as his primary residence, but also as a primary location to process, package, and stash narcotics.

202.    Based on intercepted communications, surveillance and other evidence, I believe that RIVERA uses **SUBJECT PREMISES #3** to process, package, and stash narcotics.  As a result of intercepted telephone calls, text messages, pings, and physical surveillance, the affiant and other case agents have probable cause to believe, and do believe, that RIVERA maintains narcotics and the proceeds of his narcotics trafficking activities at **SUBJECT PREMISES #3**. Below are examples of intercepted calls and other evidence regarding 53 Ward Place:

203.    On April 1, 2018 at approximately 8:56 p.m., RIVERA received an incoming call from OLIVERAS.  During this call, they discussed the following:

RIVERA: Hey I am at fifty three (53) Ward place.

OLIVERAS: Okay yeah I'll go over there. I'll go over there. Don't worry about it.

RIVERA: Alright.

OLIVERAS: Over there where I seen you last time in front of the store, but you want me to go to Ward place right?

RIVERA: Yeah.

OLIVERAS: Alright. I got you. I'll let you know when I am over there.

RIVERA: Alright.

OLIVERAS: Umm, the same thing.

RIVERA: Yeah I got you... I got your money.

204.    Based on my training, experience and knowledge of this case, during this call I believe that OLIVERAS and RIVERA were arranging to conduct a transaction at RIVERA's residence at 53 Ward Place (**SUBJECT PREMISES #3**).  OLIVERAS asks RIVERA if he wants "the same thing," which I believe is a reference to the same narcotics that RIVERA purchased the last time from OLIVERAS.  RIVERA affirms and says he has money for OLIVERAS, to pay for narcotics.

205.    As another example, as discussed in detail above, based on intercepted calls and surveillance, I believe that on April 2, 2018, RIVERA obtained a large quantity of narcotics (which I believe is likely fentanyl) from an individual referred to as Waldito.  After the transaction, RIVERA drove directly back to 53 Ward Place (**SUBJECT PREMISES #3**).

206.    On April 2, 2018 at approximately 3:15p.m., RIVERA called OLIVERAS. OLIVERAS tells RIVERA that he is driving over there now (i.e., to RIVERA's residence at 53 Ward Place).  OLIVERAS tells RIVERA to tell him about that special.  RIVERA asks OLIVERAS if it is the one that OLIVERAS has, and OLIVERAS says yeah.  RIVERA tells OLIVERAS that shit is fire.  OLIVERAS tells RIVERA that he is four to five minutes away. The calls ends shortly thereafter.

207.    At approximately 3:35PM, RIVERA received an incoming call from OLIVERAS. OLIVERAS tells RIVERA that he is right here in the front.  RIVERA tells OLIVERAS to come

to the back (i.e., of 53 Ward Place). OLIVERAS asks with the car or just walking, and RIVERA tells OLIVERAS to come with the car. OLIVERAS affirms and the call ends shortly thereafter. Investigators drove by RIVERA's residence (**SUBJECT PREMISES #3**) and observed OLIVERAS's Acura and RIVERAS's black Nissan Murano parked in the rear of **SUBJECT PREMISES #3** in close proximity to each other.

208.    Based on these and other intercepted calls, physical surveillance and electronic surveillance, I believe that RIVERA maintains narcotics at **SUBJECT PREMISES #3,** and conducts narcotics related activities to and from **SUBJECT PREMISES #3.** In addition, **SUBJECT PREMISES #3** is RIVERA's residence. On July 4, 2018, Investigators drove by **SUBJECT PREMISES #3** and observed the black Nissan Murano parked along the curb in front of the residence, indicating that RIVERA still currently resides at **SUBJECT PREMISES #3**.

209.    Based on my training and experience, I believe that RIVERA's residence (**SUBJECT PREMISES #3**) will contain other evidence of RIVERA's narcotics trafficking activities, including: cellular telephones used by RIVERA; books, notes, ledgers and other papers and documentation relating to the transportation, receipt, sale and distribution of controlled substances, and the laundering of drug proceeds; proceeds of drug sales and records of drug transactions; evidence of unexplained income or wealth; documentary evidence of money transfers; contraband, quantities of narcotics, scales, cutting agents, diluents and drug packaging materials; addresses or telephone numbers containing information regarding narcotics trafficking associates; identification documents, keys evidencing a possessory interest in and records relating to residences, other premises, vehicles, storage containers, mail boxes (including P.O.

Boxes) and other assets used to facilitate and/or that represent the proceeds of narcotics trafficking activities.

**D.    8 Ellington Street, Hartford, CT (SUBJECT PREMISES #4)**

210.    As discussed herein, Robert A. Campbell, aka "Ant" and "Anthony," is a member of this DTO, who is a close associate of Jeremy RODRIGUEZ and RIVERA.  As also discussed herein, Campbell was arrested on February 5, 2018 in Sunrise, FL after Campbell and an associate attempted to purchase two kilograms of cocaine from undercover police officers.  At the time of their arrest, investigators seized approximately $47,000 from Campbell and his associate.  Campbell has been detained since his arrest.

211.    Intercepted calls and recorded prison calls have revealed that after Campbell's arrest, Jeremy RODRIGUEZ and RIVERA have been providing narcotics proceeds to Campbell's mother, Elizabeth Gallardo, aka "Cita."   This money is being provided to Gallardo on Campbell's behalf as Campbell's share of the money obtained from narcotics transactions conducted by Jeremy RODRIGUEZ and RIVERA.  Through intercepted communications, investigators discovered that Gallardo is maintaining the currency at her residence at 8 Ellington Street, Hartford, CT (**SUBJECT PREMISES #4**).  In addition to maintaining currency, intercepted calls have revealed that there may be a "stash" of narcotics (approximately 500 grams) at **SUBJECT PREMISES #4.**  Relevant intercepted communications include the following:

212.    On March 4, 2018 between 9:45 p.m. and 10:06 p.m., investigators intercepted a call between RIVERA and Gallardo.  During this conversation, Gallardo said that her son Anthony (Campbell) had called her twice today.  Gallardo and RIVERA discussed Jeremy

RODRIGUEZ's and RIVERA's involvement in the collection of money.  Excerpts from this

approximately 21 minute conversation are set forth below:

Gallardo: Whenever Anthony tells you? He gotta tell... Whatever my son tells you, he
gotta tell you in front of Jeremy so Jeremy will know what he (Anthony)
is telling you.

RIVERA:     Yeah.

Gallardo: Whatever Anthony has to tell Jeremy... you understand? Jeremy is supposed to
have you there so you could listen what he's telling Jeremy.

RIVERA:     Yeah, so tomorrow [Voices Overlap] what time you get out? at 2:00?

Gallardo: Because I don't know... to tell you the truth? I don't know what's going on. I'm
lost. And you know... I don't know what ya'll spoke with my son or
whatever ya'll talk with him [Voices Overlap] All I'm making sure is that
they're doing the right shit for him.

RIVERA:     Yeah.

Gallardo: You understand? That's all I wanna know. If they're doing the right thing. You
know? What they're supposed to do... if they're part of it, if they're not.
That's what I wanna know. Because I don't want him over there thinking
that you know... He's locked up I don't wanna him thinking: "Oh! they're
doing this, they're doing that...

RIVERA:     No! Everything is good.

Gallardo: And they're not doing nothing either.

RIVERA:     No, everything is good. Everything is straight, everything is in order. But
the way, the that I wanted to do it is like if he would be out here. Do you
understand?

Gallardo: So, that's what I'm saying that... Like [Stammers] you say, that you want to do
things like if he was out here. So that's one thing that when Anthony calls
Jeremy, and you there? that's when you gotta speak, you gotta speak what
you gotta say hey Ant... You know?

RIVERA:     Yeah.

Gallardo: Ya'll know, ya'll know your calls or whatever. And you said to him: "This is
like that, right Ant? we're gonna keep it this way." If he says yes so

Jeremy has to keep it that way and you gotta keep it that way. I don't own you guys. I can't tell you: "Oh Heavy, you're going to do it like this... oh Heavy, I want it this way." No.

RIVERA:      Yeah.

Gallardo: No, because I can't give orders to you guys. Do you understand me? I can't give orders to you guys. That's you guys over there with Anthony... [Voices Overlap]

RIVERA:      That's why I want to talk... tomorrow, tomorrow [Voices Overlap]

Gallardo: What I want to know is if you guys are doing things right with him, you know? because I don't want him to be imprisoned thinking that everything is running right and nothing is running right. Do you understand me?

RIVERA:      Yeah, but everything for the club and the show is good. All of that is good. There is no problem with that. It's the communication.

Gallardo: So, who handles that? who handles the club and the show?

RIVERA:      Jeremy!

Gallardo: Mm.

RIVERA:      He is the one who sells all the tickets, all the VIP's. He's the one selling all that.

Gallardo: Mm...

RIVERA:      I wanted to do like Anthony should do it. Every time they sell the tickets, every night.... up [U/I] it's calculated right!

Gallardo: Uh-huh.

RIVERA:      Do you understand me?

Gallardo: Yeah.

****

Later in this conversation, RIVERA and Gallardo discussed, in part, the following:

RIVERA:      You see the first show? I brought all the money there and it was okay.

Gallardo: Uh-huh.

RIVERA:       You know?

Gallardo: And that's another thing that he asked me too. That if they're bringing me his money to save it here, and I didn't tell him yes or no.

RIVERA:       Yeah.

Gallardo: I didn't tell him anything. Because I really don't know what's going on and I don't wanna say something that is not right.

RIVERA:       So the other time, remember that I was collecting all the money for the ticket, and [U/I] then, Anthony said, "No." So I'm like, "What the hell you want me to do?" [Voices Overlap]

                                     ****

Later in this conversation, RIVERA and Gallardo discussed, in part, the following:

Gallardo: Yeah, but it's like you say. It's like, it's like I said. If Anthony told you to get the tickets for the show or whatever and bring them on over here, that's what y'all supposed to be doing. That's what you should be doing, because that's what you wanted to do, and that's what... to make it better.

RIVERA:       Yeah.

Gallardo: So it's like...

RIVERA:       No, it's up to Anthony, what he wanna do. If he wants me to do that, that's fine. [Voices Overlap]

                                     ****

Later in the conversation, RIVERA and Gallardo continue to discuss collecting money from the tickets and bringing money to Gallardo. RIVERA tells Gallardo, "yeah, but the tickets are very slow." Gallardo confirms that money from the tickets belongs to Campbell, stating, in part, "Because that's the money that Anthony... That, that for what I see, I think it's his profit, right?" and RIVERA responds, "Yeah."

213.    Based on my training, experience and involvement in this investigation, during this call I believe that Gallardo (Campbell's mother) is speaking to RIVERA about profits from

106

narcotics sales. When Gallardo said, "And that's another thing that he asked me too. That if

they're bringing me his money to save it here," I believe that Gallardo was saying that Campbell

asked her if RIVERA and Jeremy RODRIGUEZ were bringing money from narcotics sales to

Gallardo's residence and that Campbell wanted Gallardo to save it at her residence. When

Gallardo said, "If Anthony told you to get the tickets for the show or whatever and bring them on

over here, that's what y'all supposed to be doing," I believe that Gallardo is saying that if

Campbell instructs them to bring the money from narcotics sales to Gallardo's residence, then

that's what RIVERA and Jeremy RODRIGUEZ should be doing.

214.    As another example, on May 11, 2018 at 11:48 a.m. Jeremy RODRIGUEZ called

JOHNSON and they discussed, in part, the following:

> RODRIGUEZ: Was telling me that [Stammers] I don't know if is true or not. But I'm
> waiting until the dude confirm me. Cause I guess Peluca told him that, oh
> at An't mom's house we keep everything. And [Stammers] my uncle is
> like; "yo how do I know that"? "How my boy know, cause Peluca was
> telling him, I ma bring you him, and he's going to tell you Jeremy" And I
> was like; "for real." And "like yeah, you wanna know what he really told
> it us." And I said; "what he told ya?'" That he said that we got money and
> half a Key inside his house.

> JOHNSON: Wow!

> RODRIGUEZ: So I'm not going to bring Peluca. I might as well just bring tio (uncle)
> Lui.

> JOHNSON: Tio (uncle) Lui okay. Alright I'm about to be there in live [Voice Overlap]

> RODRIGUEZ: I'm about to hop in a quick shower, and then I'm about to just go get the
> car. If anything I'll go over there with my girl.

> JOHNSON: Okay!

> RODRIGUEZ: Alright!

215.    Based training, experience and knowledge of this investigation, during this call I

believe that Jeremy RODRIGUEZ is telling JOHNSON that an unidentified male known as PELUCA was talking about Jeremy RODRIGUEZ and his associates keeping a large sum of U.S. currency and a half a kilogram of narcotics at **SUBJECT PREMISES #4**. Based on the reactions from Jeremy RODRIGUEZ and JOHNSON, I believe that it affirms the investigators' beliefs that PELUCA's statements were true. Jeremy RODRIGUEZ mentions confronting PELUCA about whether he truly made these statements. Based on this conversation and other conversations, I believe that Gallardo is maintaining an undetermined amount of U.S. currency and narcotics within **SUBJECT PREMISES #4** on behalf of Campbell.

216.    On May 20, 2018 at 12:18 p.m., Jeremy RODRIGUEZ called RIVERA and they discussed, in part, the following:

RIVERA: Hello.

RODRIGUEZ: Yo.

RIVERA: Hey.

RODRIGUEZ: Yo, what you tell Cita last night?

RIVERA: Huh?

RODRIGUEZ: What you told Cita last night?

RIVERA: No, I asked her how much he got and she said that he got 600 pesos.

RODRIGUEZ: Oh, she said.. she told... she said... She she said, she said, nigga nigga, she said... She didn't know that i was in a three-way with Unk. She told Unk that you called her, and you told her, and that you asked her; "Oh, how much you got? They gave you?" That she told you 800, and then, that you told her, that you told her; "Nah, it's supposed to be more than that." And that... [Voices Overlap]

RIVERA: No, you you... No, I told her, um... "Little bro said 900 dollars," and she said; "No, I only I only got 600."

217.    Based training, experience and knowledge of this investigation, during this call I

believe that J. RODRIGEZ and RIVERA are discussing how much money was paid to Cita

(Gallardo) on Campbell's behalf.  There appears to be a discrepancy in how much Gallardo

received from Jeremy RODRIGUEZ and Gallardo is making an issue out of it with RIVERA.

This conversation further indicates that Gallardo is receiving money on behalf of Campbell, and

that the money is coming from Jeremy RODRIGUEZ's and RIVERA's narcotics proceeds.

218.    The following is a synopsis of an intercepted communication between Jeremy

RODRIGUEZ and JOHNSON which occurred on May 17, 2018:

> JOHNSON: I said yo, out of the money that's over there at the house? It might've came from that. But the money that we got out here? 'Cause he said to go talk [U/I] first, and blah blah blah. That's what we gonna do. So before she give any money, we gonna go see Harry's sister. [Voices Overlap]

> RODRIGUEZ: She was like, oh, that um... That, that ain't nobody getting no money. That she told Ant that she don't care if he tell her to give it to her. She's... Nobody is touching his money. And that supposedly she was like that Ant was mad when he was speaking with her last night. Cause he said that, he found out that Harry was talking shit about him. And that Harry going to say something to him, when go to court type shit.

> RODRIGUEZ tells JOHNSON that Cita told him that yesterday.

> RODRIGUEZ tells JOHNSON that he told Cita that he will go see her today.

> JOHNSON tells RODRIGUEZ that he does not think Cita is telling the truth about that, because she did not tell him anything about that.

> RODRIGUEZ tells JOHNSON that she told him.

> RODRIGUEZ tells JOHNSON that everything he's telling him it came out of her mouth. JOHNSON acknowledges.

> RODRIGUEZ repeats himself and tells JOHNSON that Cita she's not going to give Harry's shit or nothing.

> JOHNSON tells RODRIGUEZ that Cita called him last night to explain what the lawyer said to cuzzo

> JOHNSON tells RODRIGUEZ that today he will bring the paperwork for the lawyer.

JOHNSON tells RODRIGUEZ that he asked Cita if he could give him $500.00 dollars and that Cita acknowledge.

JOHNSON: So whatever Cita's talking about that's for the Bird [P/H] you know what I'm saying I told her last night. I said this is a business move he doing, there's nothing to do personal. The money over there, you can keep that money over there, the money out here when he said he wants to use for something. We going to use it for something, but before they get money I want to talk to him. So I could see if he telling or not. Cause if he's telling he don't get no money.

RODRIGUEZ: But [Stammers] I'm trying to say... What we gotta stop doing too Unk... I mean we don't even need to stop doing that. That's [Stammers] him, if he comes out short that's him. Stop touching this money over here, we should start touching the money at his mom. Cause it makes more... Don't you think it makes more sense, if he gets two (2) G's of us, you know what I'm saying? And not touch this shit, just the ones that he got over there.

219.    Based training, experience and knowledge of this investigation, I believe that Gallardo has direct control over all money that is being saved for Campbell. When Jeremy RODRIGUEZ mentions "2 G's," I believe that he is talking about the $2,000 that they are attempting to provide to Gallardo on behalf of Campbell on a weekly basis. It appears they are having trouble gathering $2,000 a week to provide because they are covering other costs on behalf of Campbell as well.

220.    On May 7, 2018 at 3:45 p.m., Jeremy RODRIGUEZ called JOHNSON and they discuss, in part, the following:

RIVERA: Listen, listen, I'ma tells you what I talked. He's like yo you gotta be strong on theses blah, blah, blah. You know, you got to tell them you the one running shit. I said, yo how I'ma tell a grown man this and that. They're not going to listen to me, that's, he.... little [U/I] doing that for, which you... more than me, so I can't sit here and be like yo give me the fall. He's like, I'ma take the falling and none of y'all are gonna make no fucking money, blah, blah, blah. Right down on the fucking phone though.

JOHNSON: He he called me right, this what he said.. I told him, I said yo listen

[Voices Overlap]

RIVERA: I can call Cuzzo, and he'll break it down for you. He, he, he's doing all that. I'm just picking up. They told me bumm, this what it is, that's it.

JOHNSON: Okay, yeah.

RIVERA: I told him.

JOHNSON: As far the, as far the um money what Cita can't... Cita can't pick the money up, and I told her that we still have the other money coming, right? So, so... but when, but when he was talking to me, he was, he, he said... I said, yo you said you wanted every week before the [U/I]. He was like, he was like, oh yeah I, oh yeah I [U/I] that. I said but, what's the problem? He said, no Biggie said that nobody ain't listening to him.

RIVERA: No I said ain't nobody gonna listen to me, big grown man. I said ain't nobody gonna to me. They grown as men [Voices Overlap]

JOHNSON: Well he know, like I told him, after the money got [Voices Overlap]

RIVERA: All right like he said, he told me [Voices Overlap]

JOHNSON: I told him after the money got taken out for the motherfucking, the 200 and I told him that the motherfucking... ugh, the batch that this motherfucker [Voices Overlap]

RIVERA: Did he tell you that he don't want you dealing with none of the money on that? [Voices Overlap]

JOHNSON: Yeah, so. He's just [U/I] the fuck out man. Like I said, Cita got the money. He got the money.... like I said, so that shit's done; know I'm saying?

221.    Based on my training, experience and knowledge of this investigation, I believe

that RIVERA and JOHNSON are discussing a conversation that they previously had with

Campbell.  It appears that JOHNSON spoke with Campbell and Campbell was upset that money

was not being given to Gallardo every week for him.  JOHNSON also makes reference near the

end of the call that "Cita got the money. He (Campbell) got the money... Like I said, so that shits

done".  This statement affirms investigators' beliefs that Jeremy RODRIGUEZ and his

associates are providing money to Gallardo on behalf of Campbell. Based on these calls, it appears that they are attempting to provide money to Gallardo on a weekly basis as well.

222.    On July 11, 2018, investigators received an administrative subpoena from Eversource in regards to **SUBJECT PREMISES #4**. The account holder for **SUBJECT PREMISES #4** is Elizabeth Gallardo. This indicates that Gallardo is still actively residing at **SUBJECT PREMISES #4**.

223.    On July 12, 2018, investigators drove by **SUBJECT PREMISES #4** and observed the white Acura ZDX which was utilized by several members of this DTO throughout the investigation. Campbell is the true owner of this vehicle, and Gallardo is maintaining the vehicle for him while he is in prison. The vehicle is parked in the driveway at **SUBJECT PREMISES #4**. On multiple occasions, investigators conducting physical surveillance have observed Gallardo driving this this Acura ZDX. Based on physical surveillance, it appears to be Gallardo's primary vehicle. This indicates that Gallardo is still actively residing at **SUBJECT PREMISES #4**.

224.    Earlier this week, investigators received recorded copies of Campbell's prison phone calls from the time period of July 9, 2018 through July 15, 2018. The recorded phone conversations were provided by the Broward County Sheriff's Office in Florida. The exact date and time of the call below is not available; however, it is known that the call occurred during the aforementioned time period. Below are relevant parts of a conversation between Campbell and JOHNSON:

> Campbell: Lil bro said he was gonna see my mom again like Tuesday or Wednesday
>
> JOHNSON: Why Tuesday or Wednesday?

JOHNSON: I don't know cuzzo, that's, that's you gotta be on him, I don't know feel me, he know what was supposed to be the deal I said, feel me, I said it's supposed to be...feel me

JOHNSON: I'm gonna tell him, Sunday im gonna holla at him, lil bro be in his own world

Campbell: You gotta be on him man, he feel me...gotta come correct every week, that's supposed to be...feel me... talking about Wednesday that way too long bro, feel me....I need some bread man

JOHNSON: I'm definitely gonna swing through there when we leave here

Campbell: I need my bread, It's supposed to be every week yo, whatever I told you, every week whatever on the back end when they get done.

225.    Based on this call, I believe that Campbell is talking about Jeremy RODRIGUEZ (Lil Bro) bringing bread (money) to his mom (Gallardo) every week.  Throughout the call, it appears that Jeremy RODRIGUEZ has not been bringing money on a consistent basis as Jeremy RODRIGUEZ and Campbell had agreed upon.  Campbell is asking JOHNSON to talk to Jeremy RODRIGUEZ and resolve the situation.  This conversation also bolsters my belief that Gallardo is still maintaining money for Campbell, which is being provided by Jeremy RODRIGUEZ through narcotics sales.

**E.      5 Gray Street, Apartment # 3, Hartford, CT (SUBJECT PREMISES #5)**

226.    Based on intercepted calls, physical surveillance and other evidence, I believe that OLIVERAS uses **SUBJECT PREMISES #5** as a location to process, package, stash and distribute narcotics.  OLIVERAS does not have customers enter **SUBJECT PREMISES #5.** OLIVERAS directs street-level customers to an adjoining or nearby street (typically Edgewood or Warrenton Street), where one of OLIVERAS's runners or associates sells narcotics to the customer.  OLIVERAS's customers typically are sold narcotics at this location by SPIDER, who

appears to be at **SUBJECT PREMISES #5** on daily basis and may live at that location.  During

physical surveillance, investigators have observed SPIDER leaving **SUBJECT PREMISES #5**

to serve a customer on Edgewood or Warrenton Street and then returning to **SUBJECT**

**PREMISES #5**.

227.    An administrative subpoena to Eversource Energy revealed that the account

holder of **SUBJECT PREMISES #5** is an Angel ROMAN.  Two telephone numbers were listed

for ROMAN: (a) 860-491-7965 and (b) 860-796-5060.  Investigators have intercepted ROMAN

using telephone number 860-491-7965 to communicate with OLIVERAS over Target

Telephones 6 and 7.

228.    Below are examples of intercepted communication in which OLIVERAS directs

street-level customers to either Edgewood or Warrenton Street to obtain narcotics from SPIDER:

229.    On July 15, 2018 at 7:59 p.m., OLIVERAS spoke with a customer referred to as

"Ryan."  During this call, they discussed the following:

OLIVERAS:  Yo!

Ryan:        Hey can I come by?

OLIVERAS:  Yeah go to Evergreen.

Ryan:        Alright!

OLIVERAS:  Alright?

Ryan:        Alright!

230.    On July 15, 2018 at 7:59 p.m., OLIVERAS again spoke with Ryan.  During this

call, they discussed the following:

OLIVERAS:   Yeah but what you wanted though?

114

Ryan:         Uh... I just need those three (3) a "B" and a 10 of hard.

OLIVERAS:   Three (3) bags, a "B" and a 10 of hard?

Ryan:         Yeah [Voice Overlap]

OLIVERAS:   And the three bags is for who? For Ryan? I mean for Kells?

Ryan:         Yeah the extra three (3) are for Kells and then I need a "B" and a 10 of hard as well.

OLIVERAS :  Alright three (3), "B" and a 10 hard, alright I'll send him out right now.

Ryan: Alright yeah I'm pulling up so.

231.    Immediately after this call, at 8:00 p.m., OLIVERAS called SPIDER and they discussed the following:

OLIVERAS:   Yo 13 bags and a 10 of hard for Ryan he's outside.

SPIDER:      For Ryan?

OLIVERAS:   Yeah!

SPIDER:      13 bags of regular right?

OLIVERAS:   Ah?

SPIDER:      Regular right?

OLIVERAS:   Yeah regular.

SPIDER:      Alright!

OLIVERAS:   Alright!

232.    During these calls, I believe that Ryan asks OLIVERAS if he can come purchase drugs and OLIVERAS directs Ryan to Evergreen Street.  In the second call, I believe that Ryan arranges to buy three bags of heroin for an associate, a bundle of heroin and a $10 piece of crack. Immediately thereafter, OLIVERAS calls SPIDER and lets him know what product to sell to

115

Ryan.

233.    On July 15, 2018 at 8:08 p.m., OLIVERAS spoke with a customer referred to as

"Jessica."  During this call, they discussed the following:

> Jessica: Hi can me meet?
>
> OLIVERAS: Yeah go to Evergreen.
>
> Jessica: Alright fifteen minutes.
>
> OLIVERAS: Alright what you needed?
>
> Jessica: Two (2) "B" s and a half G of white if you still have it.
>
> OLIVERAS: Alright... Alright go to Evergreen.

234.    Immediately after this call, at 8:09 p.m., OLIVERAS called SPIDER and they

discussed the following:

> SPIDER: Yo!
>
> OLIVERAS: Yo two "Bs" and a half of G for Jessica, of the special.
>
> SPIDER: Fronted or?...
>
> OLIVERAS: She should have money, but if is fronted okay. [Voice Overlap]
>
> SPIDER: Alright! [Voice Overlap]
>
> OLIVERAS: But she should have the money.
>
> SPIDER: Alright!

235.    During these calls, I believe that Jessica calls OLIVERAS and arranges to buy

two bundles of heroin/fentanyl and a half of a gram of cocaine.  OLIVERAS tells Jessica to go to

Evergreen St. to conduct the transaction.  Immediately thereafter, OLIVERAS calls SPIDER and

tells him that Jessica is coming over for "two Bs and a half of G."  SPIDER asks if he should

"front" the narcotics to Jessica, meaning provide the narcotics to her on credit, and OLIVERAS says that she should have money to pay up front.

236.   Based on intercepted communications, it appears that OLIVERAS will have trusted customers or individuals who are purchasing larger quantities of narcotics (such as 50 grams or more) wait in the parking lot of **SUBJECT PREMISES #5** to conduct the transaction.

237.   For example, as discussed above, on June 6, 2018, investigators intercepted telephone calls and text messages which revealed that Jennifer JONES was planning to travel to 5 Gray Street to meet OLIVERAS for 100 of each and two ounces of crack.  Investigators set up surveillance in the area of 5 Gray Street.  Investigators observed OLIVERAS exit 5 Gray Street and walk to his truck.  Investigators observed OLIVERAS enter the driver's side of his truck as JONES entered the passenger side of the truck.  After a short meeting, OLIVERAS and JONES both exited the truck.  OLIVERAS walked back into 5 Gray Street.  JONES reentered her car and departed the area.  Investigators maintained physical surveillance on JONES's car, which was driven by Michael SPERA.  A Newington Police Officer conducted a motor vehicle stop on SPERA's and JONES's vehicle.  During the stop, NPD officer seized approximately 100 grams of suspected fentanyl, 100 grams of suspected heroin, and 70 grams of suspected crack cocaine from OLIVERAS's and SPERA's possession.  I believe that this incident shows that OLIVERAS maintains a large quantity of narcotics at **SUBJECT PREMISES #5**.

238.   As another example, based on intercepted communications on Sunday, May 13, 2018, I believed that OLIVERAS was going to see "DOMI" (who, as discussed herein, has been identified as PERDOMO) to provide him with money.  Investigators believe that the payment was for current narcotics debt or a future purchases of narcotics.  Investigators established

surveillance on OLIVERAS at **SUBJECT PREMISES #5,** where investigators observed

OLIVERAS's primary car (a blue Chevrolet Equinox) parked and unoccupied in the lot of 5

Gray Street.  Shortly thereafter, investigators observed OLIVERAS operating the blue Chevrolet

Equinox as it drove away from the area of 5 Gray Street.  Investigators maintained physical

surveillance on the vehicle as it traveled to SKY GROCERY.  OLIVERAS was observed

parking his vehicle along the west curb in front of SKY GROCERY. It should be noted that E-

911 location data on OLIVERS's phone (Target Telephone 7) had the device in close proximity

of SKY GROCERY at this time.  Investigators observed OLIVERAS exit his Equinox and carry

a black colored plastic shopping bag in his hand into SKY GROCERY.  OLIVERAS was

accompanied by another unidentified male ("UM").  The size and shape of the items within the

black plastic bag appeared to be consistent with packaged bulk currency.  Shortly thereafter,

investigators observed as OLIVERAS and the UM exited SKY GROCERY.  It should be noted

that neither OLIVERAS or the UM appeared to be carrying the black shopping bag.  Based on

my training, experience and knowledge of this investigation, I believe that OLIVERAS delivered

money for payment for narcotics to PERDOMO.

    239.    These are just some of many calls and text messages intercepted throughout this

investigation that establish that OLIVERAS uses **SUBJECT PREMISES #5** to stash and

distribute narcotics, and that OLIVERAS collects and maintains narcotics proceeds at

**SUBJECT PREMISES #5**.  Based on this evidence, there is probable cause to believe that

within **SUBJECT PREMISES #5** there is evidence of OLIVERAS's and SPIDER's narcotics

trafficking activities, including contraband, packing materials, processing materials, cell phones,

documents or records of drug trafficking activities, proceeds of narcotics trafficking activities and other evidence.

F.    <u>**44 Belmont St, Apartment FL3W, Hartford, CT (SUBJECT PREMISES #6)**</u>

240.    Intercepted communications, physical surveillance and other evidence reveal that OLIVERAS uses, among other locations, **SUBJECT PREMISES #6** to facilitate his narcotics trafficking activities.  In response to an administrative subpoeana, Eversource Energy revealed that the account holder at **SUBJECT PREMISES #6** is JULIO A OLIVERAS.  Interestingly, the phone number on the account is the number for the phone used by Angel ROMAN, which ROMAN used during numerous intercepted calls to conduct narcotics trafficking activities.  Angel ROMAN's phone number also is the phone number on the Eversource account for **SUBJECT PREMISES #5**.

241.    Based on intercepted communication, OLIVERAS does not have any customers go inside **SUBJECT PREMISES #6**.  Intercepted communications indicate that **SUBJECT PREMISES #6** has some type of barricade on the door.  For example, during an intercepted call on May 30, 2018, OLIVERAS tells an unidentified male referred to as "John" to "take uh all those uh, sticks off the door yo, cause I'm about to come upstairs right now yo".  E-911 location information at this approximate time indicated that OLIVERAS was in the area of **SUBJECT PREMISES #6**.  In addition, investigators conducting physical surveillance at **SUBJECT PREMISES #6** shortly after this conversation confirmed that OLIVERAS was at **SUBJECT PREMISES #6**.  Through my training and experience, I know that narcotics traffickers will often utilize large pieces of wood or metal in an attempt to restrict access into an area in which there is large amounts of narcotics or bulk currency.  I believe that when OLIVERAS says to

take those "sticks off the door," I believe that OLIVERAS is referring to a barricade on the door

of **SUBJECT PREMISES #6**.  This information further bolsters my belief that OLIVERAS

maintains a sizeable quantity of bulk currency or narcotics at **SUBJECT PREMISES #6**.

242.   Based on intercepted calls and other evidence, John is frequently at **SUBJECT**

**PREMISES #6**.  **SUBJECT PREMISES #6** also appears to be the residence for OLIVERAS's

mother.  Below are examples of evidence regarding OLIVERAS's use of **SUBJECT**

**PREMISES #6** to facilitate his narcotics trafficking activities.

243.   As discussed above, on June 23, 2018 at 22:46 p.m. OLIVERAS called Luis

RODRIGUEZ.  During this call, in part, "I'm counting this money, trying to get everything ready

for tomorrow that I'm gonna see the Domi (PERDOMO) and then, ah shit come over here nigga,

I'm by myself [stammers] whatever I need you [U/I] thank you."  Based on my training,

experience and knowledge of this investigation, in this call I believe that OLIVERAS is saying

that he is counting narcotics proceeds to get ready to meet with DOMI/PERDOMO, who I

believe is a source of supply of narcotics for OLIVERAS.  E-911 precise location information

for OLIVERAS's phones (Target Telephones 6 and 7) reveal that OLIVERAS was in the area of

44 Belmont Street (**SUBJECT PREMISES #6**) at the time of this call.

244.   As discussed above, based on intercepted calls and physical surveillance on May

13, 2018, I believe that OLIVERAS was going to see "DOMI" to provide him with payment for

narcotics.  On that date, E-911 precise location information revealed that OLIVERAS was at

**SUBJECT PREMISES #6**.  Investigators responded to the area and observed OLIVERAS at

**SUBJECT PREMISES #6**.  After a short period of time, OLIVERAS left **SUBJECT**

**PREMISES #6** and traveled to **SUBJECT PREMISES #5**.  Thereafter, OLIVERAS traveled to

SKY GROCERY with a bag that I suspect contained bulk currency. Based on intercepted calls and physical observations, I believe that OLIVERAS uses **SUBJECT PREMISES #5 and 6** as "stash" locations and that OLIVERAS likely obtained narcotics proceeds from both **SUBJECT PREMISES #5 and 6**, before traveling to SKY GROCERY. Based on my training and experience, I know that narcotics traffickers will sometimes separate large amounts of currency into several different locations. This is done so that if they law enforcement conducts a raid on a location or they are robbed by another individual they do not lose all of their money and narcotics. In this investigation, I believe that OLIVERAS maintains narcotics proceeds and narcotics at multiple locations, including **SUBJECT PREMISES #6.**

245.   On May 9, 2018, at 3:36 p.m. OLIVERAS called John. They discussed, in part, the following:

John:        Hello!

OLIVERAS: Hey, yo! Next time you take... Yo, don't bring nobody in the house. Just you, nigga.

John:        Nah, nobody come in the house.

OLIVERAS: Okay, okay. Yeah, don't bring nobody in the house. Like, like, like... You know I'm saying? Like bringing them. I don't want nobody in the house.

John:        You talking about your mom house?

OLIVERAS: Yeah, yeah. Nah, don't bring nobody over there.

John:        Oh no, no. I... Yeah, she kinda... She already kinda, like, said something. But I know not to do that. You know I mean?

OLIVERAS: Yeah, that's what I told you the first day.

John:        Yeah, yeah. Because, you know, I'm gonna follow you. You know, your rules. You know I mean? Like, in the end of the day like... You know, she

121

just do that to be nice. But then I already know. I don't open those doors. You know I mean?

OLIVERAS: Yeah, yeah. Nah, is because of me, nigga. I got too much shit there. You know I mean? I, I... [Voice Overlap]

OLIVERAS: Yup! [Voices Overlap]

John: Exactly. [Voices Overlap]

OLIVERAS: I'm about to go to... [Voices Overlap]

John:  Nah, I understand. Yeah, I understand. Nah, nah. The only thing is, is, you know they..., when Billy picked me up, that's it. But other than that, nobody come up here. Nah! Hell, nah.

OLIVERAS: Hell, yeah. Nah, you could meet that nigga downstairs.

[Voice Overlap]

John:  They don't even know what floor, nobody know what floor I live in.

OLIVERAS: Hell, yeah!

John:  You know I mean?

OLIVERAS: That's what I wanted to say. 'Cause I got too much shit there. I don't want to go kill nobody, man. You know I'm saying?

John:  No, no no... Trust me I know.

246.    Based on knowledge of this investigation, I believe that OLIVERAS is telling

John to not allow anyone inside of **SUBJECT PREMISES 6**.  When OLIVERAS states "cause I

got too much shit there. I don't want to go kill nobody, man. You know I'm saying?," I believe

that OLIVERAS is reiterating to John that he has a large amount of narcotics or currency inside

of **SUBJECT PREMISES 6,** and if someone were to take it from him, he would be willing to

physically harm them.

247.    E-911 precise location information for OLIVERAS's phone revealed that

OLIVERAS stayed overnight in the area of 44 Belmont Street (**Subject Premises #6**) during the

overnight hours of July 14-15, 2018.

248.    Based on this evidence, I believe that OLIVERAS uses **SUBJECT PREMISES**

**#6** to facilitate his narcotics trafficking activities and, as such, evidence of his narcotics

trafficking activities will be located within the premises.

      **G.**     <u>**Catherine St apartment B5, Hartford, CT (SUBJECT PREMISES #7)**</u>

249.    Based on intercepted calls, physical surveillance and other evidence, I believe that

OLIVERAS, QUINONES and their associates are using 90 Catherine St., Apartment B5,

Hartford, CT (**SUBJECT PREMISES #7**) as a location to processing and stash location to store

narcotics and narcotics proceeds.

250.    On June 19, 2018, in response to an Administrative Subpoena, Eversource

advised that the account holder for **SUBJECT PREMISES #7** is Jonathan QUINONES and that

QUINONES's listed address is 38 York Street, Fl 2, Hartford, CT (**SUBJECT PREMISES #8**).

During an intercepted call on May 18, 2018 between OLIVERAS and QUINONES, they discuss

the apartment number of their new "spot" or stash location on Catherine Street.  During this call,

OLIVERAS asks, "What's the number of the spot?" and QUINONES responds, "Uh, B, is B-5."

OLIVERAS, "Oh is B-5?  Alright, Alright."  QUINONES, "Yeah B-5."  During this call, I

believe that that OLIVERAS and QUINONES are confirming the apartment number of

**SUBJECT PREMISES #7.**  Below are examples of intercepted calls, physical surveillance

and/or electronic surveillance involving **SUBJECT PREMISES #7**:

251.   On July 15, 2018, investigators intercepted a call between OLIVERAS and QUINONES.  During this call, they discussed the following:

QUINONES:   Are we going to throw something on the regular or are we going to bagging it like that.

OLIVERAS:   Why [U/I]

QUINONES:   I ain't start yet, that's why I'm asking.

OLIVERAS:   What we got over there the 5 and what else [U/I] right.

QUINONES:   Yeah, I don't know... it looks like 2 something in here, probably 3.

OLIVERAS:   Okay so [U/I] 250 on that shit right.

QUINONES:   Something.

OLIVERAS:   Yeah   [Voices overlap]

QUINONES:   [U/I]

OLIVERAS:   Yeah, throw like a little extra 50 on that shit.

QUINONES:   On the little one, right?

OLIVERAS:   Um

QUINONES:   Or the whole thing.

OLIVERAS:   [U/I] the whole thing [U/I] but is like that [U/I]

QUINONES:   [U/I] 250.

OLIVERAS:   You know what [U/I] 250 [U/I] and see that it goes

QUINONES:   Alright.

OLIVERAS:   Alright.

252.   Based on my training, experience and knowledge of this investigation, during this call I believe that QUINONES is asking OLIVERAS if they should add something to the "regular" (which I believe is a reference to heroin) before they start bagging it up.  I believe that

when OLIVERAS says "throw like a little extra 50 on that shit," OLIVERAS is telling

QUINONES to add 50 grams of additive to the heroin before they start bagging up.  I also

believe that when QUINONES says they have 250, he is referring to 250 grams of heroin.  E-911

precise location information revealed that QUINONES's phone and OLIVERAS's phone (Target

Telephone 10) stayed in the area of 90 Catherine Street during the overnight hours between July

15, 2018 and July 16, 2018.  Based on this call and the electronic surveillance, I believe that

OLIVERAS and QUINONES stayed overnight at 90 Catherine Street (**SUBJECT PREMISES**

**#7),** where they processed and packaged 250 grams of heroin.

     253.    As another example and as discussed above, on June 19, 2018, investigators

observed OLIVERAS meet with a Hispanic male in Hartford and then drive back to 90 Catherine

Street (**SUBJECT PREMISES #7**).  At 90 Catherine Street, investigators observed OLIVERAS

carrying a red bag from his car and walk towards 90 Catherine Street.  Investigators drove by and

observed OLIVERAS as he used a key and entered **SUBJECT PREMISES #7** through the rear

door.  At approximately 1:50 p.m., investigators observed as OLIVERAS exited **SUBJECT**

**PREMISES #7** empty handed and departed the area.  At approximately 2:55 p.m., OLIVERAS

received an incoming call from QUINONES.  As discussed in detail above, during this call,

OLIVERAS told QUINONES, in part, "Yeah and I already bought them other ones. I already

bought the three (3). You know what I am talking about, the big three (3)."  During this same

call, OLIVERAS told QUINONES that he brought them "to the spot."  Based on my training,

experience and involvement in this case, I believe that OLIVERAS is telling QUINONES that he

just "bought the three," which is in reference to a suspected three kilograms of narcotics that

OLIVERAS purchased.  I further believe that OLIVERAS is telling QUINONES that he dropped

off the narcotics at "your spot," which I believe is a reference to 90 Catherine St., Apt. B5, Hartford, CT (**SUBJECT PREMISES #7**).

254.    Based on this evidence, I believe that OLIVERAS and QUINONES use 90 Catherine St., Apt. B5, Hartford, CT (**SUBJECT PREMISES #7**) as a stash location to process, package and prepare narcotics.  Accordingly, I believe that **SUBJECT PREMISES #7** contains evidence of their narcotics trafficking activities.

**H.    38 York St., 2nd Floor, Hartford, CT (SUBJECT PREMISES #8)**

255.    Based on intercepted calls, physical surveillance and other evidence, I believe that OLIVERAS uses **SUBJECT PREMISES #8** as a location to stash narcotics that are packaged for street level sales and to distribute narcotics.  OLIVERAS directs narcotics customers to **SUBJECT PREMISES #8,** where they are sold narcotics by one of OLIVERAS's runners or associates (typically, Edgar ROMAN).  Based on intercepted calls and physical surveillance, Edgar ROMAN is at **SUBJECT PREMISES #8** on a daily basis and serves narcotics customers on OLIVERAS's behalf.

256.    An administrative subpoena to Eversource Energy revealed that the account holder at **SUBJECT PREMISES #8** is JONATHAN QUINONES.  Interestingly, QUINONES is also the registered owner of the vehicle that OLIVERAS regularly operates.  As described in detail in this affidavit, QUINONES is a close associate of OLIVERAS and assists OLIVERAS with his narcotics trafficking.  Below are examples of intercepted communication in which OLIVERAS directs customers to **SUBJECT PREMISES #8** to obtain narcotics:

257.    On July 15, 2018 at 4:06 p.m., OLIVERAS spoke with a narcotics customer referred to as "Matty."  During this call, they discuss the following:

126

OLIVERAS:  Yo!

Matty:      Yo I'm going to pass by I'm right down the street.

OLIVERAS:  Alright go to York.

Matty:      Alright four minutes, not even.

OLIVERAS:  What you needed?

Matty:      A "B"

OLIVERAS:  A "B" alright!

Matty:      I'm in the Honda now.

OLIVERAS:  Alright!

Matty:      Alright!

258.    Immediately thereafter, on July 15, 2018 at 4:06 p.m., OLIVERAS called Angel

ROMAN and they discussed the following:

ROMAN:      Yo!

OLIVERAS:  Yo Matty going to pull up in two, three minutes. He need a "B" ah is just
            going to be 43. [P/H]

ROMAN:      Alright!

OLIVERAS:  Alright!

259.    Based on my training, experience and knowledge of this investigation, during

these calls I believe that Matty arranges with OLIVERAS to buy a bundle of heroin.

OLIVERAS directs Matty to **SUBJECT PREMISES #8.**  Immediately thereafter, OLIVERAS

calls ROMAN and instructs him to serve Matty a bundle of heroin for $43.

260.    On July 15, 2018 at 6:15 p.m., OLIVERAS spoke with a customer who is referred

to as "Red".  During this call, they discuss, in part, the following:

Red:          Someone around?

OLIVERAS: Yeah.

Red:          Alright, I'm leaving the bodega. I just need three (3) bags and a 10 of candy for right now. I'll have that for your in a little bit.

OLIVERAS:  Go to York.

Red:          York?

OLIVERAS:  Yeah.

Red:          Alright I'll be at York in five minutes. I'm right around the corner.

OLIVERAS:  I'ma call him.

261.    On July 15, 2018 at 6:17 p.m., OLIVERAS called Angel ROMAN and they discussed the following:

ROMAN:     Yo!

OLIVERAS: Yo, you out there?

ROMAN:     Yeah.

OLIVERAS: Alright, I got V and I got Red coming. Red be there in a couple minutes. He probably getting a three (3) and a dime or 15, something like that. And then um... [Clears Throat] I don't know if Gyro is gonna be coming yet. But he had called me.

ROMAN:     Alright.

OLIVERAS: Alright?

ROMAN:     Yeah.

OLIVERAS: Yup.

262.    Based on my training, experience and knowledge of this investigation, during these calls I believe that Red calls OLIVERAS and arranges to buy three bags of heroin/fentanyl and a $10 piece of crack.  OLIVERAS directs Red to **SUBJECT PREMISES #8.**  Immediately

thereafter, OLIVERAS calls ROMAN and instructs him to serve Red "three" and a $10 or $15 piece of crack.  OLIVERAS also tells ROMAN that two other customers may be coming to get narcotics from ROMAN.

263.    On July 3, 2018 at 11:26 p.m. OLIVERAS over Target Telephone 7 places a call to SPIDER at telephone number 860-205-3816, they discuss, in part, the following

SPIDER:      Yo!

OLIVERAS:   Hey yo I'ma have Angel go over there, for you to pick up some "work" from over there. I ain't got no work on York Street.

SPIDER:      Alright!

OLIVERAS:   Give that nigga like two (2) three (3) stacks depending how much I got over there.

SPIDER:      Alright!

OLIVERAS:   Alright!

264.    Based on my training, experience and knowledge of this investigation, in this call I believe that OLIVERAS is telling SPIDER that ROMAN is out of product at **SUBJECT PREMISES #8**.  OLIVERAS is telling SPIDER to provide 2-3 stacks (200-300 bags of heroin or fentanyl) to ROMAN so that he can continue to see customers at **SUBJECT PREMISES #8**.

265.    These are just a very small sample of many calls and text messages intercepted on a daily basis that establish that OLIVERAS uses **SUBJECT PREMISES #8** to stash and distribute narcotics, and that OLIVERAS collects and maintains narcotics proceeds at **SUBJECT PREMISES #8**.  Based on this evidence, there is probable cause to believe that within **SUBJECT PREMISES #8** there is evidence of OLIVERAS's and SPIDER's narcotics trafficking activities, including contraband, packing materials, processing materials, cell phones,

documents or records of drug trafficking activities, proceeds of narcotics trafficking activities and other evidence.

**I.**     **88 Ellis St 1st floor, New Britain, CT (SUBJECT PREMISES #9)**

266.     During this investigation, myself and other investigators identified 88 Ellis Street, 1st Floor, New Britain, CT as OLIVERAS's primary residence.  E-911 location information (ping data) for OLIVERAS's phones reveal that OLIVERAS uses **SUBJECT PREMISES #9** as his main residence.  Ping data frequently shows OLIVERAS in close proximity to **SUBJECT PREMISES #9** during overnight and early morning hours, consistent with OLIVERAS residing at the premises.  For example, ping data showed that OLIVERAS stayed at **SUBJECT PREMISES #9** during the overnight hours of July 13-14, 2018.  In response to an administrative subpoena, Eversource revealed that the account holder for **SUBJECT PREMISES #9** is Lisa Rios at telephone 860-893-3716.  Based on intercepted calls and other evidence during this investigation, investigators have identified Lisa Rios as OLIVERAS's girlfriend.  Investigators have intercepted numerous calls between OLIVERAS and Rios over 860-893-3716, which reveal that they are in a dating relationship.

267.     Based on my experience, training, and information learned during this investigation, it is my belief and the belief of other law enforcement officers working on this investigation that **SUBJECT PREMISES #9** is used by OLIVERAS not only as a main residence, but also to stash proceeds from narcotics transactions.

268.     For example, on April 4, 2018 at approximately 5:49PM, OLIVERAS called Jeremy RODRIGUEZ.  Jeremy RODRIGUEZ tells OLIVERAS he is ready for him and that he (RODRIGUEZ) will go meet OLIVERAS because he doesn't trust the block right now.

OLIVERAS asks Jeremy RODRIGUEZ if he wants to meet next to Georges Pizza on Park Street and Jeremy RODRIGUEZ affirms.  Based on intercepted calls, Jeremy RODRIGUEZ was going to "reup" or obtain a quantity of narcotics from OLIVERAS.  Further, as discussed in detail above, based on intercepted calls between Jeremy RODRIGUEZ and JOHNSON, I believe that JOHNSON provided Jeremy RODRIGUEZ with approximately $6500 to provide to OLIVERAS.

269.    At approximately 6:24PM, Jeremy RODRIGUEZ called OLIVERAS.  Jeremy RODRIGUEZ tells OLIVERAS he is about to pull up in 5 minutes.  OLIVERAS tells Jeremy RODRIGUEZ that he will see his truck right there in Lena's across the street from Georges Pizza.  Jeremy RODRIGUEZ tells the OLIVERAS he is in a gold Minivan.  At approximately 6:42PM, Jeremy RODRIGUEZ calls OLIVERAS.  Jeremy RODRIGUEZ tells OLIVERAS he is in the parking lot of Georges Pizza.  At approximately 6:43PM, investigators observed Jeremy RODRIGUEZ's Minivan pull into the rear parking lot of Georges Pizza.  Investigators next observed as OLIVERAS entered the rear passenger side door of the Minivan, and met with Jeremy RODRIGUEZ who was sitting in the front passenger seat of the Minivan.  Shortly thereafter, OLIVERAS exited the Minivan and drove away in his car.  Investigators maintained surveillance of OLIVERAS, who drove back to **SUBJECT PREMISES #9**.  Based on my training, experience and knowledge of this investigation, I believe that OLIVERAS provided Jeremy RODRIGUEZ with narcotics and Jeremy RODRIGUEZ provided OLIVERAS with money.  After the transaction, I believe that OLIVERAS went back to **SUBJECT PREMISES #9** with the narcotics proceeds.

270.    Based on these telephone calls and the physical surveillance, I believe that

OLIVERAS maintains narcotics proceeds at **SUBJECT PREMISES #9.**  In addition, as

OLIVERAS's primary residence, I believe that **SUBJECT PREMISES #9** contains other

evidence of OLIVERAS's narcotics trafficking activities.  For example, OLIVERAS's phones

will be located at the residence.  Based on the affiant's training, experience, and information

gained throughout the course of this investigation, OLIVERAS uses multiple cellular telephones,

and is likely using additional telephones that are unknown to investigators.  It is common for

large-scale narcotics traffickers to compartmentalize their narcotics trafficking activities (e.g. one

telephone for sources of supply, one telephone for operations, and another telephone for

customers).

271.    In addition, based on my training and experience, I believe that **SUBJECT

PREMISES #9** will contain other evidence, such as books, notes, ledgers and other papers and

documentation relating to the transportation, receipt, sale and distribution of controlled

substances, and the laundering of drug proceeds; proceeds of drug sales and records of drug

transactions; evidence of unexplained income or wealth; documentary evidence of money

transfers; evidence of travel; addresses or telephone numbers containing information regarding

narcotics trafficking associates; identification documents, keys evidencing a possessory interest

in and records relating to residences, other premises, vehicles, storage containers, mail boxes

(including P.O. Boxes) and other assets used to facilitate and/or that represent the proceeds of

narcotics trafficking activities.

      **L.**     **755 Capitol Avenue, Hartford, CT, U-Haul Storage Facility,
Unit # 1024 (SUBJECT PREMISES # 10)**

272.    During this investigation, investigators have intercepted calls indicating that OLIVERAS maintains narcotics and/or firearms in a self storage unit at the U-Haul Self Storage facility on Capitol Avenue in Hartford, CT.  Below are examples of these calls:

273.    On June 11, 2018 at 6:04 p.m. OLIVERAS called QUINONES and they discussed, in part, the following:

OLIVERAS:   Shit, I'm jumping off the exit .uhm. gotta handle a couple things (U/I) I gotta bring this to…uhm, (U/I) I gotta go to Uhaul and grab that and bring that to Domi. (U/I) I know I'm just (U/I) to drop it off.

QUINONES:   Alright

OLIVERAS:   Yeah, I'm going to U-Haul right now as we speak

QUINONES:   alright

OLIVERAS:   I'ma grab that, if you can just come to U-Haul. (U/I) right now but uhm..

QUINONES:   Alright, yeah I'll come through there anyway when I go over there

OLIVERAS:   Yeah… and then.. uhm.. we'll just meet up at Sisson and from there we'll just go to uhm..

QUINONES:   Go over there

274.    Based on my training, experience and knowledge of this investigation, during this call I believe that OLIVERAS was telling QUINONES that he had either narcotics or narcotics proceeds that he had to give to DOMI.

275.    On June 21, 2018, in response to an administrative subpoena, U-Haul storage facility located at 755 Capitol Ave, Hartford, CT advised that OLIVERAS rents a storage locker at this facility and has rented the locker since September 12, 2017.  OLIVERAS provided U-Haul with telephone number 860-796-5060 (Target Telephone 10).  The storage unit number that OLIVERAS is currently renting is # 1024 (**SUBJECT PREMISES #10**).

276.  On July 10, 2018 at approximately 11:54 a.m., OLIVERAS spoke with QUINONES.  During this call, they discuss, in part, the following: OLIVERAS talks about being able to beat a case if they (the police) raided his U-Haul storage unit without a search warrant. OLIVERAS says that even though he has "blickys" in there, it will still be an illegal search without a search warrant.  (Based on my training, experience and involvement in this case, I believe the term "blickys" is a reference to guns).  OLIVERAS continues to talk about if his storage unit was searched illegally and the "blickys" were found in his storage unit.  QUINONES says that if OLIVERAS's unit would have been raided, then someone must be behind it.  During the call, OLIVERAS reads a news article about the raid at the U-Haul storage facility on Capital Avenue. OLIVERAS continues to read the news article and says that he is scared, but laughs.  QUINONES agrees, but also laughs.  At one point during the call, it appears that OLIVERAS is looking at a photo of the seized evidence and says, in part, "Like the blickys, it ain't none of our blickys. So we good. You feel me?"  At another point, OLIVERAS says, in part, "Like I always said, it's to close for comfort.  To close to me right there.  You feel me?"

277.  On July 10, 2018 at 1:07 p.m., Lisa Rios called OLIVERAS and  they discussed, in part, the following:

OLIVERAS: Dude, they raided the U-Haul. You know? The U-Haul, the storage?

LISA: No?

OLIVERAS: Dude, the police went in there. They arrested couple people.

LISA: But not yours right?

OLIVERAS: Nan, nah. Ma', obviously not mine. But hopefully, hopefully not mine. But, yeah.  That shit is crazy, yo.

LISA: Who's name that in, yours?

OLIVERAS: Yes.

LISA: I can imagine that there are people that go over there and they do things. You're not going over there right?

OLIVERAS: Listen, listen, listen. They just raided 9 kilos, they got five people they took. They raided the U-Haul. They got 9 kilos of Manteca (Heroin), hella guns, everything.

OLIVERAS: Girl, I don't go over there all the time. Hell nah! I just leave when I leave and I don't go back for a while. But then I go back, I grab something and I leave. But I don't have anything over there. Only a couple... a couple of those things that your brother has.

LISA: A couple of what?

OLIVERAS: A couple of those things that your brother has.

LISA: Weed?

OLIVERAS: [Sucks Teeth] Man, come on babe! What your brother got? Hello!

LISA: My brother?

OLIVERAS: Babe, I got a couple things of what your brother got. What's the only thing your brother got?

LISA: I don't know. [Voices Overlap]

OLIVERAS: Baby! Baby, I have a couple of **guns** there, baby. Damn!

LISA: My brother's?

OLIVERAS: Oh, my God, baby. Forget about it! Just... Shit!

LISA: [Laughs] Well baby, I don't know.

OLIVERAS: Baby, I'm not trying to talk. Hello! Pay attention!

LISA: It was that I went blank for a second. Okay! I get it.

OLIVERAS: I said; I got... I ain't got nothing over there. The only thing that's over there. The things that your brother got. What the heck... Your brother's don't do shit. What your brother... Do your brother... What do [U/I] got? Only that! Pay attention, babe. I said; "I ain't got nothing over there, babe. I only got a couple of those things that your brother has." You should already knew...

135

"Okay, you have those things there." But as far as Domi and all that. That other stuff I ain't got none of that in there. I'm straight. You feel me? And at the end of the day, they can't do nothing to me because that's illegal search. That's entrapment, it's loop wholes. That's bullshit. You can't do that to me. The only thing is, the people that they got caught, they... They was being investigated. That's why they got with the whole U-Haul, with this, with that. If they see me, investigate me, then they can do that. But they can't just off of somebody else go through mine.

278.    Based on these intercepted calls, I believe that OLIVERAS is stashing firearms within **SUBJECT PREMISES #10.** I also believe that OLIVERAS has used **SUBJECT PREMISES #10** to store either narcotics, narcotics proceeds and/or other evidence of OLIVERAS's narcotics trafficking activities.

### III.    GENERAL INFORMATION REGARDING DRUG TRAFFICKING

279.    During my tenure as a law enforcement officer, I have investigated and participated in numerous operations which involved, in part, drug trafficking violations, the flow of the illegal proceeds obtained from drug trafficking, and related offenses such as violations of firearms laws. My involvement in these investigations has resulted in the successful prosecution of numerous individuals and the forfeiture of assets purchased with the proceeds from unlawful drug trafficking, as well as assets used to facilitate these violations. Search warrants relating to these investigations have covered vehicles, businesses and residences of drug traffickers and their co-conspirators. In addition, these search warrants have also covered "stash houses" used as storage and distribution points for controlled substances and US currency used by drug dealers for their unlawful drug trafficking activities.

280.    Materials searched for and recovered in these locations have included various controlled substances; drug paraphernalia; books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs, records reflecting the names,

136

addresses, and telephone numbers of co-conspirators, sales receipts and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; cellular telephones, paging devices, computers and computer disks, answering machines; and various valuable assets such as real property and automobiles that were purchased with the proceeds of unlawful drug trafficking.  These items obtained during the executions of said search warrants, has constituted evidence of drug violations, the acquisitions of assets with drug trafficking proceeds, and the use of the assets to facilitate drug trafficking violations.

281.    Based on my training, experience and participation in this and other drug trafficking investigations, I know that:

a.      drug traffickers often place assets in the names other than their own to avoid detection of these assets by law enforcement;

b.      drug traffickers often place assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

c.      even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

d.      drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug business; these materials, as well as records, generally described below, are often kept and maintained within premises controlled or used by the drug traffickers within safes

or lock boxes;

       e.      drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashier's checks, money orders, telephones with memory capabilities, telephone answering machines and telephone answering tapes, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed; these materials are often maintained within the electronic memory of personal computers, I-Pads or other computerized tablets, external hard drives, memory cards and "thumb drives" kept and maintained at premises under the control of the drug traffickers;

       f.      drug traffickers commonly provide narcotics on consignment sale to their customers, who subsequently pay for the drugs after reselling the drugs.  Therefore the above mentioned books, computerized records, records, receipts, notes, ledgers, et cetera, will be secured by the drug traffickers within their residences for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

       g.      drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone and beeper numbers of drug associates within their residences, for ready access and to conceal them from law enforcement agencies;

       h.      drug traffickers commonly maintain records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates;

       i.      drug traffickers who are aware of an ongoing criminal investigation will

138

often destroy an existing format of records reflecting their drug transactions. However, it is common for drug traffickers, particularly traffickers who provide or receive drugs on a consignment basis, to create another type of drug record to assist the trafficker in the collection of drug debts;

   j.  drug traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets;

   k.  drug traffickers will commonly conceal within their residences or within the curtilage of their residences, quantities of narcotics, large amounts of currency, firearms, financial instruments, jewelry, electronic equipment and other items of value and proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money derived from drug trafficking;

   l.  drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

   m.  persons involved in drug trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

   n.  drug traffickers often have photographs, slides, or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds.

These photographs and video movies are normally in the drug traffickers possession or residence;

o.      The State of Connecticut is generally viewed as a consumer state in regards to narcotic activity.  However it is common for drug traffickers to travel to major distribution centers such as New York to purchase their narcotics for distribution.  It is known that after purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers.  It is known that drug traffickers' methods include, but are not limited to:  commercial airlines, private motor vehicles, tractor trailer units, public transportation, and motor vehicles with concealed compartments, and government and contract mail carriers.  It is known that the residences of drug traffickers will often contain records of drug related travel.  These records may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel;

p.      based on my training and experience, drug traffickers commonly have firearms and other weapons in their possession, in their cars, on their person, at their residence including, but not limited to handguns, rifles, shotguns,  automatic weapons, and knives.  These firearms and weapons are most often kept to protect and secure drug traffickers' property;

q.      based on my training, experience and participation in this and other drug trafficking investigations, I know that it is generally a common practice for drug traffickers to store their drug inventory and drug related paraphernalia in their residences, cars or those of trusted associates.  This paraphernalia frequently includes scales, funnels, sifters, grinders, plastic bags, heat sealing devices, and dilutant;

140

r.      based on my training and experience, drug dealers often create secret locations, commonly called "traps," in their automobiles.  Often, drug dealers will use these automobiles to store narcotics, weapons, money and other items and documents related to their drug trade; and

s.      based on my training, experience and participation in this and other drug trafficking investigations, I know that drug traffickers often possess, maintain and control other items related to their drug trafficking activities, as described in Attachment A to this affidavit, in their cars, homes, garages and out-buildings, and in safes or lock boxes maintained at such locations.

## IV.   CONCLUSION

148    On the basis of the foregoing information, there is probable cause to believe, and I do believe, that during the periods set forth above, Miguel ORTIZ, Bianca VELASQUEZ, Jose COTTO, Sean GRIFFIN, Antonio JOHNSON a.k.a. "UNK", Pedro RIVERA a.k.a. "HEAVY", Jeremy RODRIGUEZ, Jennifer JONES, Michael SPERO, Alexis DEJESUS, Luis RODRIGUEZ,  Jonathan QUINONES, Angel ROMAN, a Hispanic male who uses telephone number 860-205-3816 (referenced herein as "SPIDER"), Julio OLIVERAS and Victor PERDOMO conspired to possess with intent to distribute and to distribute heroin, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and possessed with intent to distribute and distributed heroin, in violation of 21 U.S.C. § 841(a)(1).

149    There is also probable cause to believe, and I do believe, that the items described in Attachment A, which are fruits, instrumentalities and evidence of these crimes will be found at **SUBJECT PREMISES #1-10.**

150     Because this is an application that pertains to an ongoing criminal investigation, and because disclosure of the information contained herein as well as disclosure of the warrants and complaints being requested herein may compromise the investigation and increase the risk of harm for the law enforcement officers responsible for conducting the arrests and searches, I request that the warrants, applications, complaints and this affidavit be ordered sealed by the Court, until further order of the Court.

151     I respectfully request that the Court authorize investigators to execute the search warrant at **SUBJECT PREMISES #6** without "knocking and announcing." As discussed herein, during this investigation, investigators have intercepted communications indicating that the door at **SUBJECT PREMISES #6** has been fortified. Investigators believe that this presents a unique danger to law enforcement personnel who attempt to serve the arrest warrants and search warrants. In addition, if the door to an apartments is fortified, this would give the occupants of the apartment an opportunity to flee or destroy evidence. Accordingly, I respectfully request that the Court authorize investigators to execute the search warrant at SUBJECT PREMISE #6 without requiring investigators to knock on the door, announce their presence and then wait a reasonable period of time before entering.

Michael A. Breen
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me
This 18 day of July, 2018.          /s/ DFM

HON. DONNA F. MARTINEZ
UNITED STATES MAGISTRATE JUDGE